UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AARON GANT, et al., | |
|     Plaintiffs, | Case: 2:19-cv-12533 |
| v. | Honorable Sean F. Cox |
| FORD MOTOR COMPANY, | Magistrate Judge David R. Grand |
|     Defendant. | |

**DEFENDANT FORD MOTOR COMPANY'S
MOTION TO DISMISS THE PLAINTIFFS' COMPLAINT**

Defendant Ford Motor Company moves to dismiss the plaintiffs' complaint under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6). In support, Ford relies on the attached brief and accompanying exhibits.

On October 2, 2019, pursuant to E.D. Mich. LR 7.1(a), Ford's counsel sent the plaintiffs' counsel a detailed email outlining the scope of Ford's motion and requesting a teleconference to discuss it. On October 2, 2019, pursuant to E.D. Mich. LR 7.1(a), Ford's counsel sent the plaintiffs' counsel a detailed email outlining the scope of Ford's motion and requesting a teleconference to discuss it. The plaintiffs' counsel did not respond until after noon EDT on October 4—Ford's deadline—to state that counsel had only just looked at Ford's email, and that they would "make every effort" to review Ford's email in full and respond, but that they would make

"no promises." As of the filing of this motion, the plaintiffs' counsel had not responded further to Ford's counsel's email or its request for a teleconference. As a result, despite reasonable efforts, Ford was unable to conduct a conference, and therefore did not obtain the plaintiffs' concurrence in Ford's requested relief.

WHEREFORE, Ford respectfully requests that the Court grant its motion and dismiss the plaintiffs' complaint in its entirety.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY: /s/ Thomas P. Branigan
THOMAS P. BRANIGAN (P41774)
JODI MUNN SCHEBEL (P55889)
MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone: 248.205.3300
Facsimile: 248.205.3309
Email: tom.branigan@bowmanandbrooke.com
Email: jodi.schebel@bowmanandbrooke.com
Email: matthew.berard@bowmanandbrooke.com

ROBERT WISE (*Admission pending*)
BOWMAN AND BROOKE LLP
901 East Byrd Street, Suite 1650
Richmond, VA 23219
Telephone: (804) 649-8200
Facsimile: (804) 649-1762
Email: rob.wise@bowmanandbrooke.com

*Attorneys for Defendant Ford Motor Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AARON GANT, et al., | |
| Plaintiffs, | Case: 2:19-cv-12533 |
| v. | Honorable Sean F. Cox |
| FORD MOTOR COMPANY, | Magistrate Judge David R. Grand |
| Defendant. | |

**BRIEF IN SUPPORT OF FORD MOTOR COMPANY'S MOTION TO
DISMISS THE PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

**STATEMENT OF ISSUES PRESENTED** ................................................ vi

**CONTROLLING OR MOST APPROPRIATE AUTHORITY** ........... viii

**Introduction** ................................................................................. 1

**Factual Background** ................................................................. 3

    A. **In this second complaint by many of the same plaintiffs, 373 Ford Fusion purchasers from 43 different states join together in a 439-page complaint.**3

    B. **These 373 plaintiffs allegedly bought one of several different models of Ford Fusion—"a front drive automatic six-speed" equipped with Ford's "6F35 Transmission"—at various times over nearly a decade.**...................3

    C. **The plaintiffs allege various warranty and fraud-based claims over unidentified vehicle "defects," including a vague "Transmission Defect."** 4

    D. **The plaintiffs allege their vehicles all came with an express warranty— but they allege no facts on when any issues arose or when they sought repairs, and many bought their vehicles used *after* the warranty expired.** 5

    E. **The plaintiffs assert Ford made affirmative misrepresentations—but other than pointing to one marketing statement that none of them allege they saw or relied on, they provide no facts as to any alleged fraud.**..........6

    F. **Attempting to show Ford's supposed knowledge of a defect, the plaintiffs cite various complaints to NHTSA and market actions, including many that are patently inapplicable to their vehicles and claims.**........................7

    G. **Without providing basic facts to inform what law should apply to their claims individually, the plaintiffs assert seven counts against Ford.** ........10

**Argument** ............................................................................... 11

I. **The plaintiffs' complaint is a textbook "shotgun" pleading— prolix, confusing, internally contradictory, and overall violative of Rule 8.** ....................................................................... 13

    A. **The plaintiffs' "shotgun" approach of pleading each count as incorporating every other count and indiscriminately relying on every allegation is improper.**................................ 13

    B. **The complaint suffers from a host of other improprieties and defects, further warranting its dismissal.** ..................... 15

II. **Beyond the facial improprieties of the plaintiffs' prolix and confusing complaint, their claims require dismissal for numerous other reasons.**....22

    A. **Under applicable Michigan procedural law, most of the plaintiffs' claims require dismissal as outright time-barred.**22

**i. Many plaintiffs' express warranty claims are time-barred.** ............................................................. 22

**ii. Scores of plaintiffs' implied warranty claims are time-barred.** ............................................................. 24

**iii. Many plaintiffs' fraud-based claims are also time-barred.** ............................................................. 25

**B. The plaintiffs fail to plead facts plausibly supporting any tolling.** ............................................................. 27

**C. In addition to other failings, the plaintiffs' claims all fail on substantive grounds as well.** ............................... 29

**i. The breach of express warranty claim fails for numerous reasons.** ............................................................. 29

**ii. The plaintiffs likewise fail to state an implied warranty claim.** ............................................................. 34

**iii. Count III for revocation of acceptance fails because it is neither a stand-alone cause of action, nor is it available even as a remedy against a remote manufacturer.** ........ 36

**iv. The MCPA claim fails on numerous grounds.** ............... 37

**1. New vehicle purchases are exempt, and there is no actionable transaction with respect to used-vehicle purchases.** ...................................... 37

**2. The MCPA claim further lacks Rule 9(b) particularity.** ........................... 38

**3. Only plaintiffs who actually bought their vehicles in Michigan could even theoretically pursue an MCPA claim.** ...................................... 39

**v. Count V for "Uniform Commercial Code - Unconscionability" also fails to state a cause of action.** . 41

**vi. The fraud-based claims in Count VI likewise fail on many levels.** ........................................................ 43

**1. The plaintiffs fail to state a claim based on any affirmative fraud.** .......... 43

**2. The plaintiffs' "silent fraud" theory also fails on numerous levels.** .......... 47

**vii. The unjust enrichment claim similarly fails for several reasons.** ........................................................ 52

**Conclusion** ............................................................. 56

# INDEX OF AUTHORITIES

## Federal Cases

*Agee v. Alphatec Spine, Inc.*, No. 1:15-cv-00750-TSB, 2017 WL 5706002
(S.D. Ohio Mar. 27, 2017) .................................................................... 13, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................11

*Beck*, 273 F. Supp. 3d at 753 ...................................................................... 50, 52

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................11

*Darne v. Ford Motor Co.*, No 13 C 03594, 2015 WL 9259455 (N.D. Ill.
Dec. 18, 2015) .......................................................................................... 9, 30

*Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008) ...... 13, 14

*Dorr v. Wells Fargo Bank, N.A.*, No. 13-14526, 2014 WL 1328200 (E.D.
Mich. Mar. 28, 2014) ....................................................................................44

*Downing v. Ford Motor Co.*, No. 17-10652, 2018 WL 3301210 (E.D. Mich.
Feb. 5, 2018) .................................................................................................12

*Ducharme v. A & S RV Ctr., Inc.*, 321 F. Supp. 2d 843 (E.D. Mich. 2004) ....... 1, 35

*Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190 (N.D. Ga. 2005) ......33

*Frank v. Dana Corp.*, 547 F. 3d 564 (6th Cir. 2008) ............................................12

*Gardner v. Quicken Loans, Inc.*, No. 13-12720, 2013 WL 4533085 (E.D.
Mich. Aug. 27, 2013) ...................................................................................42

*Hammoud v. U.S. Attorney*, No. 14-14398, 2015 WL 4756582 (E.D. Mich.
Aug. 12, 2015) .............................................................................................11

*Highsmith v. Chrysler Credit Corp.*, 150 B.R. 997, 1008 (N.D. Ill. 1993) .............40

*Hudson v. Genesee Intermediate Sch. Dist.*, No. 14-11939, 2015 WL 128030
(E.D. Mich. Jan. 8, 2015) ............................................................................3, 5

*In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2017 WL 7689654
(E.D. Mich. May 5, 2017) ........................................................................ 28, 29

*In re Ford Motor Co. DPS6 Lit.*, No. CV1706656ABFFMX, 2019 WL
3000646 ..................................................................................... 31, 32, 45, 48

*In re Ford Motor Co. E-350 Van Lit. (No. II)*, No. 03–4558, 2010 WL
2813788 (D.N.J. July 9, 2010) ......................................................................55

*In re OnStar Contract Litig.*, No. 2:07-MDL-01867, 2010 WL 3516691
(E.D. Mich. Aug. 25, 2010) ...........................................................................20

*In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013
WL 1431756 (E.D. Mich. Apr. 9, 2013) .................................................... 19, 20

*Johnson v. Ventra Grp., Inc.*, 191 F.3d 732 (6th Cir. 1999) ................................22

*MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654 (6th Cir. 2013) ..........47

*Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772 (E.D. Mich. 2019) ......... passim

*McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751(E.D. Mich. Mar. 25, 2019) .................................................................................. passim

*McQueen v. BMW of N. Am., LLC*, No. CIV.A. 12-6674 SRC, 2013 WL 4607353 (D.N.J. Aug. 29, 2013) .................................................32

*Nicholson v. Jayco, Inc.*, No. 5:15-CV-2010, 2016 WL 5463215 (N.D. Ohio Sept. 29, 2016) ................................................................ 39, 44

*Perez v. Volkswagen Grp. of Am., Inc*., No. 2:12-CV-02289, 2013 WL 1661434 (W.D. Ark. Apr. 17, 2013) .............................................42

*Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011) .................40

*Roe v. Ford Motor Co.*, No. 2:18-cv-12528-LJM-APP, 2019 WL 3564589 (E.D. Mich. Aug. 6, 2019) ................................................... passim

*Rosa v. Am. Water Heater Co.*, 177 F. Supp. 3d 1025 .........................................30

*Rosen v. Chrysler Corp.*, No. 97-CV-60374-AA, 2000 WL 34609135, at *9 (E.D. Mich. July 18, 2000) ................................................................40

*Rosenbaum v. Toyota Motor Sales, USA, Inc.*, No. 16-CV-12645, 2016 WL 9775018 (E.D. Mich. Oct. 21, 2016) ...........................................38

*Sautner v. Fleetwood Enters., Inc.*, No. 05-73252, 2007 WL 1343806, at *8 (E.D. Mich. May 8, 2007) ................................................................37

*Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601 (E.D. Mich. 2017) ...............32

*Snyder v. Boston Whaler, Inc.*, 892 F. Supp. 955 (W.D. Mich. 1994) ...................36

*Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F. 3d 690 (6th Cir. 2013) .............20

*Tomas v. Ill. Dept. of Empl. Sec.*, No. 07 C 4542, 2009 WL 2916840 (N.D. Ill. Sept. 2, 2009) .................................................................... 15, 18

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771 (7th Cir. 1994)...........13

*Walsh v. Ford Motor Co.*, 588 F. Supp. 1513 (D.D.C.) ................................... 18, 19

*Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015) ........................................................................................... 12, 13

*Wozniak v. Ford Motor Co.*, No. 2:17-cv-12794, 2019 WL 108845 (E.D. Mich. Jan. 4, 2019) ............................................................... passim

*Zervos, Inc. v. Johnson*, No. 12-13121, 2013 WL 4833974 (E.D. Mich. Sept. 11, 2013) .......................................................................................53

## State Cases

*Allen v. Mich. Bell Tel. Co.*, 18 Mich. App. 632,171 N.W.2d 689 (1969).............41

*Boyle v. General Motors Corp.*, 468 Mich. 226, 661 N.W.2d 557, 559 (2003)................................................................................... 26, 27

*Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 317 Mich. App. 395 N.W.2d 700 (2016).......................................................23

*Liss v. Lewiston-Richards, Inc*., 478 Mich. 203, 732 N.W.2d 514 (2007).............38

*Mason v. Chrysler Corp.*, 653 So. 2d 951 (Ala. 1995)............................................44

*Miller v. Gen. Motors, LLC*, No. 17-CV-14032, 2018 WL 2740240 (E.D. Mich. June 7, 2018) ............................................................................... passim

*Miller*, 2018 WL 2740240, at *8. ................................................................ 25, 30

*Nw. Acceptance Corp. v. Almont Gravel, Inc.*, 162 Mich. App. 294, 412 N.W.2d 719 (1987) ..................................................................................41

*Romeo Inv. Ltd. v. Mich. Consol. Gas Co.*, No. 260320, 2007 WL 1264008, ........26

## State Statutes

Mich. Code § 440.2725(3) ...................................................................24

Mich. Code Ann. § 440.2725 .................................................... 24, 25, 27

Mich. Code Ann. § 440.2725(1) .............................................................23

Mich. Comp. Laws § 440.2313 ..............................................................22

Mich. Comp. Laws § 445.904(1) ............................................................37

Mich. Comp. Laws § 445.911 .......................................................... 25, 40

Mich. Comp. Laws § 600.5827 ........................................................ 26, 27

## Statutes

U.C.C. § 2-275 ....................................................................................25

U.C.C. § 2-607(3)(a) ...........................................................................36

U.C.C. § 2-608(2) ...............................................................................37

U.C.C. § 3-302(1) ...............................................................................41

## Rules

Rule 12(e) ...........................................................................................14

Rule 9(b) ....................................................................................... 43, 48

## STATEMENT OF ISSUES PRESENTED

1.   <u>All Counts</u> –Pleading rules require complaints to be well-organized, with relevant and factually supported allegations tailored to the elements of the discrete claims alleged. The complaint here, at 439 pages, conflates claims by 373 plaintiffs regarding their individual purchases of vehicles spanning eight model years and over the course of 10 years, across dozens of states; with no well-pled facts supporting where they made their purchases, what the alleged defect is either in general nor what was wrong with their vehicles in particular, nor when any such issues arose and what the plaintiffs and Ford did about them; with none of their claims asserted under the laws applicable to each individual plaintiffs' claims; and with each plaintiff relying on all the complaint's 505 paragraphs of boilerplate and generic allegations, despite their irrelevance and inapplicability. Should the Court dismiss the complaint in its entirety under Rules 8 and 12(b)(6)?

2.   <u>All Counts as to Certain Plaintiffs</u>[1] – Under Michigan's applicable statutes of limitations, and as to those plaintiffs who could even assert the claims alleged (which is not clear due to the paucity of facts alleged):  (1) the express warranty claims accrued either upon tender, or upon Ford's purported failure to repair or replace the allegedly defective vehicle component, (2) the implied warranty claim accrued upon tender of delivery, and (3) the fraud-based and unjust enrichment claims accrued upon original sale. Here, while the plaintiffs fail to provide essential facts as to their claims, it is clear that:  (1) many plaintiffs' express warranty claims are barred under any set of facts, (2) many more of the implied warranty claims are facially time-barred, and (3) the same goes for the fraud-based and unjust enrichment claims. Meanwhile, the plaintiffs fail to adequately plead any applicable tolling doctrine. Should the Court dismiss these claims with prejudice as time barred?

3.   <u>Count I</u> – As for the express warranty claim, the plaintiffs provide no well-pled facts plausibly supporting the terms of their warranties, their compliance with those warranties (e.g., presentment to a Ford dealership for repair), and any breach of those warranties, including failing to allege any facts supporting the occurrence of a warranted condition that arose within the earlier of the mileage and time limits. Should the Court dismiss the express warranty claim as to all plaintiffs?

---

[1] Exhibit 5 is a chart showing those plaintiffs whose claims are facially time barred.

4.   <u>Count II</u> – As for the implied warranty claim, the plaintiffs again provide no well-pled facts supporting any lack of merchantability, including failing to identify any actual defect, as well as failing to allege any facts as to timely notice to Ford. Should the Court dismiss the implied warranty claim as to all plaintiffs?

5.   <u>Count III</u> – The plaintiffs assert a claim for revocation of acceptance despite the fact that (1) such is merely a remedy for a breach of warranty as opposed to an independent cause of action, (2) their underlying warranty claims fail, and (3) even as a remedy, revocation is unavailable against a remote manufacturer such as Ford. Should the Court dismiss this claim as well as against all plaintiffs?

6.   <u>Count IV</u> – As for the MCPA claim, (1) Michigan law exempts new-vehicle purchases, (2) there is no basis for an MCPA claim against Ford based on a used-vehicle purchase, (3) the plaintiffs fail to plead the elements with the required Rule 9(b) particularity, and (4) beyond the preceding flaws, at most, only those few plaintiffs who actually purchased their vehicles in Michigan could pursue such a claim. Should the Court dismiss the claim as to all plaintiffs?

7.   <u>Count V</u> – The fifth count is for "UCC – Unconscionability" even though, like revocation, this is merely a defense against enforcement of a contract provision, and even as such, it requires pleading as to both procedural and substantive unconscionability, while the plaintiffs fail to adequately plead either. Should the Court dismiss this count as to all plaintiffs as well?

8.   <u>Count VI</u> – The plaintiffs assert various common-law fraud theories, albeit under no particular states' laws, and without providing any well-pled, particularized facts in support as required under Rule 9(b)—neither as to affirmative nor as to "silent fraud." Should the Court dismiss the fraud-based claims in Count VI as to all plaintiffs?

9.   <u>Count VII</u> – As for the unjust enrichment claim, which is not pled under any applicable states' laws, the plaintiffs nonetheless fail to plead facts plausibly supporting the elements of this claim even under Michigan law, which law also bars such a claim where—as here—there is an express contract addressing the subject matter. Should the Court dismiss this claim as to all plaintiffs?

# CONTROLLING OR MOST APPROPRIATE AUTHORITY[2]

*Agee v. Alphatec Spine, Inc.*, No. 1:15-cv-00750-TSB, 2017 WL 5706002 (S.D. Ohio Mar. 27, 2017)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Beck v. FCA US LLC*, 273 F. Supp. 3d 735 (E.D. Mich. 2018)

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

*Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008)

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL 3000646 (C.D. Cal. May 22, 2019)

*In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)

*Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772 (E.D. Mich. 2019)*

*McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751 (E.D. Mich. Mar. 25, 2019)*

*Miller v. Gen. Motors, LLC*, No. 17-CV-14032, 2018 WL 2740240 (E.D. Mich. June 7, 2018)*

*Roe v. Ford Motor Co.*, No. 2:18-cv-12528-LJM-APP, 2019 WL 3564589 (E.D. Mich. Aug. 6, 2019)*

*Tomas v. Ill. Dept. of Empl. Sec.*, No. 07 C 4542, 2009 WL 2916840 (N.D. Ill. Sept. 2, 2009)

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771 (7th Cir. 1994)

*Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015)

*Wozniak v. Ford Motor Co.*, No. 2:17-cv-12794, 2019 WL 108845 (E.D. Mich. Jan. 4, 2019)*

---

[2] Cases appended per the Court's Practice Guidelines are indicated with an *.

## Introduction

This District has long recognized that "it is inevitable that a complex product"—e.g., an automobile—"will require some service and that fact alone does not establish a breach of warranty." *Ducharme v. A & S RV Ctr., Inc.*, 321 F. Supp. 2d 843, 850 (E.D. Mich. 2004). By the same token, the fact that a complex product may require such service does not support the notion that, if and when it does, there has been some fraud or actionable nondisclosure. Despite this, these 373 plaintiffs have sued Ford (the majority for now a second time) alleging in uniform and boilerplate fashion in this mass action purported breaches of warranty, fraud, and other claims because their vehicles, which spanned eight model years from 2010 to 2017, were "delivered with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty, including, but not limited to, the 'Transmission Defect.'" (*E.g.*, Compl. (ECF No. 1-1) ¶ 5.)

However, the plaintiffs do not identify any actual "Transmission Defect." Instead, they vaguely refer to "various problems, including but not limited to" no less than *thirteen* different alleged issues, ranging from "delayed acceleration" to "difficulty stopping" to "catastrophic failures necessitating replacement"—i.e., issues which can be attributable to any number of causes. (*Id.* ¶ 387.) In addition, the complaint does not identify which of these thirteen (or more) conditions any of the plaintiffs' vehicles allegedly experienced, when and at what mileage, if and when

they provided notice and sought warranty coverage, what repairs were attempted, or any other pertinent and necessary facts.

This complaint falls short of the bar even for warranty-based claims. Making matters worse, however, the plaintiffs go beyond warranty to assert various fraud-based claims, which fall even farther short of the heightened particularity such claims require. And throughout, by improperly joining their claims and "shotgun" pleading, the complaint presents a muddled and indecipherable mess in which each plaintiff asserts every allegation despite the patent irrelevance and immateriality to their claims, and in which each count indiscriminately incorporates every other one.

Normally, Ford would endeavor to provide the Court with a chart summarizing the bases for dismissal as to each plaintiff's claims. However, the complaint here is so fundamentally deficient on every level—including failing to identify the facts as to the individual vehicle purchases, the alleged defect(s), when and how the alleged defect(s) manifested, the particular facts on which each plaintiff purports to rely (especially for the fraud claims), what claims each asserts, and under what states' laws—that it is impossible to catalogue all the bases for dismissal as to each of these 373 plaintiffs. Even so, it is apparent from what they have pled that this complaint violates numerous fundamental tenets of proper pleading under both Rules 8 and 9(b), requiring dismissal of this complaint in its entirety.

## Factual Background

### A.   In this second complaint by many of the same plaintiffs, 373 Ford Fusion purchasers from 43 different states join together in a 439-page complaint.

This complaint spans 439 pages, with 505 paragraphs (not including subparagraphs), and includes 373 plaintiffs[3] from 43 different states. (*Generally* Compl.) This is the second go-around for most of these plaintiffs, however, as 204 of them were plaintiffs in the largely identical mass-action filed in this Court in February 2019. *Kinner v. Ford Motor Co.*, No. 2:19-cv-10583-SFC-DRG (ECF No. 1).[4] That complaint styled itself as "*In re: Ford Motor Company Fusion Transmission Litigation*," yet there is no such multidistrict litigation. *Id.* at 1.

Before Ford could respond, the *Kinner* plaintiffs dismissed, and two months later refiled the current *Gant* complaint. Aside from adding 169 plaintiffs and slight revisions, the *Gant* complaint is largely identical to the *Kinner* one—often verbatim.

### B.   These 373 plaintiffs allegedly bought one of several different models of Ford Fusion—"a front drive automatic six-speed" equipped with Ford's "6F35 Transmission"—at various times over nearly a decade.

These 373 plaintiffs allege that, between 2009 and 2019, they purchased 2010 to 2017 model-year Ford Fusions. (Compl. ¶¶ 5–379.) The complaint refers to the

---

[3] Ford counts two plaintiffs suing jointly over one vehicle as one plaintiff. Two plaintiffs, however, allege they bought two separate vehicles, which Ford likewise counts as one plaintiff each. (Compl. ¶¶ 167–68, 352–53.)

[4] *Hudson v. Genesee Intermediate Sch. Dist.*, No. 14-11939, 2015 WL 128030, at *2 (E.D. Mich. Jan. 8, 2015) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it.").

Ford Fusion generically, but in fact, over this time period the Fusion line has comprised several different models, including but not limited to the Fusion, Fusion Sport, and Fusion Hybrid. Ex. 1 (2011 Fusion+Hybrid brochure); (*also* Compl. ¶ 428 (quoting from the 2011 brochure)).

These different Fusion models have different transmissions. As the 204 overlapping *Kinner* plaintiffs pled, their Fusion vehicles were all "equipped with the 6F35 Transmission," which they describe as "a front drive automatic six-speed transmission." *Kinner* Compl. at 2 n.2, & ¶ 209. However, the 6F35 transmission is only in "certain of [Ford's] 2010 – 2017 'Fusion' model vehicles." *Id.* ¶ 208. Fusions over this period also came with a manual transmission, a hybrid transmission, as well as a 6F55 transmission in the Fusion Sport. Ex. 1.

Here, the plaintiffs again allege their vehicles have the "front drive six-speed transmission"—i.e., the 6F35 automatic transmission. (Compl. ¶ 385.) None allege owning a manual-transmission, Hybrid, or Sport with their different transmissions.

## C.   The plaintiffs allege various warranty and fraud-based claims over unidentified vehicle "defects," including a vague "Transmission Defect."

The plaintiffs assert "this lawsuit is a breach of warranty/fraud case based on defective transmissions." (Compl. ¶ 1.) They allege their vehicles' transmissions were all defective and all "failed to operate as Ford represented," and even that Ford "repeatedly lied to consumers as to the reasons for the problems consumers experienced." (*Id.*) Aside from stating each plaintiff's name, current state and city

4

of residence, date of vehicle purchase, model year, and vehicle identification number (VIN), the one-paragraph allegations for each plaintiff are all identical verbatim. (*E.g.*, *compare* Compl. ¶ 5, *with id.* ¶ 6.)

None of the plaintiffs identify what specifically is purportedly defective about their vehicles or, in particular, their transmissions. Nor do the plaintiffs allege which conditions—from among the alleged array of "various problems" listed (Compl. ¶ 387)—their vehicles experienced, nor when any such conditions manifested. Instead, the plaintiffs allege merely that the "Transmission Defect is inherent in and the same for each of the Plaintiffs' vehicles and was present at the time of sale." (*Id.* ¶ 388.)

**D.     The plaintiffs allege their vehicles all came with an express warranty— but they allege no facts on when any issues arose or when they sought repairs, and many bought their vehicles used *after* the warranty expired.**

The plaintiffs all allege their vehicles—regardless of the model year purchased or when it was purchased—were "backed by a New Vehicle Limited Warranty" (NVLW). (*E.g.*, *id.* ¶ 5.) Yet none of them append their NVLW, nor do they allege the specific terms of those warranties, other than to state they covered "any repairs needed to correct defects in materials or workmanship of covered parts," and that the powertrain coverage—covering the transmission—lasted for the earlier of "60 months or 60,000 miles." (*Id.* ¶ 382.) Nonetheless, the Court may take notice of the NVLWs, appended as Exhibits 2-1 through 2-8. *Hudson*, 2015 WL 128030, at *2.

None of the plaintiffs allege any facts as to when their vehicles manifested any issues they attribute to their transmissions, much less that they sought and did not receive coverage during the warranty period. Instead, each plaintiff identically alleges having "requested that Ford fix the defective transmission in their Fusion vehicle, but Ford could not or would not repair it." (Compl. ¶ 394.)

Meanwhile, the complaint shows that when they bought them, many plaintiffs' vehicles were well outside the five-year/60,000-mile powertrain warranty. For example, plaintiff Valerie Sevak bought a used 2010 Ford Fusion in February 2018—the powertrain warranty on that vehicle would have expired likely no later than 2015, and certainly long before she bought it in 2018. (*E.g.*, *id.* ¶ 366.) Numerous other plaintiffs' vehicles are similarly outside of their warranty term, based solely on the model year and without even considering the mileage limitations.[5] Yet none allege when they experienced any transmission issues.

**E.  The plaintiffs assert Ford made affirmative misrepresentations—but other than pointing to one marketing statement that none of them allege they saw or relied on, they provide no facts as to any alleged fraud.**

In likewise identical fashion, each plaintiff alleges they sustained economic loss "in reliance on Ford and its agent's omissions and/or misrepresentations." (*E.g.*,

---

[5] (*E.g.*, *id.* ¶¶ 6 (2013 model year), 8 (2012 model year).) This list is by no means exhaustive. Moreover, as the Court likely knows, automobile manufacturers release model years in the early fall of the prior calendar year. Thus, for example, it is common that a 2010 model year vehicle would be first purchased and the warranty period would begin to run in 2009, as with plaintiff Cook. (*Id.* ¶ 175.)

Compl. ¶ 5; *also* ¶ 421 ("Ford misrepresented the qualities of the transmission in Plaintiffs' Fusion Vehicles at the time of the sale of the vehicles.").) Yet none of them provide any facts as to their purchases, including what they saw, read, heard, or relied on, with whom they spoke, what was said, when, or any other facts.

The only representation the plaintiffs cite is a statement from the "2010 & 2011 Ford Fusion Brochure," which referred to "a 'smooth-shifting 6-speed automatic.' " (Compl. ¶ 428(a).) No plaintiff alleges to have seen or read this brochure or relied on this statement, nor do they allege facts as to how, when, or why those of them who bought, for example, a 2017 Ford Fusion would have been exposed to or relied on a marketing brochure for a 2010 or 2011 model year vehicle. Moreover, the plaintiffs do not identify where Ford purportedly should have published information concerning the alleged defect, nor any facts supporting that had Ford done so, the plaintiffs would have seen and acted on that information.

**F.      Attempting to show Ford's supposed knowledge of a defect, the plaintiffs cite various complaints to NHTSA and market actions, including many that are patently inapplicable to their vehicles and claims.**

Presumably attempting to show Ford's knowledge of the alleged "Transmission Defect" predating their individual purchases, the plaintiffs cite 121 complaints found on NHTSA's "Safercar.gov" website. (Compl. ¶ 399.) These complaints are often entirely vague, providing little to no useful information. (*E.g.*, Compl. ¶ 399(t), (uuu).) Meanwhile, across them, and where it is even possible to

discern any details, the complaints evince a wide array of purported concerns. (*Generally id.* ¶ 399(a)–(qqqqq).) In addition, many of the NHTSA complainants' vehicles were outside of warranty when they allegedly experienced any issues, either based on the vehicle model year, the mileage, or both. (*E.g.*, *id.* ¶¶ 399(a) (showing a 2010 Ford Fusion with an alleged "incident date" of December 2018), 399(jj) (issue arose at 125,000 miles).)[6]

Few of the complaints to NHTSA specifically identify what model of Fusion vehicle or transmission was involved. However, it is clear that several of them actually involve a *different* model Fusion with a *different* transmission—such as the Fusion Hybrid, which comes equipped with a continuous variable transmission labeled as the HF35 (i.e., "H" for Hybrid, as opposed to "6" for 6-speed), not the 6F35 transmission found in the plaintiffs' vehicles. (*E.g.*, Compl. ¶ 399(jj) (mentioning service by "certified hybrid mechanics), 399(nnn) ("contact owns a 2013 Ford Fusion Hybrid")); *also* Ex. 1. Still other complainants appear to own a Ford Fusion Sport, with its 6F55 transmission. (*Id.* ¶ 399(mmmm), 399(ppppp).)

The plaintiffs also assert Ford's knowledge of "the Transmission Defect" based on a "series of Technical Service Bulletins ('TSBs')."[7] (Compl. ¶ 405.) The

---

[6] (*Also, e.g.*, *id.* ¶ 399(hh) (alleged issue at 86,000 miles), (jj) (125,000 miles), (nn) (99,700 miles), (uu) (80,000 miles, with the vehicle driven another 30,000 miles after that), (ttt) (81,415 miles), (gggg) (109,227 miles).)

[7] The plaintiffs generically refer to these alerts as "Technical Service Bulletins" or "TSBs" when, in fact, some were merely Customer Satisfaction Program notices. Regardless, all the "TSBs" are appended collectively as Exhibits 3-1 through 3-55.

plaintiffs don't discuss the "TSBs'" content, except to assert they were issued "in respect of the Transmission Defects and/or the Fusion Vehicles' powertrain." (*Id.*)

Many of the so-labeled "TSBs" pertain only to limited model-year ranges—such as SB 21431, which applied only to the 2010 Ford Fusion—with no facts pled to support their applicability to any other model years or plaintiffs' vehicles.[8] Ex. 3-16; *also, e.g.*, Ex. 3-48 (applying to only "[s]ome 2013 Fusion" vehicles). Many others have nothing to do with the plaintiffs' vague "Transmission Defect," such as SSM 45815, which addressed an issue in which "vehicles equipped with air conditioning (A/C) may exhibit an A/C system that is inoperative"—an issue none of the plaintiffs allege experiencing. Ex. 3-28; *also, e.g.*, 3-52 (addressing "an engine vibration while in park and at idle" only in vehicles "equipped with a 1.5L Gasoline Turbo Direct Injection").

Meanwhile, numerous other cited "TSBs" are, on their face, inapplicable to the plaintiffs' vehicles because they pertain to different Fusion models with different transmissions. For example, TSB 13-5-21 applies only to a limited range of Fusion *Hybrids*, and *not* to the plaintiffs' vehicles with their 6F35 transmission. Ex. 3-37. The same goes for many others, such as Customer Satisfaction Program notice

---

[8] *See Darne v. Ford Motor Co.*, No 13 C 03594, 2015 WL 9259455, at *1 (N.D. Ill. Dec. 18, 2015) (acknowledging court "may take judicial notice of TSB alerts," including for the fact that they are available to the public on the Internet). As *Darne* shows, the plaintiffs' suggestion that the "TSBs" were unavailable to the plaintiffs or the public in general is inaccurate. (*See* Compl. at 434 n.2.)

13B07, which mentions nothing about the transmission—much less, suggests any defect—and instead merely announces an "improved Hybrid Powertrain Control Module calibration" to further reduce "fuel consumption" that was available for certain *hybrid*-model vehicles. Ex. 3-14; *also, e.g.*, Ex. 3-34. Nonetheless, the plaintiffs cite TSB 13-5-21, CSP 13B07, and other facially irrelevant notices[9] as among "a continuous series" addressing their undefined "defect" in 6F35-transmission Fusions. (Compl. ¶ 405).

Still other "TSBs" pertain to entirely different vehicles, such as TSB 13-6-28, which on its face applies *only* to the 2013 Ford C-MAX, Focus, and Escape, and TSB 15-0121, which applies *only* to the 2011 to 2015 Ford Fiesta and Focus "equipped with a DPS6 transmission." Exs. 3-41 & 3-50. In all, at least half the 55 cited "TSBs" address different issues, transmissions, or vehicles from the plaintiffs' issues, transmissions, and vehicles. *Generally* Exs. 3-1 through 3-55.

**G.    Without providing basic facts to inform what law should apply to their claims individually, the plaintiffs assert seven counts against Ford.**

The 373 plaintiffs each assert the same seven causes of action for:  breaches of express (Count I) and implied warranty (Count II); "Revocation of Acceptance" (Count III); Michigan Consumer Protection Act (MCPA) (Count IV); "Unconscionability" (Count V); "Fraud and/or Misrepresentation, including Fraudulent Concealment" (Count VI); and "Unjust Enrichment" (Count VII).

---

[9] *E.g.*, Exs. 3-20 (SSM 46098), 3-47 (TSB 14-0106), & 3-35 (TSB 18-2328).

(Compl. ¶¶ 404–505.)  Other than references to Michigan law in Counts II and III, the plaintiffs do not assert what law should apply to their claims, nor provide adequate facts to inform that analysis fully. However, from the facts pled—in particular, the plaintiffs' citizenship and residency—it appears that the vast majority of plaintiffs purchased and used their vehicles in states other than Michigan.

## Argument

"Rule 8(a) sets forth the basic federal pleading requirement that a complaint 'shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Hammoud v. U.S. Attorney*, No. 14-14398, 2015 WL 4756582, at *3 (E.D. Mich. Aug. 12, 2015) (Cox, J.) (adopting report and recommendation).As this Court has recognized, however, despite "this relatively low threshold, a complaint must nevertheless contain more than legal labels, conclusions, and a recitation of the elements of a cause of action; it must also contain 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). While a complaint need not contain detailed factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court expanded on *Twombly*'s "two-pronged approach." *Downing v. Ford Motor Co.*, No. 17-10652, 2018 WL

11

3301210, at *4 (E.D. Mich. Feb. 5, 2018), *report & recommendation adopted*, No. 17-CV-10652, 2018 WL 1417599 (E.D. Mich. Mar. 22, 2018), *aff'd*, No. 18-1335, 2018 WL 4621955 (6th Cir. Sept. 24, 2018). "First, it must be determined whether a complaint contains factual allegations, as opposed to legal conclusions," since "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, the facts that are pled must show a 'plausible' claim for relief"—a "context-specific" analysis "that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Moreover, fraud allegations—whether as a theory of liability or in other respects (such as for tolling)—require heightened pleading under Rule 9(b). Accordingly, the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F. 3d 564, 570 (6th Cir. 2008). "At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied." *Id.*

In addition to these standards, numerous decisions—including in this circuit—recognize the myriad problems that so-called "shotgun" pleadings and prolix, muddled complaints present. *E.g.*, *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1321(11th Cir. 2015); *Vicom, Inc. v. Harbridge Merch.*

*Servs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994); *Agee v. Alphatec Spine, Inc.*, No. 1:15-cv-00750-TSB, 2017 WL 5706002 (S.D. Ohio Mar. 27, 2017).

Here, the 373 plaintiffs' complaint violates all these basic pleading principles. At 439 pages, it is undeniably prolix, in addition to pleading in improper "shotgun" form with each claim incorporating all the rest, and each plaintiff indiscriminately asserting all the same allegations and claims despite their patent inapplicability. At the same time, the complaint lacks fundamental facts to support its claims. And despite its prolixity, it contains none of the particularity required to support alleged fraud. For numerous reasons, the Court should dismiss this action in its entirety.

## I.   The plaintiffs' complaint is a textbook "shotgun" pleading—prolix, confusing, internally contradictory, and overall violative of Rule 8.

### A.   The "shotgun" incorporation of each count and allegation into every other count is improper.

Courts often wrestle with poorly crafted complaints such as this. While they may take many forms, they commonly go by the name "shotgun pleadings," whose unifying characteristic is "that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1321.

"The unacceptable consequences of shotgun pleading are many." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 981 (11th Cir. 2008). "First, and perhaps foremost, shotgun pleading inexorably broadens the scope of discovery,

much of which may be unnecessary." *Id.* Shotgun pleadings also "lessen the time and resources the court has available to reach and dispose of the cases and litigants waiting to be heard," and "wreak havoc on appellate court dockets." *Id.* at 982. Moreover, the "mischief shotgun pleadings causes undermines the public's respect for the courts—the ability of the courts to process efficiently, economically, and fairly the business placed before them." *Id.* at 983.

"The most common type" of shotgun complaint—"by a long shot"—is "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.* The complaint here falls squarely in this category—in fact, it is worse, as its counts incorporate both all preceding *and* subsequent counts. (Compl. ¶¶ 440, 456, 464, 471, 479, 483, 502.) Thus, not only is the last count a combination of the entire complaint, but *each* of the seven counts is a combination of every other count. Moreover, every count incorporates each and every allegation throughout the complaint.

The result of the plaintiffs' shotgun approach is a prolix, confusing, and muddled complaint, exactly what the pleading rules are intended to prevent. While the problems with this complaint go far beyond this infraction, it alone is sufficient grounds to dismiss, or alternatively at a minimum, to compel a more definite statement under Rule 12(e). *Davis*, 516 F.3d at 983–84.

14

**B.**   **The complaint suffers from a host of other improprieties and defects, further warranting its dismissal.**

The complaint presents numerous other problems—chiefly, its improper amalgamation of claims by 373 plaintiffs spanning nearly a decade of transactions across 43 states (possibly more) has rendered it a confusing mess of vague and conclusory allegations and claims, whereby it is impossible to discern "which allegations apply to which plaintiffs and to which counts" and makes the complaint "unanswerable," warranting its dismissal. *See Tomas v. Ill. Dept. of Empl. Sec.*, No. 07 C 4542, 2009 WL 2916840, at *3 (N.D. Ill. Sept. 2, 2009). For example, in attempting to support claims of marketing misrepresentations, the plaintiffs allege that Ford "drafted, produced, and distributed marketing brochures to the public containing representations about the transmission." (Compl. ¶ 428.) Yet, despite the fact that the plaintiffs purport to have purchased Ford Fusions spanning model years from 2010 to 2017, they only cite one statement from one brochure applicable solely to the 2010 and 2011 Ford Fusion. (*Id.* ¶ 428(a).)

The plaintiffs' mention of this marketing statement is entirely confusing, however, for multiple reasons. First, no plaintiff alleges seeing or relying on it. Second, at most, this statement applies to only two of the eight model years, and there are no facts supporting that anyone who bought a different model year could justifiably rely on that statement—even if they had alleged as much, which none do.

15

Similarly, in their attempt to show Ford's supposed knowledge of a defect pre-dating their individual vehicle purchases, the plaintiffs cite various complaints to NHTSA. But those complaints all address varying model years of vehicles, filed at different times, for different issues—including many having nothing to do with the plaintiffs' alleged issues or the six-speed 6F35 automatic transmission. *Supra* pp. 7–10. As a result, it is impossible to tell which complaints to NHTSA the plaintiffs are alleging support Ford's supposed knowledge pre-dating each of their individual vehicle purchases.

This is a critical failing because where, as here, a plaintiff must allege facts plausibly supporting a manufacturer's knowledge of a defect pre-dating the plaintiff's purchase to support fraud-based causes of action, a paucity of alleged customer complaints can prove dispositive on initial motions practice. *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 761–62 (E.D. Mich. Mar. 25, 2019). Yet here, by their amalgamation, these 373 plaintiffs improperly attempt to have each of their claims rely on customer complaints that could not possibly satisfy the required showing as to vehicle purchases that took place *before* those complaints.[10] For example, plaintiff Ernest Hanaway alleges he bought a 2010 Ford Fusion on or about May 21, 2009. (Compl. ¶ 128.) However, not one of the plaintiffs' cited NHTSA

---

[10] Ford does not concede that these complaints satisfy the required pleading of pre-purchase knowledge, but merely makes the point here that a complaint *post*-dating a plaintiff's purchase, on its face, could never satisfy that requirement.

complaints was filed prior to his alleged 2009 purchase date. (*Id.* ¶ 399(a)–(qqqqq).) In fact, none of the plaintiffs' cited complaints was filed in 2010, nor were any filed in 2011, or in 2012. (*Id.*) How, then, do the complaints to NHTSA support Ford's knowledge of an alleged defect with respect to plaintiff Hanaway (or any other plaintiff who purchased their vehicles from 2009 to 2012)? The answer is, they do not. *See Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 793 (E.D. Mich. 2019) (recognizing that plaintiffs cannot properly rely on consumer complaints pre-dating their purchases to show a manufacturer's alleged knowledge of a defect, especially when they pertain to different model-year iterations).

Similarly, all 373 plaintiffs purport to rely also on the "TSBs" to show Ford's supposed knowledge of an alleged defect pre-dating the plaintiffs' purchases. (Compl. ¶ 405.) Yet most of if not all the "TSBs," on their face and regardless of their content, provide no such support for many plaintiffs for the same reason as with the complaints to NHTSA—they *post*-date the vehicle purchases. (*See id.*) For example, TSB 17-2192 issued on October 12, 2017 (and had nothing to do with any transmission issues). Ex. 3-54. Putting aside the substantive disconnect, this bulletin provides no plausible support for knowledge of a defect *pre*-dating vehicle purchases that took place *before* October 12, 2017. Nonetheless, all 373 plaintiffs indiscriminately rely on TSB 17-2192—and all the other "TSBs"—for their claims.

Further complicating matters is that these 373 plaintiffs reside in and likely purchased their vehicles in 43 different states, possibly more. (Compl. ¶¶ 5–379.) In some cases, they appear to have purchased their Ford Fusions new, by which it may be discernable where they purchased them. Many, however, bought their vehicles used, making it harder if not impossible to determine where and from whom they bought them. (*E.g.*, *id.* ¶ 290 (showing plaintiff Hampton buying a 2010 Ford Fusion in August 2017)); *also Roe v. Ford Motor Co.*, No. 2:18-cv-12528-LJM-APP, 2019 WL 3564589, at *9 (E.D. Mich. Aug. 6, 2019) (recognizing "common-sense dictates that the car did not sit on a dealer lot for over two years").

Moreover, the plaintiffs identify where they currently reside, but not only do they not say where they bought their vehicles, they do not identify where they primarily drove their vehicles or experienced any alleged defects. *Walsh v. Ford Motor Co.*, 588 F. Supp. 1513, 1526 (D.D.C.), *am.*, 592 F. Supp. 1359 (D.D.C. 1984), & *am.*, 612 F. Supp. 983 (D.D.C. 1985) (looking "only to those States where plaintiffs purchased their vehicles and not to where they reside" for the applicable law). While it is clear many different states' laws are in play, the plaintiffs fail to plead their claims according to applicable law, and they withhold among the most basic facts for an appropriate choice-of-law analysis. As a result, it is unclear which plaintiffs are asserting which claims, and under which states' laws, and on what bases. *Tomas*, 2009 WL 2916840, at *3.

18

For example, while they all baldly allege their vehicles were "backed by" Ford's NVLW, they ignore that "enforceability and interpretation" of the NVLW—even where applicable to a particular plaintiff's vehicle—is governed by the law of the state of purchase, not merely the plaintiff's current residence. *E.g.*, Ex. 2-1 at 7. Similarly, many states require vertical privity for breach of implied warranty under the UCC, including Alabama, Arizona, California, Connecticut, Florida, Illinois, Indiana, New York, North Carolina, Ohio, Washington, and Wisconsin, where collectively 145 plaintiffs currently reside—yet none allege such privity. *E.g.*, *Walsh*, 588 F. Supp. at 527–35 (cataloging states requiring privity on implied warranty claims)[11]; *also Matanky*, 370 F. Supp. 3d at 786–87 (same for Connecticut, Illinois, and Ohio); *McKee*, 376 F. Supp. 3d at 759 (same for Florida). In addition, the plaintiffs assert a generic unjust enrichment claim under no particular state's law, despite the fact that "[s]tate law requirements under unjust enrichment law vary widely." *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 WL 1431756, at *24 (E.D. Mich. Apr. 9, 2013) (Cox. J.).

As these examples show, the ability of the plaintiffs' claims to withstand even initial scrutiny depends on the applicable law, which in turn requires fundamental facts that the plaintiffs improperly withhold. This applies to all their claims, such as the Michigan Consumer Protection Act (MCPA) claim that all plaintiffs assert,

---

[11] As the amended *Walsh* opinion addresses, New Jersey subsequently removed the vertical privity requirement. 612 F. Supp. 983.

despite none of the plaintiffs alleging they purchased their vehicles in Michigan. As this Court has noted, "there are material differences between the various consumer protection acts" across the jurisdictions, warranting a choice-of-law analysis under Michigan law. *In re OnStar Contract Litig.*, No. 2:07-MDL-01867, 2010 WL 3516691, at \*12 (E.D. Mich. Aug. 25, 2010). Under Michigan's choice-of-law analysis, the state where a plaintiff purchased the vehicle has a strong interest in having its own consumer protection laws apply to that transaction. *Id.* Yet it is unclear from this deficient complaint where and from whom they purchased their vehicles, and even with a Michigan defendant such as Ford, the choice-of-law analysis may nonetheless point to another state's law and preclude a claim under the MCPA. *See Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F. 3d 690 (6th Cir. 2013) (affirming that Tennessee law applied to claim against Ford brought in Michigan).

Moreover, where different states' laws apply, they require pleading according to the elements of the claims according to those states' laws. The plaintiffs should not be able to shield their claims from such initial scrutiny by withholding patently relevant and necessary facts as to their claims and by failing to plead their claims according to the elements of the applicable jurisdictions' substantive laws. *In re Refrigerant Compressors*, 2013 WL 1431756, at \*24 (dismissing claims where the plaintiffs failed to plead them under the applicable states' laws).

*       *       *       *       *       *

20

When "a complaint is so 'prolix and/or confusing [that it] makes it difficult for the defendant to file a responsive pleading and makes it difficult for the trial court to conduct orderly litigation," the Court should not allow the pleading to stand and thus plead "by means of obfuscation." *Agee*, 2017 WL 5706002, at *2 (dismissing under Rule 8 a 96-page, 591-paragraph complaint as being overlong and disorganized). This complaint is undeniably prolix. And its generic, boilerplate, and shotgun pleading approach makes it impossible to determine which allegations apply to which plaintiffs, and which plaintiffs assert which claims under which states' laws, thereby impeding the Court's ability to conduct orderly litigation, including by subjecting the claims to initial scrutiny.

The plaintiffs' pleading-by-obfuscation method should not be condoned. Rather, under Rule 8, the Court should dismiss this action in its entirety, or at a minimum, strike it and compel a more definite statement. And should the Court permit amendment, it should require the plaintiffs to organize and present their claims appropriately, including by individually pleading necessary facts, according to the applicable states' laws, and by scrutinizing their claims under those laws and the facts to winnow out those that are patently irrelevant and non-viable.[12]

---

[12] Ford reserves the right to move to sever and for other appropriate relief given the improper joinder of claims by these 373 plaintiffs with different vehicles, from different states, with different (if any) issues. Ford also reserves the right to raise additional challenges to the plaintiffs' claims should the Court grant leave to amend.

**II.    Beyond the facial improprieties of the plaintiffs' prolix and confusing complaint, their claims require dismissal for numerous other reasons.**

**A.    Under applicable Michigan procedural law, most of the plaintiffs' claims require dismissal as outright time-barred.**

A "federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state." *Johnson v. Ventra Grp., Inc*., 191 F.3d 732, 738 (6th Cir. 1999). "Under Michigan's common law choice of law rule, statutes of limitation are considered procedural and are governed by the law of the forum." *Id.* at 746. Here, many—and in some cases, all—the applicable statutes of limitations bar plaintiffs' claims outright, requiring their dismissal with prejudice. While far more plaintiffs' claims are insufficiently pled in terms of their timeliness and evince that they are very likely time barred, requiring their dismissal as well.

**i.    Many plaintiffs' express warranty claims are time-barred.**

The plaintiffs allege Ford breached an "express warranty as defined in UCC sections 20313 and/or 2A-210." (Compl. ¶ 442.) To the extent they rely on Ford's NVLW and its "repair or replace" warranty as a UCC-defined warranty, Michigan law disagrees. A "repair-or-replace" provision "that does not 'explicitly state that [the] plaintiff's vehicle will be free from defects, but rather states that the manufacturer will repair or replace any defects that arise during the specified period,' does not constitute an 'express warranty' within the meaning of the Michigan UCC, MCL § 440.2313." *Miller v. Gen. Motors, LLC*, No. 17-CV-14032,

2018 WL 2740240, at *4 (E.D. Mich. June 7, 2018) (quoting *Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 317 Mich. App. 395, 894 N.W.2d 700 (2016)). Such provisions "are contractual promises under Article 2, but are not warranties." *Grosse Pointe*, 317 Mich. App. at 406, 894 N.W.2d at 706.

Michigan law thus considers Ford's NVLW's promise to repair or replace any defects in materials or workmanship that arose within the earlier of five years or 60,000 miles from original purchase to be a "contractual promise" subject to the UCC's four-year limitations period, which runs from an alleged breach—i.e., the failure to repair or replace as promised—instead of from tender of delivery. *Id.* at 405–08, 894 N.W.2d at 705–07 (recognizing that a repair-and-replace provision is nonetheless a "term of a contract of sale"); *also* Mich. Code Ann. § 440.2725(1) ("An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued."). Thus, at most, the longest a plaintiff could have to bring a claim for breach of express warranty based on Ford's NVLW would be five years from the original purchase *plus*, assuming a defect manifested and was not cured on the last day of that five-year period, another four years—in other words, at most, nine years from original purchase. Here, it is apparent on the face of the complaint that, even assuming this scenario, sixteen (16) plaintiffs' express warranty

claims as listed on Exhibit 5 are time barred, requiring their dismissal with prejudice.[13]

As for the rest, the plaintiffs' deficient pleading—including failing to state when any purported breach occurred and when the claim thereby accrued—precludes proper statute-of-limitations scrutiny and is yet another reason for dismissal. *Miller*, 2018 WL 2740240, at *5 (dismissing claim where plaintiffs did not allege they experienced a failure and presented their vehicles within the warranty period). Indeed, were the plaintiffs to have pled their claims with sufficient facts as required, it is likely far more of their express warranty claims would be time-barred.

To the extent, however, the plaintiffs assert the existence of such a UCC-defined express warranty (which, other than by referencing the "repair or replace" provision, they have wholly failed to identify), then such claims are governed by a four-year limitations period running from tender of delivery—the same as for the implied warranty as discussed in the following subsection. Mich. Code Ann. § 440.2725; *also infra* Part II.A.ii. In which case, for the same reasons many plaintiffs' implied warranty claims are time barred, so too are their express warranty claims.

### ii.    Scores of plaintiffs' implied warranty claims are time-barred.

As for Count II for breach of implied warranty of merchantability, (Compl. ¶¶ 456–63), under "the Uniform Commercial Code, a buyer only has four years" to file

---

[13] This is so even with respect to those who were former *Kinner* plaintiffs and even accounting for Michigan Code § 440.2725(3).

suit, which "starts to run at 'tender of delivery.' " *Roe*, 2019 WL 3564589, at *13 (citing UCC § 2-275); *also* Mich. Code Ann. § 440.2725. "And once started, the four-year timer runs even if the buyer does not know of the breach of warranty." *Id.* Moreover, as with the written warranty, the implied warranty runs from the original purchase or in-service date. *Miller*, 2018 WL 2740240, at *8.

Here, "tender of delivery was when Ford sold Plaintiffs' vehicles to one of its dealers or, at latest, when Plaintiffs' vehicles were purchased from the dealer." *Roe*, 2019 WL 3564589, at *13 (citing cases). As a result, dozens and dozens of plaintiffs' implied warranty claims are outright time-barred, which is discernable even on the deficient and minimal facts pled—for example, plaintiffs Hall and Duncan, who bought their 2010 Fusion "[o]n or about June 1, 2017." (Compl. ¶ 88); *also Miller*, 2018 WL 2740240, at *9 ("because the Limited Warranty expired before Plaintiff Miller purchased her vehicle, her claim for breach of the implied warranty of merchantability fails"). The Court should therefore dismiss with prejudice the implied warranty claims as listed in Exhibit 5.

### iii.    Many plaintiffs' fraud-based claims are also time-barred.

Under Michigan law, Counts IV, VI, and VII—asserting claims under the MCPA, for common-law fraud, and for unjust enrichment—are all subject to six-year statutes of limitations. Mich. Comp. Laws § 445.911 (providing limitations period under the MCPA); *id.* § 600.5813 (providing a catch-all six-year limitations

period); *Romeo Inv. Ltd. v. Mich. Consol. Gas Co.*, No. 260320, 2007 WL 1264008, at *8 (Mich. Ct. App. May 1, 2007) (same for unjust enrichment claim).

The latest point at which the statutes would have started to run on the MCPA claims was when the vehicles were first offered for sale, since the alleged MCPA violations all stem from alleged misrepresentations and nondisclosures in the course of offering the vehicles for sale. (*See* Compl. ¶ 474(a)–(k).); *also* Mich. Comp. Laws § 445.911 ("An action under this section shall not be brought more than 6 years after the occurrence of the method, act, or practice which is the subject of the action . . . ."). Indeed, the plaintiffs allege no facts to support that their claims would have accrued at any later date. Thus, the Court should dismiss with prejudice the MCPA claims by those plaintiffs whose actions are time-barred, as listed in Exhibit 5.

The same goes for common-law fraud in Count VI, for which the limitations period "begins to run from the time the fraud is perpetrated," *Boyle v. General Motors Corp.*, 468 Mich. 226, 230, 661 N.W.2d 557, 559 (2003), "regardless of the time when damage results," Mich. Comp. Laws § 600.5827. Here, that accrual date would be the same as with the MCPA—when the vehicles were first offered for sale. The unjust enrichment claim, like the others, could not possibly be pursued by those plaintiffs who bought their vehicles used. *See infra* Part II.C.vii. While for new-vehicle plaintiffs, the limitations period would likewise run from the date of original

purchase. Thus, both Counts VI and VII are likewise time-barred with respect to those plaintiffs who did not timely bring their actions, as shown in Exhibit 5.

### B.     The plaintiffs fail to plead facts plausibly supporting any tolling.

Recognizing the time-barred nature of their claims, the plaintiffs baldly assert that all statutes of limitations for all claims by all plaintiffs are tolled by the discovery rule and fraudulent concealment. (Compl. ¶¶ 421–39.) Neither saves their claims.

*First*, the plaintiffs fail to plead either of these purported tolling doctrines adequately, including by identifying to which claims their tolling theories purportedly apply. For example, they indiscriminately assert the discovery rule, but Michigan law squarely rejects its application in most, if not all, instances. *Boyle*, 468 Mich. at 230, 661 N.W.2d at 559 (recognizing that the discovery rule has been "rejected" in fraud-based actions); Mich. Comp. Laws § 600.5827 (providing that, in general, a claim "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results"); *id.* § 440.2725 (establishing that warranty claims accrue upon tender of delivery, "regardless of the aggrieved party's lack of knowledge of the breach"). Thus, the plaintiffs failed to show how their bald and factually unsupported assertion that they "did not discover the operative facts that are the basis of their claims" is legally irrelevant. (*See* Compl. ¶ 435.)

*Second*, the plaintiffs' bald assertion of purported delayed discovery is entirely unsupported. For example, to the extent they assert Ford failed to honor its "repair or replace" promise, (*id.* ¶ 432), there is no factual basis to support how or why the discovery of that failure was delayed—if Ford did not honor its warranty, the plaintiffs would have known that when it happened. Similarly, they assert Ford made "factual representations about the transmission," but that "Plaintiffs' Fusion vehicles as delivered to Plaintiffs were extremely unresponsive and were not 'smooth-shifting,' as Plaintiffs' drive [sic] was repeatedly interrupted by jerky shifts and dangerous hesitations." (*Id.* ¶¶ 428–29.) Again, they would have discovered this wh*en they first drove their vehicles* (i.e., when "delivered"). They plead nothing to support any other inference.

*Third*, fraudulent concealment tolling is equally unavailing, as it requires pleading—with Rule 9(b) particularity—three elements:  "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2017 WL 7689654, at *4 (E.D. Mich. May 5, 2017). In short, it requires "affirmative acts . . . designed to prevent subsequent discovery," while "[m]ere silence is insufficient." *Miller*, 2018 WL 2740240, at *9.

The plaintiffs wholly fail to plead sufficient facts as to any of the three elements, much less to a Rule 9(b) standard. There are no well-pled facts of any affirmative acts of concealment by Ford. Instead, the plaintiffs rely on the same alleged misrepresentations and nondisclosures from when they purchased their vehicles, (Compl. ¶¶ 428–34), which is insufficient. *See Matanky*, 370 F. Supp. 3d at 802. Where they do assert any subsequent affirmative acts, they do so in only the baldest and most conclusory fashion, with no supporting facts. (*E.g.*, *id.* ¶¶ 430, 438.) And while a "mere allegation of due diligence without asserting what steps were taken is insufficient," *In re Auto. Parts*, 2017 WL 7689654, at *4, the plaintiffs don't even allege due diligence. Instead, they assert "[n]o amount of diligence by Plaintiffs could have led to the discovery" of their claims. (Compl. ¶ 436.) Yet they contradict this bald assertion by citing *publicly available* complaints to NHTSA and "TSBs."

Moreover, "for Ford to have fraudulently concealed the [Transmission Defect], it would have to at least have known that" they were defective. *Roe*, 2019 WL 3564589, at *14. As addressed below, *infra* Part II.C.i, the plaintiffs fail to plead facts plausibly supporting either a defect or Ford's alleged knowledge thereof. In sum, on every level, the plaintiffs' bald tolling assertions fail.

**C.   In addition to other failings, the plaintiffs' claims all fail on substantive grounds as well.**

**i.   The breach of express warranty claim fails for numerous reasons.**

In boilerplate fashion typical of the entire complaint, the plaintiffs all allege that their vehicle purchases or leases were "accompanied by an express warranty," which they do not append or cite. (Compl. ¶ 442.) Nonetheless, by referencing and relying on it, they incorporate Ford's New Vehicle Limited Warranty (NVLW) for each model year at issue (2010 through 2017), of which the Court can and should take judicial notice. *Rosa v. Am. Water Heater Co.*, 177 F. Supp. 3d 1025, 1038 (noting the court could take judicial notice of a product warranty referred to throughout the complaint). However, Ford's NVLW would not apply to used vehicles purchased outside the warranty period—i.e., beyond five years or 60,000 miles from original purchase. *Miller*, 2018 WL 2740240, at *8 (dismissing claim where the limited warranty expired in 2013, and plaintiff bought the vehicle in 2014).

Here, numerous plaintiffs appear to have purchased their vehicles used, and likely beyond the expiration of the NVLW's powertrain warranty period based purely on the model year and date of purchase, such as plaintiff Sevak who bought her 2010 Ford Fusion in February 22, 2018, long after the NVLW expired. (Compl. ¶ 366.) The complaint contains numerous similar examples. (*E.g.*, Compl. ¶¶ 10, 44, 73, 82, 88, 102, 163, 225, 290, 303, 320, 328, 355, 378.) Many more plaintiffs likely purchased their vehicles beyond the NVLW's mileage expiration as well, but they fail to allege facts showing their vehicles were within or outside NVLW coverage. *Darne*, 2017 WL 3836586, at *6 (requiring facts like the mileage to support that "the

alleged issues fell within the covered period"). Instead, they plead in only bald, conclusory, and facially implausible fashion that each of their vehicles was "backed by a New Vehicle Limited Warranty," when that is demonstrably incorrect. Even as to those plaintiffs who purchased their vehicles used while the NVLW was still in effect (which is largely impossible to discern from the complaint), the express warranty claims fail for numerous reasons.

*First*, establishing a breach of the NVLW first requires the plaintiffs to allege facts plausibly supporting an actual defect, which they have not done. Instead, they merely "describe a laundry list of ways in which their vehicles' performance is subpar," and then conclusorily "tie all of these problems to a 'defect' in the [6F35] transmission." *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL 3000646, at *7 (C.D. Cal. May 22, 2019). As the *In re Ford Motor Co.* court concluded, this is entirely deficient. Indeed, in striking similarity, the complaint in that litigation defined "the 'Transmission Defect' as follows: the DPS6 transmission 'is defective in design and/or manufacture in that, among other problems, the transmission consistently slips, bucks, kicks, jerks, harshly engages, has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and, eventually, premature transmission failure.' " *Id.* This is virtually identical to how the plaintiffs here describe "the Transmission Defect." (Compl. ¶ 387.) Yet as *In re Ford Motor*

31

*Co.* observed, this "merely describes performance problems with the vehicle and does not amount to identifying the defect . . . .  It is therefore insufficient." *Id.*; *see also McQueen v. BMW of N. Am., LLC*, No. CIV.A. 12-6674 SRC, 2013 WL 4607353, at *7 (D.N.J. Aug. 29, 2013) (dismissing claim where plaintiff provided only "a conclusory allegation that the transmission system is defective").

*Second*, by not alleging facts as to an actual defect, the plaintiffs necessarily fail to allege facts plausibly supporting any breach. As noted above, the NVLW covers only defects in materials and workmanship, which does not apply to alleged design defects. *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 614 (E.D. Mich. 2017). Thus, to the extent the plaintiffs assert a design defect, the NVLW does not cover that. This District has stated that "if 'sufficient facts are alleged to assert both' a design and a manufacturing defect, 'then dismissal at the pleading stage is premature.' " *Id.* But here, the plaintiffs fail to allege any facts as to the actual alleged defect, much less sufficient facts to support that it is manufacturing defect as opposed to a design defect for any one of their 373 vehicles.

*Third*, even were an NVLW to apply as to any of their vehicles, the plaintiffs uniformly fail to allege facts plausibly supporting that they complied with its terms. As this District has noted in addressing the same NVLW terms, Ford promised "to 'repair, replace, or adjust all parts on [a] vehicle that malfunction or fail during normal use during the applicable coverage period' if the vehicle 'is properly operated

and maintained' and 'was taken to a Ford dealership for a warranted repair during the warranty period.' " *Wozniak v. Ford Motor Co.*, No. 2:17-cv-12794, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019); *also e.g.*, Ex. 2-1 at 8–9. In *Wozniak*, the court found that the plaintiffs there "failed to adequately plead a breach because they ha[d] not pleaded that the named Plaintiff presented their vehicles to a Ford dealership before the earlier of" the NVLW's mileage or time limits. *Id.* The court concluded:  "Because the warranty expires upon the earlier of the time or mileage limits, Plaintiffs must allege both the timeline between the start of the warranty period and the sought-after repairs and the mileage on their vehicles at the time of presentment." *Id.*; *also Roe*, 2019 WL 3564589, at *9.

Here, the plaintiffs allege no facts as to the timeline for their alleged warranty claims.[14] They allege no well-pled facts supporting that they presented their vehicles to Ford, nor that Ford refused or failed to repair their vehicles, while their vehicles were in warranty. *See, e.g., Fedrick v. Mercedes-Benz USA, LLC,* 366 F. Supp. 2d 1190, 1198 (N.D. Ga. 2005) ("It is the refusal to remedy within a reasonable time, or a lack of success in the attempts to remedy which would constitute a breach of warranty."). Instead, they allege only in the most boilerplate manner that they all supposedly "have provided Ford with sufficient opportunities to repair or replace

---

[14] Even those vehicles purchased more recently and within the past five years may nonetheless be outside of warranty coverage based on the mileage limit.

their vehicles." (Compl. ¶ 446.)[15] This lone boilerplate assertion is patently deficient as to these 373 plaintiffs. It is also facially implausible in light of the numerous examples of plaintiffs who did not even purchase their vehicles until *after* the NVLW would have expired based on the time period alone. (*E.g.*, Compl. ¶¶ 355, 366.) It is further implausible in light of the cited complaints to NHTSA, many of which show alleged transmission issues arising only after—in some instances, long after—five years, 60,000 miles, or both. (*E.g.*, Compl. ¶ 399(e) (2010 Fusion with transmission incident in March 2018), (jj) (same at 125,000 miles).)

*Fourth*, the plaintiffs seek numerous forms of damages with no facts pled to support that they would be entitled to recover such damages under the NVLW's terms. (Compl. at 427.) For example, they seek attorney's fees, which are not recoverable on a contract claim unless the contract provides for them, and the NVLW does not. The plaintiffs further ignore the NVLW's express limitations, which, for example, preclude recovery of a "refund of the purchase or lease price," "[i]ncidental, consequential and actual damages," and other forms of relief sought. (Compl. at 427.) Thus, for numerous reasons, the express warranty claim fails.

### ii. The plaintiffs likewise fail to state an implied warranty claim.

---

[15] Should the plaintiffs argue, as in *Wozniak*, that the limited warranty failed of its essential purpose, (Compl. ¶ 449), the Court should dispense with that argument as in *Wozniak* under virtually identical circumstances. 2019 WL 108845, at *2–3.

As with their express warranty claim, the implied warranty claim primarily fails because the plaintiffs plead no facts plausibly supporting that any of their vehicles are defective or otherwise unmerchantable. Instead, they plead only (1) identical boilerplate, and (2) legal conclusions. (Compl. ¶¶ 5–379, 456–63.)  Yet, a mere conclusory assertion that products "did not comply with the statutory definition of 'merchantable goods' adds no substance" to implied warranty claims such as these that "contain[] no factual allegations." *Miller*, 2018 WL 2740240, at *9.

Moreover, even assuming the plaintiffs' vehicles required repairs at some point—a proposition for which they provide no well-pled facts—"it is inevitable that a complex product [such as an automobile and its transmission] will require some service and that fact alone does not establish a breach of warranty." *Ducharme*, 321 F. Supp. 2d at 850. Here, it is facially implausible that, for example, plaintiff Hall's 2010 Ford Fusion that she bought used in June 2017 after seven (or more) years of service was not merchantable. (Compl. ¶ 88.) Scores of similar examples are found across both the plaintiffs and their cited complaints to NHTSA. (*E.g.*, *id.* ¶¶ 163, 225, 290, 366, 399(e) & (jj).) While these are among the more egregious examples, the reality is no plaintiff provides any well pled facts plausibly supporting unmerchantability, including what actually was defective about their vehicles, and how, when, and at what mileage they experienced any issues.

35

In addition, a UCC implied warranty claim requires that when, as here, tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." U.C.C. § 2-607(3)(a). None of the plaintiffs allege they provided notice.

### iii.  Count III for revocation of acceptance fails because it is neither a stand-alone cause of action, nor is it available even as a remedy against a remote manufacturer.

Count III primarily fails because revocation of acceptance is a remedy for breach of warranty, and not properly an independent cause of action. Indeed, a buyer's ability to seek revocation, even as a remedy, rises or falls with the underlying warranty claim. *See Snyder v. Boston Whaler, Inc.*, 892 F. Supp. 955, 959 (W.D. Mich. 1994). Where the buyer fails to state a claim for breach of warranty, the buyer likewise cannot pursue revocation as a remedy. *Id.* That is the case here. The plaintiffs seek revocation based solely on the alleged "breaches of express and implied warranties." (Compl. ¶ 468.) Since those counts fail, so, too, does Count III.

Even as a form of relief, revocation of acceptance requires well-pled facts plausibly supporting entitlement to it. Here, the plaintiffs offer no such facts, only conclusory allegations. For example, UCC section 2-608 requires that revocation of acceptance "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer

notifies the seller of it." U.C.C. § 2-608(2). The plaintiffs allege no facts showing timely revocation, much less before a substantial change in their vehicles. To the contrary, the meager facts alleged show scores of the plaintiffs purchasing their vehicles (often used) many years ago and driving them likely tens if not hundreds of thousands of miles. (*E.g.*, Compl. ¶ 128 (showing purchase in May 2009.)

Count III also fails because, even as a remedy, revocation is not available against a remote manufacturer like Ford. *Sautner v. Fleetwood Enters., Inc.*, No. 05-73252, 2007 WL 1343806 (E.D. Mich. May 8, 2007) ("The weight of authority under Michigan law opposes remote revocation."). Moreover, none of the plaintiffs who purchased their vehicles used would be entitled to revocation.

**iv.     The MCPA claim fails on numerous grounds.**

Count IV asserts an MCPA claim, even though the overwhelming majority of the plaintiffs reside in other states and do not say where they purchased their vehicles. Beyond this, the MCPA claims fail for numerous reasons.

**1.     New vehicle purchases are exempt, and there is no actionable transaction with respect to used-vehicle purchases.**

The MCPA does not apply to a "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1). The Michigan Supreme Court construes this exemption broadly, finding that "the relevant inquiry is whether the general transaction is specifically authorized by law,

regardless of whether the specific misconduct alleged is prohibited." *Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203, 210, 732 N.W.2d 514 (2007) (citation and internal quotation marks omitted).

Under similar facts, courts have concluded that sales of new vehicles by licensed dealers are "specifically authorized and regulated by law" and thus "exempt from the MCPA." *Matanky*, 370 F. Supp. 3d at 799–800; *also Rosenbaum v. Toyota Motor Sales, USA, Inc.*, No. 16-CV-12645, 2016 WL 9775018, at *3 (E.D. Mich. Oct. 21, 2016) (same). Accordingly, those plaintiffs who bought new vehicles cannot pursue claims under the MCPA. Nor, however, can those who bought their vehicles used, and thus had no transaction—even indirect—with Ford. In other words, either way, the MCPA claim fails.

### 2. The MCPA claim further lacks Rule 9(b) particularity.

Where, as here, plaintiffs assert consumer protection claims alleging that a defendant engaged in "deceptive and unfair business practices by intentionally and knowingly misrepresenting" a product's capabilities and failing to disclose an alleged defect, such "claims sound in fraud," and "must meet Rule 9(b)'s heightened pleading standard." *Matanky*, 370 F. Supp. 3d at 797. Here, the plaintiffs fall well short of pleading an MCPA violation with the requisite particularity. Instead, they offer only a laundry list of boilerplate legal conclusions, with no actual facts.

38

For example, they allege Ford represented that the "Plaintiffs' vehicles' transmissions were of a particular standard or quality when they were not." (Compl. ¶ 474(b).) Yet nowhere do they identify any particular statement, much less who supposedly made it, to whom, when, or how. To the extent they rely on the lone statement in the 2010/2011 marketing brochure about a "smooth-shifting" transmission, that statement is wholly insufficient for numerous reasons, including that no plaintiff alleges having seen or relied on it, the statement does not even pertain to the vast majority of the vehicles, and regardless, it is nonactionable puffery. *E.g.*, *Nicholson v. Jayco, Inc.*, No. 5:15-CV-2010, 2016 WL 5463215, at *19 (N.D. Ohio Sept. 29, 2016) ("quietest riding, best handling coach on the market" was subjective opinion and nonactionable puffery).

The generic, meaningless, boilerplate nature of the plaintiffs' MCPA allegations is perhaps best exemplified by their assertion that Ford attempted "to disclaim" the "implied warranty of merchantability." (Compl. ¶ 474(h).) Nowhere in Ford's NVLWs is there any attempt to disclaim the implied warranty of merchantability—certainly, the plaintiffs do not point to any such attempt. Rather, this is merely another example of their providing only unsupported boilerplate assertions and legal conclusions, far short of the required particularity.

**3.    Only plaintiffs who actually bought their vehicles in Michigan could even theoretically pursue an MCPA claim.**

Where plaintiffs do not reside in Michigan and did not buy their vehicles in Michigan, "the MCPA does not apply." *Highsmith v. Chrysler Credit Corp.*, 150 B.R. 997, 1008 (N.D. Ill. 1993), *aff'd in part, rev'd in part*, 18 F.3d 434 (7th Cir. 1994). Indeed, this is consistent with the Sixth's Circuit recognition under Ohio's similar choice-of-law analysis that "the consumer-protection laws of" individual plaintiffs and putative class members' states would "govern their claims" because "the State with the strongest interest in regulating such conduct is the State where the consumers—the residents protected by its consumer-protection laws—are harmed by it." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946–47 (6th Cir. 2011). Michigan has little interest in having its law applied to purchases by non-residents, as evidenced by the statute's restriction of putative MCPA class members only to those "residing or injured in this state." Mich. Comp. Laws § 445.911(3); *also Rosen v. Chrysler Corp.*, No. 97-CV-60374-AA, 2000 WL 34609135, at *9 (E.D. Mich. July 18, 2000) (recognizing "the state where the consumer is located" as having "the greatest interest in vitiating its own laws to protect its citizens").

Here, only 19 of the 373 plaintiffs even currently reside in Michigan. (Compl. ¶¶ 12, 14, 53, 82, 89, 107, 110, 115, 129, 149, 202, 220, 264, 278, 290, 346, 349, 350, 378.) Of those, 13 (at least) appear to have bought their vehicles used, with no facts of where they bought them nor where they then resided. In short, even as to

those who currently reside in Michigan, none of the plaintiffs adequately plead facts

plausibly supporting that the MCPA could or should apply to their vehicle purchases.

> ### v. Count V for "Uniform Commercial Code - Unconscionability" also fails to state a cause of action.

Count V for "Unconscionability" fails for numerous reasons. (*Id.* ¶¶ 479–82.)

*First*, unconscionability under UCC section 2-302 is not properly a cause of

action. Rather, it is a possible defense against the enforcement of a contract or

provision thereof. *See* U.C.C. § 3-302(1).

*Second*, even as an attempted challenge to Ford's contractual limitations, the

plaintiffs fail to assert unconscionability properly. While they baldly ask to the Court

to "strike any contractual limitations on Plaintiffs' remedies as unconscionable," the

plaintiffs do not actually identify any specific limitations or contractual provisions

they want stricken. (Compl. at 433.) This is wholly inadequate.

Even as a defense, unconscionability must be adequately alleged as to both

procedure and substance. *Nw. Acceptance Corp. v. Almont Gravel, Inc.*, 162 Mich.

App. 294, 302, 412 N.W.2d 719 (1987). Procedural unconscionability is where the

weaker party had no realistic alternative to acceptance of the term. *Allen v. Mich.

Bell Tel. Co.*, 18 Mich. App. 632, 637, 171 N.W.2d 689 (1969). If, however, under

a fair appraisal of the circumstances, the weaker party was free to accept or reject

the term, there was no procedural unconscionability. *Id*. Here, the plaintiffs do not

plead procedural unconscionability. Even if they had, and even if they "had no ability

to haggle with their Ford dealer"—or with a third-party seller in the case of used-vehicle purchases—"for a warranty tailored to their specific needs," the plaintiffs nonetheless "still had meaningful choices. General Motors, Toyota, and Kia, to name a few." *Roe*, 2019 WL 3564589, at *10.

Moreover, plaintiffs who purchased their vehicles used after the NVLW expired have "no standing" to assert unconscionability of the NVLW and are "not in a position to hypothesize about the circumstances surrounding the negotiation and execution of the original contracts of sale." *Perez v. Volkswagen Grp. of Am., Inc.*, No. 2:12-CV-02289, 2013 WL 1661434, at *5 (W.D. Ark. Apr. 17, 2013).

Substantive unconscionability, meanwhile, requires that the challenged contract term be "substantively unreasonable," so much so that "the inequity of the term is so extreme as to shock the conscience." *Gardner v. Quicken Loans, Inc.*, No. 13-12720, 2013 WL 4533085, at *5 (E.D. Mich. Aug. 27, 2013), *aff'd*, 567 F. App'x 362 (6th Cir. 2014). Again, the plaintiffs do not identify in what way Ford's warranty is so substantively unreasonable as to shock the conscience. To the contrary, courts recognize there "is nothing facially unconscionable about a five-year/60,000 mile warranty in the auto industry." *Roe*, 2019 WL 3564589, at *10.

*Third*, the plaintiffs' unconscionability count further fails because, while they assert Ford had "superior knowledge concerning the above described Transmission Defect," (Compl. ¶ 480), they have "not pled factual content" permitting such a

reasonable inference as to this bald conclusion. *Roe*, 2019 WL 3564589 at *10. "It follows that Plaintiffs have not pled the type of information asymmetry necessary to establish unconscionability." *Id.* In short, this count fails on every level.

### vi.   The fraud-based claims in Count VI likewise fail on many levels.

Count VI for "Fraud and/or Misrepresentation, including Fraudulent Concealment" is based not on any particular state or states' laws. And while unclearly presented, this fraud-based claim appears to be based on two theories: affirmative representation, and nondisclosure or active concealment. The plaintiffs' failure to plead essential facts concerning their vehicle purchases precludes a choice-of-law analysis, improperly frustrating full scrutiny of this claim. Regardless, it is clear that under Michigan law, at least,[16] as well as the universally applicable federal pleading standards under Rule 9(b), the plaintiffs' Count VI fails to state a claim under any theory and requires dismissal.

### 1.   The plaintiffs fail to state a claim based on any affirmative fraud.

For affirmative misrepresentations, "Rule 9(b) requires a plaintiff to allege 'the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' " *McKee*, 376 F. Supp. 3d at 760. It also requires the

---

[16] Again, Ford reserves the right to challenge the plaintiffs' claims under other states' laws, should the Court grant leave to amend and the plaintiffs replead their claims adequately, including by providing facts necessary for a choice-of-law analysis.

complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Dorr v. Wells Fargo Bank, N.A.*, No. 13-14526, 2014 WL 1328200, at *4 (E.D. Mich. Mar. 28, 2014) (Cox, J.).

Here, the plaintiffs allege conclusorily that "Ford repeatedly and publicly represented that the automatic transmissions in Fusion Vehicles provide superior function, utility, reliability and other benefits and characteristics"; yet the only representation they identify is the non-actionable marketing statement that the 2010 and 2011 Ford Fusion had a "smooth-shifting 6-speed automatic" transmission. (Compl. ¶ 495.) Their unidentified representations are obviously insufficient to support fraud under Rule 9(b), while their reliance on the lone marketing statement likewise fails.

*First*, the statement concerning a "smooth-shifting 6-speed automatic" is textbook subjective, non-actionable puffery. *E.g.*, *Nicholson*, 2016 WL 5463215, at *19 ("quietest riding, best handling coach on the market" was mere subjective opinion and nonactionable puffery); *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954 (Ala. 1995) (recognizing statement regarding "a 'smooth riding' car" was not a statement "of material fact," but was instead "merely sales talk").

*Second*, the plaintiffs plead no facts plausibly supporting that they actually relied on any such alleged marketing statements—much less any of the other

required facts. Instead, they offer only generic boilerplate allegations that are entirely implausible given what little facts they do plead. For example, they plead no facts plausibly supporting that any of the 373 plaintiffs who purchased other than 2010 and 2011 model-year Fusions would have seen and relied on the marketing brochure for those vehicles. Even among those who purchased a 2010 or 2011 Fusion, many bought them used several years after their release, when it would be entirely implausible they would have been exposed to the alleged marketing statements, much less reasonably relied on them—such as plaintiff Sevak, who bought her 2010 Ford Fusion used in February 2018. (Compl. ¶ 366.)[17]

*Third*, given that none of the plaintiffs allege any facts as to their actual experiences with their vehicles, they likewise have not sufficiently alleged facts plausibly supporting that, even as to the marketing statements concerning the 2010 and 2011, such statements were even false. Instead, the plaintiffs provide a laundry list of alleged issues lumped together under the label "Transmission Defect." (Compl. ¶ 387.) Meanwhile, no plaintiff identifies which issues, if any, they experienced—much less that any of them did not experience "smooth shifting." This failure further warrants dismissal. *See In re Ford Motor Co.*, 2019 WL 3000646, at *4 (dismissing misrepresentation claims based on statements about vehicle performance where complaint alleged only "problematic performance," which failed

---

[17] (*Also, e.g., id.* ¶¶ 17, 36, 38, 44, 47, 73, 78, 82, 88, 102, 161, 163, 202, 218, 225, 238, 247, 264, 290, 303, 306, 307, 318, 320, 328, 347, 355, 358, 372, 378 (same).)

to "render false a claim that it offered 'great handling on all roads,' 'the performance of a manual,' and 'seamless gear changes for amazing responsiveness'").

*Fourth*, the plaintiffs' lone allegations concerning Ford's purported "affirmative scheme" are nonsensical. (*See* Compl. ¶ 500.) According to plaintiffs, the "scheme" was that Ford misrepresented the nature of its vehicles "to prevent Plaintiffs from obtaining information about the nature and existence of their claims involving their vehicles' defective transmissions." (*Id.*) In other words, the alleged "scheme" is either the same as the alleged fraud itself (which is entirely circular), or else the plaintiffs confuse a claim for fraud with a tolling argument based on alleged fraudulent concealment of the existence of a claim. Regardless, they allege no facts plausibly supporting the required "scheme." *See McKee*, 376 F. Supp. 3d at 760.

Moreover, other allegations in their lone "scheme" paragraph are downright bizarre. (Compl. ¶ 500.) For example, the plaintiffs assert Ford charged " 'inspection fees' for warranty work in order to deter Plaintiffs from seeking repairs and submitting claims timely," (*id.*)—yet none of the 373 plaintiffs allege any such experiences. (*See id.* ¶¶ 5–379.) Nor does Ford perform warranty work or charge any fees—dealers and other service facilities do that, as is common knowledge. The plaintiffs also allege Ford refused "to service vehicles because Plaintiffs have commenced litigation against Ford, to limit the number of repairs or repair attempts." (*Id.*) None of the plaintiffs allege anything about any other litigation.

46

In sum, Count VI fails to state a claim for affirmative fraud or fraudulent misrepresentations on every level, warranting its dismissal on this ground.

### 2.    The plaintiffs' "silent fraud" theory also fails on numerous levels.

"To state a silent fraud claim (i.e., Michigan's version of fraudulent concealment) under Michigan law, 'mere nondisclosure is insufficient. There must be circumstances that establish a legal duty to make a disclosure.' " *Matanky*, 370 F. Supp. 3d at 793. A "legal duty to make a disclosure will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Id.* Meanwhile, a plaintiff's "failure to inquire dooms the silent-fraud claim" because, absent such an inquiry, the defendant has "no duty to make any further disclosure." *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 666 (6th Cir. 2013).

Here, the plaintiffs do not allege they made a specific inquiry to Ford regarding their transmissions' capabilities or performance attributes. To the contrary, they allege only—at most, and in the most conclusory and non-particularized manner—mere nondisclosure. (*E.g.*, Compl. ¶¶ 484–85, 490–91.) "Accordingly, their silent fraud claim fails to state a claim on which relief may be granted." *Matanky*, 370 F. Supp. 3d at 794. On this ground alone, the Court can and should dismiss the silent fraud/fraudulent concealment claim in Count VI.

In addition, claims involving fraudulent omissions require plaintiffs to plead, per Rule 9(b), " 'the who, what, when, where, and how' of the alleged omission." *Wozniak*, 2019 WL 108845, at *3. "Specifically, a plaintiff pleading a fraudulent omission must allege '(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud.' " *Id.* Moreover, such a claim requires plaintiffs to allege facts plausibly supporting that the "manufacturer knew of a defect before sale" as part of the "what" of the omission. *Id.*; *see also McKee*, 376 F. Supp. 3d at 761 ("Plaintiff identifies GM's 'knowledge of the defect' as the 'what' of his fraud claim.").

Here, the plaintiffs allege as the "what" Ford's purported failure to disclose knowledge of the vague "Transmission Defect." (*E.g.*, Compl. ¶ 490.) Primarily, this fails to satisfy the "what" requirement for the same reasons as other of their claims fail—because their amorphous "Transmission Defect" "merely describes performance problems with the vehicle and does not amount to identifying the defect that Ford failed allegedly to disclose. It is therefore insufficient." *In re Ford Motor Co.*, 2019 WL 3000646, at *7.

The "silent fraud" theory fails for additional reasons. As to Ford's purported knowledge of the vague "Transmission Defect" before individual plaintiff purchases, the plaintiffs rely on essentially two types of allegations: 1) the "TSBs"

48

and complaints to NHTSA, along with 2) boilerplate, generic references to items such as "pre-and post-production testing data . . . amongst other sources of internal information." (Compl. ¶¶ 393, 396–406, 487, 490(a).) Neither type suffices.

*First*, as shown above, the majority of the cited "TSBs" have nothing to do with the plaintiffs' alleged "Transmission Defect," the 6F35 transmission, or their vehicles. *See supra* at 8–10. The lack of any connection is further magnified considering none of the plaintiffs plead any facts as to what conditions *their* individual vehicles experienced. The same goes for many of the complaints to NHTSA—the plaintiffs don't identify how the issues discussed in the complaints relate to the "Transmission Defect" overall, much less to their specific experiences.

*Second*, as to both the "TSBs" and the complaints to NHTSA, the plaintiffs fail to identify which of them purport to evince Ford's knowledge of the alleged defect pre-dating *their* individual purchases. For example, on their face, items such as "TSBs" issued in 2013, 2014, 2015, or later cannot support knowledge by Ford of a defect pre-dating purchases by plaintiffs in 2010, 2011, or 2012. The same goes for the complaints to NHTSA, only *one* of which was filed before 2014 (Compl. ¶ 399(dddd) (filed November 4, 2013)), and the majority of which were not filed until 2018 or 2019 (*generally id.* ¶ 399); *also McKee*, 376 F. Supp. 3d at 761–62 (finding plaintiff's reliance on complaints to NHTSA insufficient, in part, because "most of Plaintiff's consumer complaints *post-date* his purchase of the vehicle").

49

Overall, this is like the complaint in *Beck v. FCA US LLC*,**Error! Bookmark not defined.** wherein the court found no plausible inference of knowledge of an alleged defect based on Chrysler's purported review of forty-three cited complaints to NHTSA because the plaintiff there did not "state how many of these complaints were filed *before* [the plaintiff] purchased" his vehicle. 273 F. Supp. 3d 735, 753 (E.D. Mich. 2018) (emphasis in original). Here, *none* of the 373 plaintiffs identify which of the complaints to NHTSA, "TSBs," or any other purported sources of information purportedly provided knowledge of any alleged defect before *their* individual vehicle purchases.

*Third*, the plaintiffs further misplace their reliance on the "TSBs" and complaints to NHTSA because, in such limited quantities, they provide no plausible support for the notion that Ford had "fair notice" that "one particular part is constantly having problems." *Roe*, 2019 WL 3564589, at *7. Indeed, after discarding those that have nothing to do with the Ford Fusion, its 6F35 transmission, and the plaintiffs' vague "Transmission Defect" (to the extent that is even discernable), the plaintiffs are left with a small number of complaints and "TSBs" over a ten-year period. This Court has recognized, however, that complaints about an alleged issue "must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day," which is the case with Ford, or GM, or Toyota, or any other manufacturer that sells "over two million vehicles in North

America each year." *Id.* Yet the complaint here "does not include factual allegations that make it reasonable to infer that complaints about and repairs of the [transmission] were anything more than a blip on Ford's complaints-and-repairs radar." *Id.* The plaintiffs' reliance on the NHTSA complaints further erodes because even assuming Ford's knowledge of each complaint, "it does not necessarily follow that Ford knew that the [transmission] was *defective*." *Id.* (emphasis in original).

Moreover, the plaintiffs' vehicles span eight model years, comprising over 1.8 million vehicles. Exs. 4-1–4-7 (showing sales of Ford Fusions from 2010 through 2017). Even crediting all the cited complaints to NHTSA (121), that would be a rate of only six one-thousandths of one percent (121 complaints ÷ 1,838,255 vehicles sold = a 0.006582% complaint rate). Yet the plaintiffs ignore this minimal rate, and give no indication of how it "compares to the failure rate of a part that the law would deem 'defective.' " *Roe*, 2019 WL 3564589, at *7. Thus, "even assuming Ford knew of all [transmission] complaints and repairs, more information is necessary to infer that Ford knew that the [transmission] was defective." *Id.*

The plaintiffs' boilerplate notice/knowledge allegations fare no better. (*E.g.*, Compl. ¶ 487.) Indeed, courts "routinely reject generalized allegations about testing' and manufacturer 'analyses' made in support of finding knowledge of a defect," such as the plaintiffs assert. *See McKee*, 376 F. Supp. 3d at 761; *also Beck*, 273 F. Supp.

3d at 753 (collecting cases).[18] Moreover, bald allegations about "testing" such as the plaintiffs' fails to support manufacturer knowledge where, as here, the complaint "does not say what the testing revealed." *Roe*, 2019 WL 3564589, at *6. To paraphrase *Roe*, even assuming the generic "testing" involved transmission testing, the Court would have to blindly infer that such testing "revealed some type of defect. But absent even a hint as to the test results, it is no more likely that the testing revealed a flawed [transmission] than a flawless [transmission]," which fails to meet the plausibility requirement. *Id.*

Similarly, allegations as to Ford's "internal records, communications with its dealerships or service technicians, and review of its warranty data are conclusory and insufficient because they do not plausibly allege" facts supporting that Ford "knew of the defect *prior* to the time it distributed" the plaintiffs' vehicles. *McKee*, 376 F. Supp. 3d at 762 (emphasis in original); (*see, e.g.*, Compl. ¶ 487).

By failing to plead facts plausibly supporting the "what" of any alleged fraudulent omission or concealment—a/k/a, silent fraud—the plaintiffs have "thus failed to satisfy Civil Rule 9(b)'s heightened particularity standard," and their "common-law fraud claim fails" on this ground. *McKee*, 376 F. Supp. 3d at 762.

### vii.    The unjust enrichment claim similarly fails for several reasons.

---

[18] *See also Wozniak*, 2019 WL 108845, at *3 n.4 (observing that although the *Beck* court's collection of cases was in connection with a claim under California law, its analysis was nonetheless equally applicable in general as to whether plaintiffs have adequately pled the "what" of alleged knowledge of a defect).

As their final count, the plaintiffs baldly assert a claim for "Unjust Enrichment," but again, under no state's law in particular—presumably, attempting for all 373 plaintiffs to rely on Michigan law. (Compl. ¶¶ 502–05.) Ford does not concede that Michigan law can or should rightly apply to these 373 plaintiffs' claims. However, because the plaintiffs have wholly failed to plead facts to properly inform a full choice-of-law analysis, and the plaintiffs have not sought to apply another state's laws, the Court can and should at a minimum analyze the plaintiffs' unjust-enrichment claim at least with respect to Michigan law, under which this claim fails.

"The elements of the quasi-contractual claim of unjust enrichment are a benefit conferred, awareness by the recipient that a benefit has been received and, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it." *Miller*, 2018 WL 2740240, at *15. However, "implying a contract-in-law to prevent unjust enrichment should be approached with some caution." *Zervos, Inc. v. Johnson*, No. 12-13121, 2013 WL 4833974, at *2 (E.D. Mich. Sept. 11, 2013). Here, the plaintiffs' claim fails for numerous reasons.

*First*, the plaintiffs premise their unjust enrichment claim on alleged fraud. (Compl. ¶ 504.) Rule 9(b) therefore applies as to this claim as well, yet this claim—like all the others—fails to provide the requisite particularity, requiring its dismissal.

*Second*, under Michigan law (as well as numerous other jurisdictions whose laws may apply),[19] where there is an express contract governing the subject matter at issue, "unjust enrichment claims must be dismissed." *Matanky*, 370 F. Supp. 3d at 803. For example, where—as here—the terms of a manufacturer's limited warranty govern "the parties' rights and obligations with respect to defects in materials and workmanship . . . no contract will be implied in law to defeat" the warranty's express terms. *Miller*, 2018 WL 2740240, at *15.

The plaintiffs may respond that the rules permit pleading in the alternative. But they have not done that; rather, their unjust enrichment claim incorporates by reference their express warranty claim, as well as the allegations that Ford's NVLW accompanied each and every one of the plaintiffs' vehicles. (Compl. ¶ 502; *also id.* ¶ 382.) Even pleading "in the alternative" would not save this claim because regardless of whether the plaintiffs can recover under it, Ford's NVLW is an agreement "which governs the same subject matter as the unjust enrichment claims." *Miller*, 2018 WL 2740240, at *15.

*Third*, this claim also fails for the same basic reasons as the others—i.e., insufficient facts plausibly supporting the existence of any actual defect from which it can be reasonably inferred that there is anything "unjust" or inequitable.

---

[19] *E.g.*, *McKee*, 376 F. Supp. 3d at 762 ("Under Florida law, 'the existence of an express contract between the parties concerning the same subject matter' precludes a claim for unjust enrichment.").

*Fourth*, this claim further fails for lack of "facts sufficient to establish that Ford obtained any benefit from the complained-of conduct." *Wozniak*, 2019 WL 108845, at 4. The plaintiffs baldly allege "Ford has profited and benefitted from the purchase and leasing of Plaintiffs' vehicles, in that Ford sold Plaintiffs defective products for the price of non-defective products." (Compl. ¶ 503.) Yet they plead no facts supporting this assertion, such as identifying what these "non-defective products" are and their relative cost. *Wozniak*, 2019 WL 108845, at *4. To the extent the plaintiffs were to argue that Ford unjustly benefitted from not repairing their vehicles under warranty, such a theory would likewise fail because none of them have "adequately plead presentment within the warranty period," thereby leaving this basis of any unjust enrichment claim "without merit." *Id.*

*Fifth*, the plaintiffs fail to allege facts plausibly supporting a benefit conferred on Ford—not as to any who purchased their vehicles new from a Ford dealer, and certainly not with respect to those who bought their vehicles used. *See In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03–4558, 2010 WL 2813788, at *33 (D.N.J. July 9, 2010), *am.*, 2011 WL 601279 (D.N.J. Feb. 16, 2011) (holding unjust enrichment claims failed both as to new and used vehicle purchases where plaintiffs failed to show a "sufficiently direct relationship . . . such that Ford received a benefit" from such purchases). For these reasons, the unjust enrichment claim fails.

## Conclusion

For these reasons, Ford asks that the Court dismiss this action in its entirety, (or at its election, strike the complaint and order a more definite statement to comply with Rules 8 and 9(b)), with Ford reserving the right to move against any amended complaint or supplemental statement should the Court allow it.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY:  /s/ Thomas P. Branigan
THOMAS P. BRANIGAN (P41774)
JODI MUNN SCHEBEL (P55889)
MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone:  248.205.3300
Facsimile:  248.205.3309
Email:  tom.branigan@bowmanandbrooke.com
Email:  jodi.schebel@bowmanandbrooke.com
Email:  matthew.berard@bowmanandbrooke.com

ROBERT WISE (*Admission pending*)
BOWMAN AND BROOKE LLP
901 East Byrd Street, Suite 1650
Richmond, VA 23219
Telephone: (804) 649-8200
Facsimile: (804) 649-1762
robert.wise@bowmanandbrooke.com

*Attorneys for Defendant Ford Motor Company*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2019, I electronically filed the foregoing paper Defendant Ford Motor Company's Motion to Dismiss with the Clerk of the Court using the ECF System, which will send notification to all ECF counsel of record.

**BOWMAN AND BROOKE LLP**

BY: /s/ Thomas P. Branigan
THOMAS P. BRANIGAN (P41774)
JODI MUNN SCHEBEL (P55889)
MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone: 248.205.3300
Facsimile: 248.205.3309
Email: tom.branigan@bowmanandbrooke.com
Email: jodi.schebel@bowmanandbrooke.com
Email: matthew.berard@bowmanandbrooke.com

*Attorneys for Defendant Ford Motor Company*