UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AARON GANT, et al.,

    Plaintiffs,

v.

FORD MOTOR COMPANY, INC.,

    Defendant.

Case: 2:19-cv-12533

Honorable Sean F. Cox

Magistrate Judge David R. Grand

**DEFENDANT FORD MOTOR COMPANY'S
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendant Ford Motor Company moves to dismiss the plaintiffs' First Amended Complaint (FAC) (ECF No. 12) under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), relying on the attached brief and accompanying exhibits.

On October 2, 2019, pursuant to E.D. Mich. LR 7.1(a), Ford's counsel sent the plaintiffs' counsel a detailed email outlining the scope of Ford's motion to dismiss the earlier complaint (ECF No. 1-1) and requesting a teleconference to discuss it. The plaintiffs' counsel responded that they would attempt to respond with their position on those issues, but did not before Ford's deadline for its motion to dismiss, which Ford filed on October 4, 2019 (ECF No. 9). On November 21, 2019, in response to the Court's order allowing the plaintiffs either to proceed on their original complaint or amend (ECF No. 10), the plaintiffs filed their FAC.

i

On January 10, 2020, Ford's counsel conferred with the plaintiffs' counsel by telephone concerning the nature of Ford's anticipated motion to dismiss the FAC and the legal bases for it—including by resending the October 2, 2019 email which addressed many of the same grounds for dismissal that would be raised against the FAC—and requested but did not obtain concurrence in the relief sought. Instead, the plaintiffs' counsel suggested they may seek further leave to amend, including perhaps to attempt to plead their claims according to the law applicable to their claims individually. On January 13, 2020, Ford advised the plaintiffs that it could not agree to further amendment at this time, including because Ford raised the plaintiffs' failure to plead their claims according to the applicable laws in its prior motion to dismiss, the Court had already granted the plaintiffs the opportunity to amend to address the issues Ford had raised, yet the plaintiffs did not remedy this failing (or others) in their FAC, nor would the limited amendment they suggested address other deficiencies in the FAC—i.e., overall, it would be futile.

WHEREFORE, Ford respectfully requests that the Court grant its motion[1] and dismiss the FAC in its entirety with prejudice.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY:  /s/ Thomas P. Branigan
     THOMAS P. BRANIGAN (P41774)

---

[1] By October 3, 2019 text entry, the Court granted leave to file excess pages on Ford's motion to dismiss (ECF No. 3), allowing opening briefs of 55 pages each.

JODI MUNN SCHEBEL (P55889)
MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone:  248.205.3300
Facsimile:  248.205.3309
Email:  tom.branigan@bowmanandbrooke.com
Email:  jodi.schebel@bowmanandbrooke.com
Email:  matthew.berard@bowmanandbrooke.com

*Attorneys for Defendant
Ford Motor Company, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AARON GANT, et al., | |
| Plaintiffs, | Case: 2:19-cv-12533 |
| v. | Honorable Sean F. Cox |
| FORD MOTOR COMPANY, | Magistrate Judge David R. Grand |
| Defendant. | |

**BRIEF IN SUPPORT OF FORD MOTOR COMPANY'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

## STATEMENT OF ISSUES PRESENTED

1.  <u>All Counts</u> – Pleading rules require complaints to be well-organized, with relevant and factually supported allegations tailored to the elements of the plaintiffs' individual, discrete claims asserted, and the claims plead according to the applicable law. The amended complaint here, at 376 pages with hundreds of pages of exhibits, conflates claims by 360 plaintiffs regarding their individual purchases of vehicles spanning eight model years and over the course of 10 years, across dozens of states. If possible, this amended complaint is even more muddled and confusing than its predecessor, in that the plaintiffs all still fail to provide any well-pled facts identifying any actual defect. None of them allege their claims under the laws applicable to their claims and they all purport to rely on the same generic set of facts as to issues such as Ford's purported knowledge of a vague alleged "Transmission Defect" despite the patent irrelevance and inapplicability of those facts to their claims. The plaintiffs who have pled some facts as to their vehicle experiences show their claims are affirmatively barred for various reasons. Moreover, dozens of plaintiffs still provide no well-pled facts supporting their claims, and instead recite merely that they purchased a Ford Fusion, with no other individual factual allegations. Should the Court dismiss the amended complaint in its entirety under Rules 8 and 12(b)(6)?

2.  <u>All Counts as to Certain Plaintiffs</u>[2] – Under Michigan's applicable statutes of limitations, and as to those plaintiffs who could even assert the claims alleged (which is not clear due to the paucity of facts properly alleged):  (1) the express warranty claims accrued either upon tender, or upon Ford's purported failure to repair or replace the allegedly defective vehicle component, (2) the implied warranty claim accrued upon tender of delivery, and (3) the fraud-based and unjust enrichment claims accrued upon original sale. Here, putting aside the plaintiffs' failure to provide essential facts as to their claims, it is clear that: (1) many plaintiffs' express warranty claims are barred under any set of facts, (2) many more of the implied warranty claims are facially time-barred, and (3) the same goes for the fraud-based and unjust enrichment claims. Meanwhile, the plaintiffs fail to adequately plead any applicable tolling doctrine. Should the Court dismiss these claims with prejudice as time-barred?

---

[2] Exhibit 1.1 is a chart showing those plaintiffs whose claims are facially time-barred.

i

3.     Count I – As for the express warranty claim, the plaintiffs still provide no well-pled facts plausibly supporting the terms of their warranties, that there was a warranty-covered actual defect, or that their alleged issues are covered by the terms of any applicable express warranty. Moreover, scores of plaintiffs still fail to allege even the most basic facts as to their compliance with those warranties (e.g., timely presentment to a Ford dealership for repair), much less any breach of those warranties, including failing to allege any facts supporting the occurrence of a warranted condition that arose within the earlier of the mileage and time limits. Should the Court dismiss the express warranty claim as to all plaintiffs?

4.     Count II – As for the implied warranty claim, the plaintiffs again provide no well-pled facts supporting any lack of merchantability, including failing to identify any actual defect, as well as failing to allege any facts as to timely notice to Ford. Moreover, for many of the plaintiffs, a lack of vertical privity bars their claims under the applicable states' laws. Should the Court dismiss the implied warranty claim as to all plaintiffs?

5.     Count III – The plaintiffs assert a claim for revocation of acceptance under Michigan law despite the fact that (1) such is merely a remedy for a breach of warranty as opposed to an independent cause of action, (2) Michigan law does not apply to the vast majority of the plaintiffs' claims based on their allegations, (3) their underlying warranty claims fail, (4) the plaintiffs don't provide sufficient facts plausibly supporting the elements of entitlement to restitution, and (5) even as a remedy, revocation is unavailable against a remote manufacturer such as Ford. Should the Court dismiss this purported claim as to all plaintiffs?

6.     Count IV – As for the MCPA claim, (1) Michigan law exempts new-vehicle purchases, (2) there is no basis for an MCPA claim against Ford based on a used-vehicle purchase, (3) the plaintiffs fail to plead the elements with the required Rule 9(b) particularity, and (4) beyond the preceding flaws, at most, only those few plaintiffs who actually purchased their vehicles in Michigan could pursue such a claim. Nonetheless, even they still fail to plead facts plausibly supporting this claim. Should the Court dismiss this claim as to all plaintiffs?

7.     Count V – The fifth count is for "UCC – Unconscionability" even though this is merely a defense against enforcement of a contract provision, and even as such, it requires pleading as to both procedural and substantive unconscionability, neither of which the plaintiffs adequately plead. Moreover, as an adjunct to a claim

involving alleged breach of warranty, this purported claim would nonetheless fail given the lack of any viable underlying warranty claim. Should the Court dismiss this count as to all plaintiffs?

8.      <u>Counts VI, VII, and VIII</u> – The plaintiffs assert various fraud-based claims, but under no particular states' laws, and without providing any well-pled, particularized supporting facts as required under Rule 9(b) for such claims. The economic-loss rule, meanwhile, bars these fraud-/tort-based claims. Moreover, these various theories further fail for numerous other reasons, including failure to plead any actual defect, much less Ford's knowledge thereof predating the plaintiffs' vehicle purchases.  Should the Court dismiss the fraud-based claims in Counts VI, VII, and VIII as to all plaintiffs?

9.      <u>Count IX</u> – The unjust enrichment claim is not pled under any applicable states' laws, and even under Michigan law, the plaintiffs nonetheless fail to plead facts plausibly supporting the elements of this claim. Moreover, Michigan law bars such a claim where—as here—there is an express contract addressing the subject matter. Moreover, the plaintiffs premise their unjust enrichment claim on alleged fraud, yet they fail to comply with Rule 9(b), and the economic-loss rule otherwise bars such a fraud-based theory of relief. Should the Court dismiss this claim as to all plaintiffs?

# CONTROLLING OR MOST APPROPRIATE AUTHORITY[3]

*Agee v. Alphatec Spine, Inc.*, No. 1:15-cv-00750-TSB, 2017 WL 5706002 (S.D. Ohio. Mar. 27, 2017)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Beck v. FCA US LLC*, 273 F. Supp. 3d 735 (E.D. Mich. 2018)

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

*Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008)

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL 3000646 (C.D. Cal. May 22, 2019)

*In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)

*Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772 (E.D. Mich. 2019)*

*McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751 (E.D. Mich. Mar. 25, 2019)*

*Miller v. Gen. Motors, LLC*, No. 17-CV-14032, 2018 WL 2740240 (E.D. Mich. June 7, 2018)*

*Roe v. Ford Motor Co.*, No. 2:18-cv-12528-LJM-APP, 2019 WL 3564589 (E.D. Mi. Aug. 6, 2019)*

*Tomas v. Ill. Dept. of Empl. Sec.*, No. 07 C 4542, 2009 WL 2916840 (N.D. Ill. Sept. 2, 2009)

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771 (7th Cir. 1994)

*Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015)

*Wozniak v. Ford Motor Co.*, No. 2:17-cv-12794, 2019 WL 108845 (E.D. Mich. Jan. 4, 2019)*

---

[3] Cases appended per the Court's Practice Guidelines are indicated with an *.

# TABLE OF CONTENTS

**Introduction** ................................................................................. 1

**Factual Background** ................................................................... 4

A. In this third complaint by many of the same plaintiffs, 360 Ford Fusion purchasers from 41 different states join together in a 376-page complaint. ........................................................................... 4

B. The plaintiffs allege various warranty and fraud-based claims for unidentified vehicle "defects," including a vague "Transmission Defect." ..................................................................................... 5

C. The plaintiffs again cite various complaints to NHTSA, TSBs, and CSPs, but again without identifying which are purportedly relevant to individual plaintiffs' vehicles and claims. ................................. 8

D. Again without pleading their claims according to the laws applicable to their claims individually, the plaintiffs all assert the same nine counts. ................................................................................. 10

**Argument** ................................................................................. 11

A. The plaintiffs' FAC remains an improper "shotgun" pleading—prolix, confusing, conflating, indiscriminate, and overall violative of Rule 8. ................................................................................. 13

    I. Beyond the facial improprieties of the plaintiffs' prolix and confusing complaint, their claims require dismissal for numerous other reasons. ..................................................................... 19

        A. Under applicable Michigan procedural law, most of the plaintiffs' claims require dismissal as outright time-barred. ........................................................................... 19

            i. Many plaintiffs' warranty claims are outright time-barred. ...................................................................... 19

            ii. Many plaintiffs' fraud-based claims are also facially time-barred. ................................................................. 22

        B. The plaintiffs fail to plead facts plausibly supporting any tolling. ...................................................................... 23

        C. The plaintiffs' claims all fail on substantive grounds as well. ....................................................................... 26

i.   The breach of express warranty claim fails for numerous reasons. ............................................................. 26

ii.  The plaintiffs likewise fail to state valid implied warranty claims. ................................................................. 30

iii. Count III fails because, among other reasons, revocation and UCC damages are not stand-alone causes of action, and revocation is not available even as a remedy against a remote manufacturer. ...................... 33

iv.  The MCPA claim fails on numerous grounds. ................... 35

   1. Only plaintiffs who actually bought their vehicles in Michigan could even theoretically pursue an MCPA claim. ........................................................................ 35

   2. The MCPA exempts new vehicle purchases, while there is no actionable transaction as to used-vehicle purchases. ..................................................................... 37

   3. The MCPA claim further lacks Rule 9(b) particularity. .................................................................. 38

v.   The "Unconscionability" claim also fails for several reasons. ........................................................................... 39

vi.  The fraud-based claims (Counts VI–VIII) fail on many levels. .............................................................................. 41

   1. The plaintiffs fail to plead fraud with Rule 9(b) particularity. .................................................................. 41

      a. The plaintiffs fail to plead the "who" with Rule 9(b) particularity. .................................................... 42

      b. The plaintiffs fail to plead the "what" per Rule 9(b). ........................................................................ 43

   2. The economic-loss rule bars the fraud-based claims. .................................................................................. 48

   3. Each fraud-based claim also fails on numerous other levels. ............................................................... 48

      a. The "Affirmative Fraud" claims fails for additional reasons. .................................................... 48

      b. "Silent Fraud" likewise fails for additional reasons. ....................................................................... 51

c. "Innocent Misrepresentation" also fails for additional reasons. .................................................. 52

vii.   The Unjust Enrichment claim similarly fails for several reasons. .................................................. 53

**Conclusion**.................................................................................. 55

# INDEX OF AUTHORITIES

## Cases

*Agee v. Alphatec Spine, Inc.*,
   No. 1:15-cv-00750-TSB, 2017 WL 5706002 (S.D. Ohio. Mar. 27,
   2017)................................................................................................. 13, 18

*Allen v. Mich. Bell Tel. Co.*,
   171 N.W.2d 689 (Mich. Ct. App. 1969)..............................................40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................... 3, 11

*Beck v. FCA US LLC*,
   273 F. Supp. 3d 735 (E.D. Mich. 2018) ......................................... 45, 47

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................... 3, 11

*Boyle v. General Motors Corp.*,
   661 N.W.2d 557 (Mich. 2003) ............................................................23

*Callaghan v. BMW of N. Am., LLC*,
   No. 13-cv-04794-JD, 2014 WL 6629254 (N.D. Cal. Nov. 21, 2014) ................46

*Cyr v. Ford Motor Co.*,
   No. 345751, 2019 WL 7206100 (Mich. Ct. App. Dec. 26, 2019) ......................38

*Darne v. Ford Motor Co.*,
   No. 13 CV 03594, 2017 WL 3836586 (N.D. Ill. Sept. 1, 2017) .................. 28, 29

*Davis v. Coca-Cola Bottling Co. Consol.*,
   516 F.3d 955 (11th Cir. 2008) .............................................................13

*Downing v. Ford Motor Co.*,
   No. 17-10652, 2018 WL 3301210 (E.D. Mich. Feb. 5, 2018),
   (adopting report and recommendation), No. 17-CV-10652, 2018
   WL 1417599 (E.D. Mich. Mar. 22, 2018), *aff'd*, No. 18-1335, 2018
   WL 4621955 (6th Cir. Sept. 24, 2018)..................................................12

*Ducharme v. A & S RV Ctr., Inc.*,
   321 F. Supp. 2d 843 (E.D. Mich. 2004) .............................................30

*Duffie v. Mich. Grp., Inc. - Livingston*,
   No. 14-CV-14148, 2016 WL 8259511 (E.D. Mich. Jan. 15, 2016)....................54

*Farm Bureau Mut. Ins. Co. of Mich. v. CNH Indus. Am., LLC*,
   No. 1:14-CV-704, 2015 WL 11439053 (W.D. Mich. Aug. 25, 2015)................34

*Fedrick v. Mercedes-Benz USA, LLC*,
   366 F. Supp. 2d 1190 (N.D. Ga. 2005) ................................................29

*Fitzgerald v. Chrysler Corp.*,
   No. 96 C 0021, 1996 WL 473456 (N.D. Ill. Aug. 16, 1996) ...............................36

*Frank v. Dana Corp.*,
  547 F. 3d 564 (6th Cir. 2008) ...............................................................12
*Gardner v. Quicken Loans, Inc.*,
  No. 13-12720, 2013 WL 4533085 (E.D. Mich. Aug. 27, 2013) ..........40
*Gertz v. Toyota Motor Corp.*,
  No. CV 10-1089 PSG (VBKx), 2011 WL 3681647 (N.D. Cal. Aug.
  22, 2011) ..............................................................................................27
*Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*,
  894 N.W.2d 700 (Mich. 2016) .............................................................20
*Hammoud v. U.S. Attorney*,
  No. 14-14398, 2015 WL 4756582 (E.D. Mich. Aug. 12, 2015) ..........11
*Harnden v. Ford Motor Co.*,
  408 F. Supp. 2d 315 (E.D. Mich. 2005) ...............................................33
*Henderson v. Chrysler Corp.*,
  477 N.W.2d 505 (Mich. Ct. App. 1991)................................................33
*Highsmith v. Chrysler Credit Corp.*,
  150 B.R. 997 (N.D. Ill. 1993)...............................................................36
*Hudson v. Genesee Intermediate Sch. Dist.*,
  No. 14-11939, 2015 WL 128030 (E.D. Mich. Jan. 8, 2015)............5, 6
*In re Auto. Parts Antitrust Litig.*,
  No. 12-MD-02311, 2017 WL 7689654 (E.D. Mich. May 5, 2017)...................25
*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*,
  No. CV1706656ABFFMX, 2019 WL 3000646 (C.D. Cal. May 22,
  2019) ...................................................................... 26, 27, 43, 49
*In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*,
  No. 03–4558, 2010 WL 2813788 (D.N.J. July 9, 2010) ......................54
*In re Refrigerant Compressors Antitrust Litig.*,
  No. 2:09-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)..... 18, 41, 53
*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
  No. 05 C 2623, 2009 WL 937256 (N.D. Ill. Apr. 6, 2009).................................49
*Johnson v. Ventra Grp., Inc.*,
  191 F.3d 732 (6th Cir. 1999) ................................................................19
*Kahn v. Burman*,
  673 F. Supp. 210 (E.D. Mi. 1987) ........................................................52
*King v. Taylor Chrysler-Plymouth, Inc.*,
  457 N.W.2d 42 (Mich. Ct. App. 1990)..................................................35
*Kinner v. Ford Motor Co.*, No. 2:19-cv-10583-SFC-DRG (ECF No. 1)
  (E.D. Mi. Feb. 26, 2019) ............................................................. 5, 20
*Liss v. Lewiston-Richards, Inc.*,
  732 N.W.2d 514 (Mich. 2007) ...................................................... 37, 38

*MacDonald v. Thomas M. Cooley Law Sch.*,
   724 F.3d 654 (6th Cir. 2013) ................................................................52

*Mason v. Chrysler Corp.*,
   653 So. 2d 951 (Ala. 1995) ..................................................................51

*Matanky v. Gen. Motors LLC*,
   370 F. Supp. 3d 772 (E.D. Mich. 2019) ....................................... passim

*McKee v. Gen. Motors LLC*,
   376 F. Supp. 3d 751 (E.D. Mich. Mar. 25, 2019) ........................ passim

*McQueen v. BMW of N. Am., LLC*,
   No. CIV.A. 12-6674 SRC, 2013 WL 4607353 (D.N.J. Aug. 29,
   2013) ....................................................................................................27

*Miller v. Gen. Motors, LLC*,
   No. 17-CV-14032, 2018 WL 2740240 (E.D. Mich. June 7, 2018) ............. passim

*Murphy v. The Proctor & Gamble Co.*,
   695 F. Supp. 2d 600 (E.D. Mich. 2010) ...............................................48

*Nicholson v. Jayco, Inc.*,
   No. 5:15-CV-2010, 2016 WL 5463215 (N.D. Ohio Sept. 29, 2016)........... 39, 51

*Nw. Acceptance Corp. v. Almont Gravel, Inc.*,
   412 N.W.2d 719 (Mich. Ct. App. 1987).................................................40

*Pilgrim v. Universal Health Card, LLC*,
   660 F.3d 943 (6th Cir. 2011) ................................................................36

*Republic Bank & Tr. Co. v. Bear Stearns & Co.*,
   683 F.3d 239 (6th Cir. 2012) ................................................................42

*Roe v. Ford Motor Co.*,
   No. 2:18-cv-12528-LJM-APP, 2019 WL 3564589 (E.D. Mi. Aug. 6,
   2019) .............................................................................................. passim

*Romeo Inv. Ltd. v. Mich. Consol. Gas Co.*,
   No. 260320, 2007 WL 1264008 (Mich. Ct. App. May 1, 2007)........................22

*Rosa v. Am. Water Heater Co.*,
   177 F. Supp. 3d 1025 (S.D. Tex. 2016) .................................................26

*Rosen v. Chrysler Corp.*,
   No. 97-CV-60374-AA, 2000 WL 34609135 (E.D. Mich. July 18,
   2000) ....................................................................................................36

*Rosenbaum v. Toyota Motor Sales, USA, Inc.*,
   No. 16-CV-12645, 2016 WL 9775018 (E.D. Mich. Oct. 21, 2016) ............. 30, 37

*Sautner v. Fleetwood Enters., Inc.*,
   No. 05-73252, 2007 WL 1343806 (E.D. Mich. May 8, 2007).............................34

*Schechner v. Whirlpool Corp.*,
   237 F. Supp. 3d 601 (E.D. Mich. 2017) ................................................27

*Sloan v. Gen. Motors LLC*,
  No. 16-cv-07244-EMC, 2017 WL 3283998 (N.D. Cal. Aug. 1, 2017................27
*Smith v. Bank of Am. Corp.*,
  No. CIV. 10-14161, 2011 WL 653642 (E.D. Mich. Feb. 14, 2011)...................42
*Snyder v. Boston Whaler, Inc.*,
  892 F. Supp. 955 (W.D. Mich. 1994)................................................................33
*Tomas v. Ill. Dept. of Empl. Sec.*,
  No. 07 C 4542, 2009 WL 2916840 (N.D. Ill. Sept. 2, 2009)........................ 14, 17
*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
  20 F.3d 771 (7th Cir. 1994)..............................................................................12
*Walsh v. Ford Motor Co.*,
  588 F. Supp. 1513 (D.D.C.), *am.*, 592 F. Supp. 1359 (D.D.C. 1984),
  & *am.*, 612 F. Supp. 983 (D.D.C. 1985) ............................................................17
*Weiland v. Palm Beach County Sheriff's Office*,
  792 F.3d 1313(11th Cir. 2015)..................................................................... 12, 13
*Woodland Harvesting, Inc. v. Ga. Pac. Corp.*,
  693 F. Supp. 2d 732 (E.D. Mich. 2010) ...........................................................42
*Wozniak v. Ford Motor Co.*,
  No. 2:17-cv-12794, 2019 WL 108845 (E.D. Mich. Jan. 4, 2019) .... 29, 30, 43, 54

**Rules**

Fed. R. Civ. P. 26 .............................................................................................3
Fed. R. Civ. P. 8 ......................................................................... 11, 13, 18, 42
Fed. R. Civ. P. 9 .............................................................................. passim
Mich. Comp. Laws § 440.2313 .......................................................................19
Mich. Comp. Laws § 440.2608 .......................................................................34
Mich. Comp. Laws § 440.2725 .......................................................................21
Mich. Comp. Laws § 440.2725(1) ...................................................................20
Mich. Comp. Laws § 440.2725(3) ...................................................................20
Mich. Comp. Laws § 445.904(1) ............................................................... 37, 38
Mich. Comp. Laws § 445.911 ..........................................................................22
Mich. Comp. Laws § 445.911(3) .....................................................................36
Mich. Comp. Laws § 600.5827 ........................................................................23
U.C.C. § 2-302(1) ...........................................................................................40
U.C.C. § 2-313 ...............................................................................................19
U.C.C. § 2-607(3)(a) .......................................................................................32
U.C.C. § 2A-210 .............................................................................................19

## Introduction

For the majority of the 360 plaintiffs[4] in this mass complaint, this is the *third* attempt to plead their claims. After filing and later dismissing essentially the same claims in the related *Kinner* action, the majority of these plaintiffs—joined by over 100 more—refiled largely the same claims. Ford moved to dismiss, and the Court gave the plaintiffs a choice:  amend or respond. The plaintiffs filed their FAC.

Ford's earlier motion pointed out a multitude of deficiencies, including that their warranty claims lacked any facts as to any of the plaintiffs' individual vehicle and warranty-claim experiences. And their fraud-based claims fell even farther short of the mark, failing to plead with Rule 9(b) particularity facts such as who said what to whom and when, what statements or representations each individual plaintiff purportedly relied on, and why those statements were purportedly false.

Ford's motion, however, highlighted even more fundamental defects. For example, it showed that the plaintiffs' approach of lumping together generalized allegations spanning nearly a decade of vehicle purchases by hundreds of plaintiffs, and asserting the same facts and legal counts as to each plaintiff regardless of applicable law and whether the facts supported their claims, individually obfuscated and frustrated proper legal scrutiny of their claims. Ford's motion also showed that

---

[4] This count is based on the number of vehicles at issue. (FAC ¶¶ 116–490.) Of the total 375 plaintiffs, 15 assert their claims are "scheduled to be dismissed without prejudice," leaving a total of 360. (*E.g.*, FAC ¶ 184.)

1

the plaintiffs' entire premise—that because some but not all of them had claimed to experience a wide array of alleged driving conditions, their 360 vehicles spanning nearly a decade of model years covering with different transmission designs nonetheless all had a common "Transmission Defect"—fundamentally failed to properly allege the existence of *any* actual defect.

The FAC does nothing to address either these fundamental flaws or the vast majority of the numerous other pleading defects Ford raised. The FAC still lumps together allegations spanning nearly a decade, without identifying which facts apply to which plaintiffs. The FAC still asserts the same boilerplate counts as to each and every plaintiff—who hale from and bought their vehicles in over 40 different states—without pleading their claims according to the applicable law. The FAC still asserts the same conclusory "Transmission Defect" based on vague allegations of myriad different purported driving conditions, which approach Ford's prior motion showed numerous courts have rejected. And the FAC still wholly lacks any particularized facts whatsoever to support the various fraud-based claims.

The main difference with the FAC is that now many plaintiffs have alleged facts showing their claims are affirmatively barred and wholly unsupported, such as the scores of plaintiffs who assert Ford breached its written warranty, yet allege facts showing they bought their vehicles long *after* that warranty coverage had already expired; or the plaintiffs who don't allege ever having sought any warranty coverage;

or the plaintiffs who, despite asserting fraud, don't allege to have been exposed to or relied on *any* representations by Ford. In short, the FAC fixes nothing.

The plaintiffs now insist they need burdensome discovery from Ford before they can comply with Rules 8 and 9(b), and they demand responses to over 180 discovery requests (attached as Exs. 3.1–3.3)—all of which span the eight model years of vehicles, and many of which seek separate answers as to each of the 360 plaintiffs and their vehicles. The plaintiffs unilaterally sent this discovery *without* agreement or leave of Court, in violation of Rule 26(d)(1).

It is well recognized that "the doors of discovery" are not unlocked "for a plaintiff armed with nothing more than conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), and that courts should rightly "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Here, after multiple pleading attempts, the plaintiffs' FAC remains woefully fundamentally deficient on numerous levels. The plaintiffs' sweeping premature discovery is not only legally backwards, per *Twombly* and *Iqbal*, it also would do nothing to cure the myriad flaws Ford highlights, such as the continued failure to plead according to the applicable law, the failure to weed out plaintiffs and claims which on the meager facts alleged show they are unfounded, the improper aggregation and conflation of 360 plaintiffs' separate claims, and the wholesale lack of any particularized facts on alleged fraud.

Indeed, on this latter point, there is nothing Ford could produce in discovery that would cure the gaping hole in the fraud allegations where the plaintiffs have failed to allege what they personally supposedly saw, heard, or relied on—those facts would reside solely with the plaintiffs, not Ford.

Now, on the day Ford's motion is due, the plaintiffs moved for leave to file an 828-page *Second* Amended Complaint (SAC), with no explanation for why they did not attempt these amendments in their FAC. (ECF No. 19-2.) Aside from restructuring their claims to assert them generically under the various states' laws, the SAC continues to ignore numerous pleading defects—it still provides no Rule 9(b) particularity, still asserts patently baseless claims, still fails to plead the plaintiffs' claims individually, and still fails to provide even the most basic of facts for scores of plaintiffs, among other flaws. Ford will timely respond to the motion to amend. But for now, the only things the SAC does is concede the FAC's failure to plead according to applicable law, and confirm that not only should the Court grant Ford's motion and dismiss, but that it should do so with prejudice.

**Factual Background**

**A.    In this third complaint by many of the same plaintiffs, 360 Ford Fusion purchasers from 41 different states join together in a 376-page complaint.**

This complaint spans 376 pages and 584 paragraphs (not including subparagraphs and exhibits), and includes 360 plaintiffs from 41 states. (*Generally* FAC.) This is now the third go-around for most, however, as over 190 of the current

4

plaintiffs were also in the largely identical mass-action filed in this Court in February 2019. *Kinner v. Ford Motor Co.*, No. 2:19-cv-10583-SFC-DRG (ECF No. 1) (E.D. Mi. Feb. 26, 2019).[5] Before Ford could respond, the *Kinner* plaintiffs dismissed, refiling this action two months later with an additional 169 plaintiffs. Ford moved to dismiss. Instead of responding (and with leave), the plaintiffs filed this FAC.

**B.    The plaintiffs allege various warranty and fraud-based claims for unidentified vehicle "defects," including a vague "Transmission Defect."**

Between 2009 and 2019, these 360 plaintiffs bought 2010 to 2017 model-year Ford Fusions, which, as they acknowledge, comprise several different models, with different transmissions. (FAC ¶¶ 16, 116–490.) The plaintiffs assert "this lawsuit is a breach of warranty/fraud case based on defective transmissions" in their vehicles. (*Id.* ¶ 1.) The plaintiffs don't identify what specifically is purportedly defective about their transmissions. Instead, at most, some of them merely allege experiencing one or more from among a largely generic checklist of assorted conditions. (*E.g.*, *id.* ¶ 116.) Meanwhile, many plaintiffs provide no such information, and instead provide only the model year, VIN, and purchase date. (*E.g.*, *id.* ¶ 118); *also* Ex. 1.2.

The plaintiffs allege their vehicles were all "backed by a New Vehicle Limited Warranty" (NVLW), which they neither append nor allege the specific terms of, other than to state they covered "any repairs needed to correct defects in materials

---

[5] *Hudson v. Genesee Intermediate Sch. Dist.*, No. 14-11939, 2015 WL 128030, at *2 (E.D. Mich. Jan. 8, 2015) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it.").

or workmanship of covered parts," with powertrain coverage—covering the transmission—for the earlier of "60 months or 60,000 miles." (*Id.* ¶ 13.) The Court may take notice of the NVLWs. (ECF No. 9, Exs. 2.1–2.8); *Hudson*, 2015 WL 128030, at *2.

Unlike in their prior complaint, many plaintiffs now identify from whom they bought their vehicles, which, in many instances, show they bought them used, often after many years in service, with high mileage, and from non-Ford-affiliated sellers—such as plaintiff Parra, who bought his 2011 Ford Fusion in 2015, with well over 60,000 miles, from "Jose's Auto Salvage Yard." (FAC ¶ 483.)

Many plaintiffs also now assert some facts as to when they first experienced any alleged issues, which they generically label as caused by their vague "Transmission Defect." For many of them, these newly added facts show vehicle purchases actually *post*-dating when their NVLWs expired (*e.g.*, FAC ¶¶ 199, 477), or allege issues that arose for the first time only *after* the NVLWs expired (*e.g.*, *id.* ¶¶ 126–28.) Meanwhile, many others still plead no facts as to when they experienced any alleged issues or showing that they ever sought warranty coverage (*e.g.*, *id.* ¶¶ 121, 135), while many others allege they sought repairs only *outside* warranty (*e.g.*, *id.* ¶ 124.) While many allege their vehicles *were repaired*. (*E.g.*, *id.* ¶¶ 122, 132.)

For alleged fraud, the FAC includes some new allegations concerning alleged marketing representations. (FAC ¶¶ 27–47.) Many of these marketing materials,

6

however, do not even pertain to 2010 through 2017 Fusions, and instead pertain only to prior model-year iterations. (*E.g.*, *Id.* Exs. A–D.) None of the plaintiffs alleges to have seen, read, heard, or relied on these materials. In fact, even as to the limited materials cited with respect to 2010 through 2017 model years (*e.g.*, *id.* Exs. E–R), no plaintiff specifically identifies having seen, read, heard, or relied on any of them.

Instead, some plaintiffs include in their "Plaintiff-Specific Allegations" boilerplate references to what they supposedly saw and relied on "in deciding on Vehicle [sic]." (*E.g.*, *id.* ¶ 121.) For example, some allege they saw and relied on "Internet Marketing" (*id.*), but don't identify what that was, where or when they saw it, nor what it purportedly said. Some allege they relied on "TV, Radio or Billboard Ad's" (*e.g.*, *id.* ¶ 122), but again don't identify what those were, when they ran, nor what they said. Several plaintiffs mention "Historical Brand Slogans" (*e.g.*, *id.* ¶ 132), or "Consumer Awards/Reviews" (*e.g.*, *id.* ¶ 166), with no indication what those were. While some identify "Dealership Salesperson" as the "advertisement or representation by Ford" on which they relied, with no indication of who the salesperson was or what was supposedly said. (*E.g.*, *id.* ¶ 145.) Rather, where any plaintiffs allege they received and relied on representations by "Ford dealership sales personnel," they identify only generic snippets, such as "Vehicle Dependability," "Drivability," and "Reliability." (*E.g.*, *id.* ¶ 123.) Again, no plaintiff identifies who made such representations, when, nor what in particular was said.

**C.      The plaintiffs again cite various complaints to NHTSA, TSBs, and CSPs, but again without identifying which are purportedly relevant to individual plaintiffs' vehicles and claims.**

Ford's previously highlighted the lack of any well-pled factual allegations supporting its supposed knowledge of the vague "Transmission Defect" pre-dating the plaintiffs' individual purchases. (ECF No. 9.) Oddly, the plaintiffs responded by including in their FAC numerous allegations concerning *other* vehicles and *other* alleged issues—including allegations involving the entirely different DPS6 transmission found *not* in the Fusion but instead in Ford Focus and Fiesta vehicles— as well as allegations concerning issues involving brakes, airbags, steering wheels, and wheels, which have nothing to do with the plaintiffs' vague alleged "Transmission Defect." (FAC ¶¶ 79, 80; *id.* Exs. Y, Z, AA, BB, CC, EE.)

Even as to the limited number of alleged issues actually involving transmissions in some manner, the plaintiffs don't identify which—if any—of those issues Ford was supposedly aware of before they bought their vehicles. For example, the plaintiffs cite a July 11, 2017 newspaper article discussing a small recall involving only a limited number of Ford Fusions that were manufactured at one particular plant between May and mid-June 2017. (*Id.* ¶ 80 & Ex. DD.) No plaintiff identifies their vehicle as within this extremely limited recall population, nor does the FAC identify to which plaintiff's claim—if any—this recall is relevant and why.

In addition, in their FAC (as in its predecessor), the plaintiffs cite some programs Ford initiated to address various disparate vehicle performance issues over the past decade as supposedly addressing the "Transmission Defect"—for example, Customer Satisfaction Program (CSP) 17B38. (*Id.* ¶ 83.) That CSP, however, involved a possible condition in "some" vehicles—i.e., certain 2017 Ford Fusions built between certain dates at one plant—"if the ignition is briefly powered on and off, the powertrain control module (PCM) may not fully complete the shutdown process. As a result, the PCM will remain powered which results in excessive current draw and can lead to a drained battery." (*Id.* & n.13.) No plaintiff alleges having a "drained battery," and the FAC provides nothing to explain any relevance of this CSP to any plaintiffs' claims for allegedly defective transmissions.

The plaintiffs also rely (as they did before) on some Technical Service Bulletins, or TSBs, which they assert "detail the same Transmission Defects that Plaintiffs complain of here." (*Id.* ¶ 62.) On their face, this handful of TSBs address disparate issues impacting different model years of Fusion vehicles (and some others), with different root causes and different resolutions. (*Id.* Ex. U.) The plaintiffs allege Ford did not "share that knowledge" concerning the TSBs with them or the public (*id.* ¶ 66), yet these TSBs are all publicly available. In fact, one of the cited "TSBs" is actually a voluntary safety recall, of which Ford sent notice directly to vehicle owners. (FAC Ex. U, ECF No. 14-9, PageID 2167.)

In addition, as before, the FAC references some customer complaints located on NHTSA's "Safercar.gov" website—423 for the 6F35 Ford Fusion transmission for model years 2010 to 2017, and 150 for the hybrid HF35 transmission in the 2013 to 2017 model years. (FAC ¶ 52, Exs. S & T.) These customer complaints include many involving 2010 to 2012 model-year Fusions, despite the fact that—as the plaintiffs allege—some 2010 to 2012 Fusions "contain a different type of six-speed automatic transmission" that none of the plaintiffs own and is not at issue here. (FAC ¶ 16(c).) As before, many of these complaints appear to have nothing to do with transmissions. (*E.g.*, ECF No. 14-8, PageIDs 2119–20 (NHTSA ID##10861612 (involving brakes), 10864820 (fuel system), 10983120 (steering)).) Many were not lodged until years after these plaintiffs' vehicle purchases—often not until 2017, 2018, and even 2019—and many involve vehicles that were well outside of warranty when any issues were experienced, either based on the model year, mileage, or both, such as the 2010 vehicle with a December 2018 "incident date" at over 223,000 miles. (*E.g.*, ECF No. 14-8, PageID 2109 (NHTSA ID #11163459 (a)).)

**D.    Again without pleading their claims according to the laws applicable to their claims individually, the plaintiffs all assert the same nine counts.**

The 360 plaintiffs each assert the same nine causes of action:  breaches of express and implied warranty (Counts I and II); "Revocation of Acceptance" (Count III); Michigan Consumer Protection Act (Count IV); "Unconscionability" (Count V); several fraud-based claims (Counts VI through VIII); and "Unjust Enrichment"

10

(Count IX). (FAC ¶¶ 491–584.) Other than references to Michigan law in Counts III and IV, the plaintiffs do not identify under what law they purport to pursue their claims, and many still don't provide adequate facts to inform that analysis fully. From what is pled, though, the overwhelming majority of plaintiffs bought and used their vehicles in states other than Michigan.

## Argument

"Rule 8(a) sets forth the basic federal pleading requirement that a complaint 'shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Hammoud v. U.S. Attorney*, No. 14-14398, 2015 WL 4756582, at *3 (E.D. Mich. Aug. 12, 2015) (Cox, J.) (adopting report and recommendation). This Court has recognized, however, that despite "this relatively low threshold, a complaint must nevertheless contain more than legal labels, conclusions, and a recitation of the elements of a cause of action; it must also contain 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 547) . While a complaint need not contain detailed factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted) .

In *Iqbal*, the Court expanded on *Twombly*'s "two-pronged approach." *Downing v. Ford Motor Co.*, No. 17-10652, 2018 WL 3301210, at *4 (E.D. Mich.

Feb. 5, 2018), (adopting report and recommendation), No. 17-CV-10652, 2018 WL 1417599 (E.D. Mich. Mar. 22, 2018), *aff'd*, No. 18-1335, 2018 WL 4621955 (6th Cir. Sept. 24, 2018). "First, it must be determined whether a complaint contains factual allegations, as opposed to legal conclusions," since "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, the facts that are pled must show a 'plausible' claim for relief"—a "context-specific" analysis "that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Moreover, fraud allegations—whether as a theory of liability or, for example, for tolling—require heightened pleading under Rule 9(b), by which plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F. 3d 564, 570 (6th Cir. 2008). "At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied." *Id.*

In addition, numerous decisions—including in this circuit—recognize the myriad problems that so-called "shotgun" pleadings and prolix, muddled complaints present. *E.g.*, *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1321(11th Cir. 2015); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994); *Agee v. Alphatec Spine, Inc.*, No. 1:15-cv-00750-TSB, 2017

WL 5706002 (S.D. Ohio. Mar. 27, 2017). Here, the FAC violates all these basic

pleading principles. At 376 pages (not counting exhibits), it is undeniably prolix,

with each plaintiff indiscriminately asserting all the same allegations and claims

despite their patent inapplicability. At the same time, the FAC lacks fundamental

facts to support its claims and, despite its prolixity, lacks the particularity required

to assert fraud. For numerous reasons, the Court should dismiss this action entirely.

**A.    The plaintiffs' FAC remains an improper "shotgun" pleading—prolix, confusing, conflating, indiscriminate, and overall violative of Rule 8.**

Poorly crafted complaints such as this can take many forms, but they

commonly go by the name "shotgun pleadings," whose unifying characteristic is

"that they fail to one degree or another, and in one way or another, to give the

defendants adequate notice of the claims against them and the grounds upon which

each claim rests." *Weiland*, 792 F.3d at 1321.  "The unacceptable consequences of

shotgun pleading are many." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d

955, 981 (11th Cir. 2008). "First, and perhaps foremost, shotgun pleading inexorably

broadens the scope of discovery, much of which may be unnecessary." *Id.* Shotgun

pleadings also "lessen the time and resources the court has available to reach and

dispose of the cases and litigants waiting to be heard," and "wreak havoc on appellate

court dockets." *Id.* at 982. Moreover, the "mischief shotgun pleadings causes

undermines the public's respect for the courts—the ability of the courts to process

efficiently, economically, and fairly the business placed before them." *Id.* at 983.

Ford's earlier motion showed the prior complaint to be an improper "shotgun" pleading for many reasons. (ECF No. 9 at 13–21.) The FAC addressed only one of those concerns—no longer having each count adopt the allegations of all preceding and subsequent counts. However, all the other prior infirmities Ford highlighted persist in the FAC, requiring its dismissal. Chiefly, the FAC continues the improper amalgamation of claims by 360 plaintiffs spanning nearly a decade of transactions across 41 states (possibly more). The result is a confusing mess of vague and conclusory allegations and claims, whereby it is impossible to discern "which allegations apply to which plaintiffs and to which counts," leaving the complaint "unanswerable" and warranting its dismissal. *See Tomas v. Ill. Dept. of Empl. Sec.*, No. 07 C 4542, 2009 WL 2916840, at *3 (N.D. Ill. Sept. 2, 2009).

Indeed, all 360 plaintiffs purport to rely on all the same marketing statements, all the same CSPs and TSBs, and all the same customer complaints. None of them identify which of those items in particular (if any) are purportedly relevant to their claims individually. Meanwhile, it is patently obvious that the same items are not—and cannot be—relevant to each individual plaintiff's claims. For example, the marketing materials for the 2010 and 2011 Ford Fusion are patently irrelevant to plaintiffs such as Barry Satarsky, who bought a used 2016 Ford Fusion in November 2018. (FAC ¶¶ 97, 141.) Nor are marketing materials for a 2017 Ford Fusion relevant to plaintiffs like Janice Cook, who bought her 2010 Ford Fusion in December 2009,

whose vehicle was repaired in 2011, and who has not pled that she was ever exposed to—much less relied on—the 2017 marketing materials. (*Id.* ¶¶ 46, 286). Nonetheless, every plaintiff indiscriminately adopts this and all the other supposedly "common" factual allegations, regardless of their relevance.

Similarly, in their attempt to show Ford's supposed knowledge of a defect pre-dating their individual vehicle purchases, the plaintiffs cite various customer complaints to NHTSA. But those complaints all address varying model years of vehicles, filed at different times, for different issues, with many having nothing to do with transmissions. As a result, it is impossible to tell which complaints to NHTSA purportedly support which plaintiffs' individual claims. This is a critical failing because where, as here, a plaintiff must allege facts plausibly supporting a manufacturer's knowledge of a defect pre-dating the plaintiff's purchase to support fraud-based causes of action, a paucity of alleged customer complaints can prove dispositive on initial motions practice. *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 761–62 (E.D. Mich. Mar. 25, 2019). Yet, by their amalgamation, these 360 plaintiffs improperly attempt to have each of their claims rely on customer complaints that are entirely irrelevant to their claims. For example, plaintiff Rita Hinkle alleges she bought a 2010 Ford Fusion on or about November 1, 2009. (FAC ¶ 420.) However, only one of the plaintiffs' cited complaints to NHTSA was filed before her alleged November 2009 purchase date. (*Id.* Ex. S, ECF No. 14-7, PageID

2026 NHTSA ID No. 10284037.) The rest were lodged only *after* she bought her vehicle, and thus provide zero support for her claims. *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 793 (E.D. Mich. 2019). Yet she purports to rely on all of them.

Likewise, all 360 plaintiffs purport to rely also on the same CSPs and TSBs to show Ford's supposed knowledge of an alleged defect pre-dating the plaintiffs' purchases. (FAC ¶¶ 63–66, 83.) Yet many of these (on their face and regardless of their content) provide no such support for many plaintiffs for the same reason as with the complaints to NHTSA—i.e., because they *post*-date the vehicle purchases. For example, TSB 17S16, which originally issued on August 21, 2017, cannot possibly support knowledge of a defect *pre*-dating vehicle purchases that took place *before* that date. (FAC Ex. U, ECF No. 14-9, PageID No. 2159; *also* FAC ¶ 83 & n.13.) Yet all 360 plaintiffs indiscriminately rely on all the same CSPs and TSBs.

The confusion is further magnified as to the scores of plaintiffs who provide *no* individual information whatsoever, and instead identify only residence and the model year, vehicle model, VIN, and purchase date for their vehicles. (*E.g.*, FAC ¶¶ 118, 135, 140.) Given their lack of allegations of having experienced *any* issues with their vehicles, it is entirely unclear why these plaintiffs are even suing Ford.

Also, the FAC now compounds their improper "shotgun" approach by introducing even more patently irrelevant allegations with no discernable connection to any plaintiff's claims, such as the new allegations concerning alleged issues with

16

completely different vehicle lines, components, and systems (*e.g.*, *id.* ¶ 80), and the repeated references to marketing statements about fuel economy despite no plaintiff alleging any issues related to fuel economy (*id.* ¶¶ 16, 28, 29, 31, 34, 40, 42, 44, 45).

Moreover, the plaintiffs still fail to plead their claims according to the applicable law, despite the fact that their claims will individually be governed by dozens of different states' laws, with many plaintiffs' claims being properly barred outright under those laws. *See Walsh v. Ford Motor Co.*, 588 F. Supp. 1513, 1526 (D.D.C.), *am.*, 592 F. Supp. 1359 (D.D.C. 1984), & *am.*, 612 F. Supp. 983 (D.D.C. 1985) (recognizing that "those States where plaintiffs purchased their vehicles" would provide the applicable law). As a result, it is unclear which plaintiffs are asserting which claims, and under which states' laws, and on what bases (if any). *Tomas*, 2009 WL 2916840, at *3.

For example, many states require vertical privity for breach of implied warranty under the UCC, including at least Alabama, Arizona, California, Connecticut, Florida, Illinois, Indiana, New York, North Carolina, Ohio, Washington, and Wisconsin, where collectively 145 plaintiffs allege they purchased their vehicles. *E.g.*, *Walsh*, 588 F. Supp. at 527–35  (cataloging states requiring privity on implied warranty claims); *also Matanky*, 370 F. Supp. 3d at 786–87  (same for Connecticut, Illinois, and Ohio); *McKee*, 376 F. Supp. 3d at 759  (same for Florida). Yet no plaintiff alleges such privity. Similarly, the plaintiffs assert a generic

unjust enrichment claim under no particular state's law, despite the fact that "[s]tate law requirements under unjust enrichment law vary widely." *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 WL 1431756, at *24 (E.D. Mich. Apr. 9, 2013) (Cox. J.) Moreover, where different states' laws apply, they require pleading according to the elements of the claims according to those states' laws, which the FAC still fails to do. *In re Refrigerant Compressors*, 2013 WL 1431756, at *24 (dismissing claims not pled them under the applicable states' laws).

As these numerous examples show, the ability of the plaintiffs' claims to withstand even initial scrutiny requires that they plead their claims properly and on an individual basis, providing adequate facts to support each plaintiff's claims, while omitting those facts and allegations which are irrelevant to their individual claims. Yet the plaintiffs once again fail to do this. Instead, they have improperly amalgamated their claims, aggregating allegations in the hopes of evading individual scrutiny and presenting a false impression of validity by sheer volume of plaintiffs. In short, they have again pled "by means of obfuscation," which courts rightly condemn. *E.g.*, *Agee*, 2017 WL 5706002, at *2. After the multiple failed pleading attempts, the Court should dismiss with prejudice under Rule 8.[6]

---

[6] If this action is not dismissed, Ford reserves the right to move to sever and for other appropriate relief given the improper joinder of claims by these 360 plaintiffs with different vehicles, from different states, with different (if any) issues, whose claims, if any, would require adjudication under different states' laws.

I.   **Beyond the facial improprieties of the plaintiffs' prolix and confusing complaint, their claims require dismissal for numerous other reasons.**

A.   **Under applicable Michigan procedural law, most of the plaintiffs' claims require dismissal as outright time-barred.**

A "federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state." *Johnson v. Ventra Grp., Inc*., 191 F.3d 732, 738 (6th Cir. 1999). "Under Michigan's common law choice of law rule, statutes of limitation are considered procedural and are governed by the law of the forum." *Id.* at 746. Here, many—and in some cases, all—the applicable statutes of limitations bar plaintiffs' claims outright, requiring their dismissal with prejudice. While many plaintiffs' claims remain insufficiently pled in terms of their timeliness and evince that they are very likely time-barred, warranting their dismissal as well.

i.   **Many plaintiffs' warranty claims are outright time-barred.**[7]

The plaintiffs allege Ford breached an "express warranty as defined in UCC sections 2-313 and/or 2A-210."   (FAC ¶ 493.) To the extent they rely on Ford's NVLW and its "repair or replace" warranty as a UCC-defined warranty, Michigan law disagrees. Rather, interpreting the same warranty terms as here, this District has held that Ford's NVLW "does not constitute an 'express warranty' within the meaning of the Michigan UCC, MCL § 440.2313." *Miller v. Gen. Motors, LLC*, No.

---

[7] As explained below, Counts III and V are not properly considered independent causes of action, but rather are adjunct to underlying warranty claims and are therefore subject to the same limitations periods as their predicate claims.

17-CV-14032, 2018 WL 2740240, at *4 (E.D. Mich. June 7, 2018). Such provisions "are contractual promises under Article 2, but are not warranties." *Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 894 N.W.2d 700, 706 (Mich. 2016).

Michigan law thus considers Ford's NVLW's promise to repair or replace any defects in materials or workmanship that arose within the earlier of five years or 60,000 from original purchase to be a "contractual promise" subject to the UCC's four-year limitations period, which runs from an alleged breach—i.e., the failure to repair or replace as promised—instead of from tender of delivery. *Id.* at 705–07 (recognizing that a repair-and-replace provision is nonetheless a "term of a contract of sale"); *also* MCL § 440.2725(1)  ("An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued."). Thus, theoretically at most, and barring facts pled to the contrary, a plaintiff could have nine years to bring a claim—five years from original purchase *plus*, assuming a warranted defect manifested and was not cured on the last day of that five-year period, another four years.

Here, it is apparent on the face of the complaint that, even assuming this scenario, many plaintiffs' express warranty claims, as listed on Exhibit 1.1 are outright time-barred on this basis, requiring their dismissal with prejudice.[8] In

---

[8] This is so even with *Kinner* and accounting for MCL § 440.2725(3).

addition, some plaintiffs have now pled facts affirmatively showing their claims are time-barred, like plaintiff Callan, who bought her 2010 Ford Fusion on May 16, 2010, experienced "the Transmission Defect" *the next day*, and had her last "unsuccessful" repair attempt in March 2011, yet did not file this action until August 2019—more than *eight years later*. (FAC ¶ 372; *also, e.g.*, *id.* ¶¶ 149, 272, 305.)

To the extent the plaintiffs assert there is a UCC-defined express warranty under applicable law (which they have wholly failed to identify), then such claims are governed by a four-year limitations period running from tender of delivery—the same as for implied warranty. MCL § 440.2725. In which case, for the same reasons many plaintiffs' implied warranty claims are facially time-barred as discussed below, so too are such express warranty claims.

As for alleged breach of the UCC's implied warranty of merchantability (FAC ¶¶ 510–20), "a buyer only has four years" to file suit, which "starts to run at 'tender of delivery.' " *Roe*, 2019 WL 3564589, at *13. "And once started, the four-year timer runs even if the buyer does not know of the breach of warranty." *Id.* Moreover, as with the written warranty, the implied warranty runs from the original purchase or in-service date. *Miller*, 2018 WL 2740240, at *8.

Here, "tender of delivery was when Ford sold Plaintiffs' vehicles to one of its dealers or, at latest, when Plaintiffs' vehicles were purchased from the dealer." *Roe*, 2019 WL 3564589, at *13. As a result, dozens of plaintiffs' implied warranty claims

are outright time-barred—for example, plaintiff Copeland, who bought her 2012 vehicle in August 2017, after the warranty had expired, and plaintiffs Hall and Duncan, who bought their 2010 Fusion "[o]n or about June 1, 2017." (FAC ¶¶ 121, 199); *also Miller*, 2018 WL 2740240, at *9 ("because the Limited Warranty expired before Plaintiff Miller purchased her vehicle, her claim for breach of the implied warranty of merchantability fails"). The Court should therefore dismiss the implied warranty claims as listed in Exhibit 1.1 on this basis.

### ii.   Many plaintiffs' fraud-based claims are also facially time-barred.

Under Michigan law, Counts IV and VI through IX—asserting claims under the MCPA, for various forms of fraud, and for unjust enrichment—are all subject to six-year statutes of limitations (unless a shorter period were to apply under the borrowing statute, except as to the MCPA). MCL §§ 445.911  (MCPA limitations period), 600.5813 (catch-all six-year limitations period), & 600.5861 (borrowing statute); *Romeo Inv. Ltd. v. Mich. Consol. Gas Co.*, No. 260320, 2007 WL 1264008, at *8 (Mich. Ct. App. May 1, 2007) (same for unjust enrichment).

The latest point at which the statutes would have started to run on the MCPA claims was when the vehicles were first offered for sale, since the alleged MCPA violations all stem from alleged misrepresentations and nondisclosures in the course of offering the vehicles for sale. (*See* FAC ¶ 533(a)–(k)); *also* MCL § 445.911 (stating an MCPA action "shall not be brought more than 6 years after the occurrence

of the method, act, or practice which is the subject of the action"). The plaintiffs allege no facts to support that their claims would have accrued at any later date. Thus, the Court should dismiss with prejudice the MCPA claims by those plaintiffs whose actions are time-barred, as identified in Exhibit 1.1.

The same goes for the fraud-based claims asserted in Counts VI through IX, for which the limitations period "begins to run from the time the fraud is perpetrated," *Boyle v. General Motors Corp.*, 661 N.W.2d 557, 559 (Mich. 2003), "regardless of the time when damage results," MCL § 600.5827. Here, that accrual date would be the same as with the MCPA—when the vehicles were first offered for sale or originally purchased (with the borrowing statute, where applicable). Thus, Counts VI through IX are likewise time-barred with respect to those plaintiffs who did not file timely, as shown in Exhibit 1.1.

### B. The plaintiffs fail to plead facts plausibly supporting any tolling.

Recognizing the time-barred nature of their claims, the plaintiffs baldly assert that all limitations periods for all claims are tolled by the discovery rule and fraudulent concealment. (FAC ¶¶ 8, 91–110.) Neither saves their claims.

*First*, the FAC lacks facts supporting either of these tolling doctrines, including failing to identify to which plaintiffs' claims they apply. For example, the FAC indiscriminately asserts the discovery rule, but Michigan law rejects its application in most or all instances. *Boyle*, 661 N.W.2d at 559 (recognizing that the

discovery rule has been "rejected" in fraud-based actions); Mich. Comp. Laws §§ 440.2725 (warranty claims accrue upon tender of delivery, "regardless of the aggrieved party's lack of knowledge of the breach"), & 600.5827 (a claim generally "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results").

*Second*, the plaintiffs don't support their delayed-discovery assertion. To the extent they assert Ford failed to honor its "repair or replace" promise (*id.* ¶ 102), there is no factual basis to support how or why discovery of that fact was delayed— if Ford did not honor its warranty, the plaintiffs would have known that immediately.

Similarly, the plaintiffs assert Ford made "factual representations about the transmission," but they refer only to the lone representation of a "smooth-shifting 6-speed automatic," which is (1) non-actionable puffery, and further (2) pertained to the 2010 and 2011 "non-hybrid transmission" only. (FAC ¶ 97.) Moreover, they assert that their "vehicles as delivered to Plaintiffs were extremely unresponsive and were not 'smooth-shifting,' as Plaintiffs' drive [sic] was repeatedly interrupted by jerky shifts and dangerous hesitations," (*id.* ¶¶ 98–99), which belies any reasonable inference that their discovery of the alleged "defect" was delayed.

*Third*, fraudulent concealment tolling is equally unavailing, as it requires pleading—with Rule 9(b) particularity—three elements: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative

24

facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2017 WL 7689654, at *4 (E.D. Mich. May 5, 2017). In short, it requires "affirmative acts . . . designed to prevent subsequent discovery," while "[m]ere silence is insufficient." *Miller*, 2018 WL 2740240, at *9.

The plaintiffs fail to plead sufficient facts as to any of the three elements, much less to a Rule 9(b) standard. There are no well-pled facts of any affirmative acts of concealment by Ford. Instead, the plaintiffs rely on the same alleged misrepresentations and nondisclosures from when they purchased their vehicles, (FAC ¶¶ 96–104), which is insufficient. *See Matanky*, 370 F. Supp. 3d at 802.  Where they do assert any subsequent affirmative acts, they do so in only bald, conclusory fashion, with no supporting facts. (*E.g.*, FAC ¶¶ 100, 109.) And while a "mere allegation of due diligence without asserting what steps were taken is insufficient," *In re Auto. Parts*, 2017 WL 7689654, at *4, the plaintiffs don't even allege due diligence and instead insist that "[n]o amount of diligence by Plaintiffs could have led to the discovery" of their claims. (FAC ¶ 107.) Yet they contradict this bald assertion by citing *publicly available* complaints to NHTSA, TSBs, and CSPs.

Moreover, "for Ford to have fraudulently concealed the [Transmission Defect], it would have to at least have known that" they were defective. *Roe*, 2019 WL 3564589, at *14. As addressed below, *infra* Part II.C.i, the plaintiffs plead

insufficient facts plausibly supporting either a defect or Ford's alleged knowledge thereof. In sum, on every level, the plaintiffs' bald tolling assertions fail.

**C.   The plaintiffs' claims all fail on substantive grounds as well.**

**i.   The breach of express warranty claim fails for numerous reasons.**

In boilerplate fashion typical of the entire FAC, the plaintiffs all allege their vehicle purchases or leases were "accompanied by an express warranty," which they neither append nor cite. (FAC ¶ 494.) Nonetheless, by referencing and relying on it, they incorporate Ford's NVLW for each model year, of which the Court should take notice. *Rosa v. Am. Water Heater Co.*, 177 F. Supp. 3d 1025, 1038 (S.D. Tex. 2016). Together, the FAC and NVLWs show the express warranty claims fail.

*First*, pleading breach of the NVLW requires the plaintiffs to plead factual allegations plausibly supporting an actual defect, which they fail to do. Instead, they merely "describe a laundry list of ways in which their vehicles' performance is subpar," and then conclusorily "tie all of these problems to a 'defect' in the transmission." *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL 3000646, at *7 (C.D. Cal. May 22, 2019). In *In re Ford Motor Co.*, the complaint defined "the 'Transmission Defect' as follows: the DPS6 transmission 'is defective in design and/or manufacture in that, among other problems, the transmission consistently slips, bucks, kicks, jerks, harshly engages, has premature internal wear, sudden acceleration, delay in downshifts,

26

delayed acceleration, difficulty stopping the vehicle, and, eventually, premature transmission failure.' " *Id.* This is virtually identical to "the Transmission Defect" alleged here (FAC ¶ 9), which "merely describes performance problems with the vehicle and does not amount to identifying the defect" and "is therefore insufficient." 2019 WL 3000646, at *7; *see also McQueen v. BMW of N. Am., LLC*, No. CIV.A. 12-6674 SRC, 2013 WL 4607353, at *7 (D.N.J. Aug. 29, 2013) (same).

*Second*, by not alleging facts as to an actual defect, the plaintiffs necessarily fail to allege facts plausibly supporting any breach of warranty. This District has stated that "if 'sufficient facts are alleged to assert both' a design and a manufacturing defect, 'then dismissal at the pleading stage is premature.' " *Id.* But here, the plaintiffs allege that *all* their vehicles and *all* 2010 through 2017 Ford Fusion vehicles in general were "defective" for the same reasons, which is tantamount to alleging only design defect. *See Gertz v. Toyota Motor Corp.*, No. CV 10-1089 PSG (VBKx), 2011 WL 3681647, at *10 (N.D. Cal. Aug. 22, 2011). As noted above, however, the NVLW covers only defects in materials and workmanship, which does not apply to design defects. *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 614 (E.D. Mich. 2017); *also Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *8 (N.D. Cal. Aug. 1, 2017 (noting the "overwhelming weight of state law authority holds that design defects are *not*

covered under" a "materials or workmanship warranty"). Thus, to the extent the plaintiffs assert a design defect, the NVLW does not cover that.

*Third*, even after amendment, scores of plaintiffs still fail to plead any facts plausibly supporting any breach, such as plaintiff Velasquez, who alleges only that he purchased a 2017 Ford Fusion, and nothing more. (FAC ¶ 118.) Such deficient pleading fails to state a claim for breach of warranty (or anything else). *Darne v. Ford Motor Co.*, No. 13 CV 03594, 2017 WL 3836586, at *6 (N.D. Ill. Sept. 1, 2017) (requiring facts like the mileage and incident date to support that "the alleged issues fell within the covered period"). Many other plaintiffs added facts confirming they bought their vehicles *used* and *outside* the warranty period—i.e., beyond five years or 60,000 miles from original purchase. *Miller*, 2018 WL 2740240, at *8 (dismissing claim where the limited warranty expired in 2013, and plaintiff bought the vehicle in 2014); (FAC ¶¶ 193, 199, 274, 401, 431, 439, 477, 489.) Still more plaintiffs provide no facts plausibly supporting that there was any warranty coverage still in effect when they bought their vehicles used, and what facts they do provide plausibly support only the inference that there was not. (*E.g.*, FAC ¶¶ 128, 165.) While other plaintiffs allege having sought repairs only "outside the warranty." (*E.g.*, *id.* ¶ 204.) And other plaintiffs likely purchased their vehicles beyond the NVLW's mileage expiration as well, but they fail to plead facts showing whether

28

their vehicles were within or outside NVLW coverage, contrary to their pleading

burden. (*E.g.*, FAC ¶ 414); *Darne*, 2017 WL 3836586, at *6.

*Fourth*, Ford's NVLW is a promise to repair or replace "if the vehicle 'is

properly operated and maintained' and 'was taken to a Ford dealership for a

warranted repair during the warranty period.' " *Wozniak v. Ford Motor Co.*, No.

2:17-cv-12794, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019); *also, e.g.*, (ECF

No. 9, Ex. 2.1 at 8–9). The *Wozniak* court found those plaintiffs "failed to adequately

plead a breach because they ha[d] not pleaded that the named Plaintiff presented

their vehicles to a Ford dealership before the earlier of" the NVLW's mileage or

time limits. *Id.* The court concluded: "Because the warranty expires upon the earlier

of the time or mileage limits, Plaintiffs must allege both the timeline between the

start of the warranty period and the sought-after repairs and the mileage on their

vehicles at the time of presentment." *Id.*; *also Roe*, 2019 WL 3564589, at *9.

Despite this requirement, and even after amendment, the overwhelming

majority of plaintiffs still fail to allege presentment to a Ford dealership within the

NVLW's time/mileage limits with a failure to repair. *See Fedrick v. Mercedes-Benz

USA, LLC,* 366 F. Supp. 2d 1190, 1198 (N.D. Ga. 2005) ("It is the refusal to remedy

within a reasonable time, or a lack of success in the attempts to remedy which would

29

constitute a breach of warranty.")[9]; (*e.g.*, FAC ¶¶ 117–22, 124–32, 134–37, 139–44, 146–47, 150–58, 160–61.) While many of these plaintiffs don't plead any supporting facts whatsoever, many others allege they sought repairs only from non-Ford facilities (*e.g.*, *id.* ¶ 151), or only outside the warranty's time or  mileage allowance (*e.g.*, *id.* ¶¶ 119, 129), or that their vehicles were repaired under warranty (*e.g.*, *id.* ¶ 122). This listing is far from exhaustive, and for numerous reasons, the express warranty claims identified in Exhibit 1.1 fail on the pleadings.

### ii.    The plaintiffs likewise fail to state valid implied warranty claims.

The implied warranty of merchantability provides for only a minimum level of quality. Indeed, "[m]erchantable is not a synonym for perfect. The warranty of merchantability is that goods are of average quality in the industry." *Rosenbaum v. Toyota Motor Sales, USA, Inc.*, No. 16-CV-12645, 2016 WL 9775018, at *2 (E.D. Mich. Oct. 21, 2016). Even assuming some plaintiffs' vehicles required repairs at some point, "it is inevitable that a complex product [such as an automobile and its transmission] will require some service and that fact alone does not establish a breach of warranty." *Ducharme v. A & S RV Ctr., Inc.,* 321 F. Supp. 2d 843, 850 (E.D. Mich. 2004), *aff'd*, 127 F. App'x 204 (6th Cir. 2005)

---

[9] Should the plaintiffs argue, as in *Wozniak*, that the limited warranty failed of its essential purpose, (FAC ¶ 500), the Court should dispense with that argument as in *Wozniak* under virtually identical circumstances. 2019 WL 108845, at *2–3.

As with express warranty, the implied warranty claim primarily fails because the plaintiffs plead no facts plausibly supporting that any of their vehicles are unmerchantable. *See, supra* Part II.C.i. Instead, they plead only generic boilerplate and legal conclusions of an alleged "Transmission Defect." (FAC ¶¶ 8, 510–20.)  A mere conclusory assertion that products "did not comply with the statutory definition of 'merchantable goods' adds no substance" to implied warranty claims like these that "contain[] no factual allegations." *Miller*, 2018 WL 2740240, at *9.

The "Plaintiff-Specific Allegations" further reveal numerous deficiencies in the implied warranty claims. For example, lead named plaintiff Gant alleges he "experienced the Transmission Defect" by early 2016, yet the only repair attempt he references was in March 2019—*three years later*—indicating the alleged issue did not impede his use. (FAC ¶ 116.) Other examples abound, such as the scores of plaintiffs who still allege no facts to support that they experienced any issues whatsoever with their vehicles (*e.g.*, FAC ¶¶ 336, 477), those alleging facts showing their vehicles performed without issue for many years (*e.g.*, *id.* ¶¶ 274, 401), and those alleging that their vehicles were repaired. (*E.g.*, *id.* ¶¶ 116, 122.) As these and numerous other examples throughout the FAC show, the plaintiffs' bald and indiscriminate legal conclusions are entitled to no weight. Beyond these fundamental flaws, however, the plaintiffs' claims fail for one or more additional reasons.

31

*First,* a UCC implied warranty claim requires that when tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." U.C.C. § 2-607(3)(a). No plaintiff pleads facts plausibly supporting timely notice to Ford of alleged breach. The most some assert—again, only with boilerplate—is that they "contacted Ford about the Transmission Defect" at some time. (*E.g.*, FAC ¶ 145.) Yet they don't say whom they contacted supposedly as "Ford," nor that this contact included providing actual notice of an alleged breach. Nor are the plaintiffs entitled to any such inference, considering the numerous examples throughout the FAC of alleged "contact" with Ford that make no sense, such as plaintiffs Hall and Duncan, who allege they bought their 2010 Ford Fusion in June 2017, experienced "the Transmission Defect" *three years earlier* in 2014, and "contacted Ford about the Transmission Defect in 2015"—*two years before they bought their vehicle*. (*Id.* ¶ 199; *also, e.g., id.* ¶ 264 (similar).) Meanwhile, other plaintiffs alleging they "contacted" Ford did so only *outside* the implied warranty period. (*E.g.*, ¶ 251 (contact nearly five years and 90,000 miles after purchase).)

*Second*, the plaintiffs pled this claim only under Michigan law, which is improper as to non-Michigan plaintiffs. Yet they failed to plead under the applicable states' laws, leaving only Michigan law, which requires privity—which the plaintiffs don't allege and which is lacking. *E.g., Harnden v. Ford Motor Co.*, 408 F. Supp.

2d 315, 322 (E.D. Mich. 2005), *aff'd sub nom. Harnden v. Jayco, Inc.*, 496 F.3d 579

(6th Cir. 2007) (acknowledging weight of authority interpreting Michigan law to

require that "a consumer be in privity of contract with a remote manufacturer to state

a breach of implied warranty claim seeking purely economic damages").

### iii. Count III fails because, among other reasons, revocation and UCC damages are not stand-alone causes of action, and revocation is not available even as a remedy against a remote manufacturer.

The plaintiffs assert revocation or damages under Michigan's Uniform

Commercial Code. (FAC ¶¶ 521–29.) However, the overwhelming majority of the

plaintiffs did not purchase their vehicles in Michigan and have no basis to apply

Michigan law to their vehicle purchases. Thus, for all those non-Michigan

purchasers, Count III fails as a matter of law on this basis.

As to the Michigan plaintiffs and under Michigan law, revocation and

damages are merely *remedies* for breach of warranty—they are not independent

causes of action, and their viability as remedies stands or falls with the underlying

warranty claim. *See, e.g.*, *Snyder v. Boston Whaler, Inc.*, 892 F. Supp. 955, 959

(W.D. Mich. 1994). Where there is no breach of warranty, there is likewise no

remedy of either revocation nor damages. *Id.*; *also Henderson v. Chrysler Corp.*,

477 N.W.2d 505, 507–08 (Mich. Ct. App. 1991) (acknowledging that "[r]evocation

of acceptance is a statutory remedy" and "is inextricably connected" to the predicate

underlying contract claim). Here, the plaintiffs seek revocation and damages based

solely on alleged "breaches of express and implied warranties." (FAC ¶ 525.) Since those counts fail, so too does Count III.

Even as a remedy, revocation is precluded against a remote manufacturer like Ford. *Sautner v. Fleetwood Enters., Inc.*, No. 05-73252, 2007 WL 1343806, at *8 (E.D. Mich. May 8, 2007) ("The weight of authority under Michigan law opposes remote revocation."); *also Farm Bureau Mut. Ins. Co. of Mich. v. CNH Indus. Am., LLC*, No. 1:14-CV-704, 2015 WL 11439053, at *5 (W.D. Mich. Aug. 25, 2015) ("courts have uniformly required privity because revocation 'is inextricably connected to the contractual relationship between a buyer and a seller' ").

Also, as a form of relief, revocation requires well-pled supporting facts, which the FAC lacks. For example, MCL  section 440.2608 requires that revocation "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." No plaintiff alleges—certainly not with any well-pled facts—such timely revocation, much less before a substantial change in their vehicles.

Furthermore, the assertion that the FAC "is sufficient notice under the UCC" is both factually and legally incorrect. (FAC at 355 n.20), In the cited case, the court found the complaint was sufficient notice because it was served "less than one month after plaintiff began storing the vehicle." *King v. Taylor Chrysler-Plymouth, Inc.*,

34

457 N.W.2d 42, 45 (Mich. Ct. App. 1990). Whereas here, the FAC is rife with examples like Michigan plaintiffs McGaugh and Johnson, who experienced "the Transmission Defect" in 2014 but didn't serve this complaint until 2019—five years later. (FAC ¶ 164.) In all, no plaintiff alleges facts supporting timely notice.

Finally, the plaintiffs cannot excuse their untimeliness on bald assertions that Ford supposedly engaged in a fraudulent cover-up by assuring "that the defects . . . were 'normal.' " (FAC ¶ 526.) In addition to lacking well-pled facts under Rules 8 or 9(b), most Michigan plaintiffs allege no such assurances from Ford, and many allege they actually sought repairs from *non-Ford-affiliated* entities. (*E.g.*, *id.* ¶ 218.) The FAC cites no Michigan law to excuse their delay as "attributable to efforts or promises to correct the defect or nonconformity." (*Id.* at 355 n.19.) Regardless, the plaintiffs allege only that independent dealerships sometimes assured that their issues were "normal" (*id.* ¶ 526)—i.e., the *opposite* of a promise to correct.

### iv.  The MCPA claim fails on numerous grounds.

The FAC globally asserts an MCPA claim despite the overwhelming majority of plaintiffs residing and having bought their vehicles outside of Michigan. Even as to the few Michigan plaintiffs, the MCPA claim fails for many reasons.

### 1.  Only plaintiffs who actually bought their vehicles in Michigan could even theoretically pursue an MCPA claim.

Where plaintiffs do not reside in Michigan and did not purchase, lease, or maintain their vehicles in Michigan, "the MCPA does not apply." *Highsmith v.*

*Chrysler Credit Corp.*, 150 B.R. 997, 1008 (N.D. Ill. 1993), *aff'd in part, rev'd in part*, 18 F.3d 434 (7th Cir. 1994); *also Fitzgerald v. Chrysler Corp.,* No. 96 C 0021, 1996 WL 473456, at *7 (N.D. Ill. Aug. 16, 1996), *aff'd*, 116 F.3d 225 (7th Cir. 1997) (rejecting MCPA claim where the plaintiff was "not a Michigan resident, he was not injured in Michigan, and he did not purchase or execute his service contract in Michigan"). This is consistent with the Sixth's Circuit recognition under Ohio's similar choice-of-law analysis that "the consumer-protection laws of" individual plaintiffs and putative class members' states would "govern their claims" because "the State with the strongest interest in regulating such conduct is the State where the consumers—the residents protected by its consumer-protection laws—are harmed by it." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946–47 (6th Cir. 2011). Michigan, meanwhile, has little interest in having its law applied to purchases by non-residents, as evidenced by the statute's restriction of putative MCPA class members to those "residing or injured in this state." MCL § 445.911(3); *cf. Rosen v. Chrysler Corp.*, No. 97-CV-60374-AA, 2000 WL 34609135, at *10 (E.D. Mich. July 18, 2000) ("it is the state where the consumer is located which would have the greatest interest in vitiating its own laws") (applying New Jersey choice-of-law rules).

Here, only 11 plaintiffs allege both Michigan residence and purchases. (FAC ¶¶ 125, 193, 200, 218, 226, 240, 375, 457, 460, 461, 489.) Another seven reside in

Michigan but either bought their vehicles elsewhere or don't allege where they bought them (and their continued failure to plead the facts should further bar their MCPA claims). (*Id.* ¶¶ 123, 164, 221, 313, 331, 389, 401.) No plaintiff has stated a viable MCPA claim, for the reasons stated below. But the lack of Michigan residence and transactions, and the continued failure to plead their claims properly is all the more reason to dismiss outright 349 of the 360 plaintiffs' MCPA claims.

### 2.    The MCPA exempts new vehicle purchases, while there is no actionable transaction as to used-vehicle purchases.

The MCPA does not apply to a "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." MCL § 445.904(1). This exemption is broadly construed, whereby "the relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Liss v. Lewiston-Richards, Inc*., 732 N.W.2d 514 (Mich. 2007) (citation and internal quotation marks omitted).

Courts have often concluded that sales of new vehicles by licensed dealers are "specifically authorized and regulated by law" and thus "exempt from the MCPA." *Matanky*, 370 F. Supp. 3d at 799–800; *also Rosenbaum*, 2016 WL 9775018, at *3 (same). Just this past month, on facts strikingly similar on multiple levels—e.g., a mass action against Ford alleging purported transmission defects, asserting the same claims, and brought by the same plaintiffs' counsel—the Michigan Court of Appeals

37

reached the same conclusion. *Cyr v. Ford Motor Co.*, No. 345751, 2019 WL 7206100 (Mich. Ct. App. Dec. 26, 2019) (unpublished).[10] Following *Liss*, that court concluded that "the extensive regulatory and licensing framework of the automotive industry under state and federal law explicitly sanctions the manufacture, sale, and lease of automobiles, and the provision of express and implied warranties concerning those automobiles and their components," and therefore "such conduct is 'specifically authorized' under state and federal law" and "Ford is exempt from plaintiffs' MCPA claims under MCL 445.904(1)." *Id.* at *6.

Accordingly, those plaintiffs who bought new vehicles cannot pursue claims under the MCPA. Nor can those who bought their vehicles used and thus had no transaction—even indirectly—with Ford. Either way, the MCPA claim fails.

### 3. The MCPA claim further lacks Rule 9(b) particularity.

Where plaintiffs allege a defendant engaged in "deceptive and unfair business practices by intentionally and knowingly misrepresenting" a product's capabilities and failing to disclose an alleged defect, such "claims sound in fraud," triggering "Rule 9(b)'s heightened pleading standard." *Matanky*, 370 F. Supp. 3d at 797. The FAC falls well short of this requisite particularity, offering instead, they only a laundry list of boilerplate legal conclusions, with no actual facts. For example, it

---

[10] Per MCR 7.215(C), while there is published authority following *Liss* for the same proposition, including that cited above, Ford cites *Cyr* because of its particularly striking factual similarities, and provides a copy of *Cyr* as Exhibit 2.6.

asserts Ford represented the "Plaintiffs' vehicles' transmissions were of a particular standard or quality when they were not." (FAC ¶ 533(b).) Nowhere do the plaintiffs identify any particular statement to any one of them individually, much less who supposedly made it, to whom, when, or how. Rather, the plaintiffs overwhelmingly don't allege—not even conclusorily—having seen, read, heard, or relied on any representations (*e.g.*, FAC ¶¶ 116, 117, 118); even those few who do provide only vague boilerplate, such as that they were promised "Sustainability/Long-Lasting," or reviewed "Internet Marketing" (*e.g. id.* ¶¶ 120, 121).

To the extent the plaintiffs rely on statements such as the 2010/2011 marketing brochure's curt mention of a "smooth-shifting" transmission, that reliance fails for numerous reasons, including that no plaintiff alleges having seen or relied on it, the statement does not even pertain to the vast majority of plaintiffs or their vehicles, and regardless, it is nonactionable puffery. *See, e.g., Nicholson v. Jayco, Inc.*, No. 5:15-CV-2010, 2016 WL 5463215, at *19 (N.D. Ohio Sept. 29, 2016) ("quietest riding, best handling coach on the market" was subjective opinion and nonactionable puffery). In short, the FAC falls well short of Rule 9(b) in every facet.

### v.   The "Unconscionability" claim also fails for several reasons.

The plaintiffs don't identify as to which of them this claim applies and why—i.e., which claim they are subject to "any limitation" that is supposedly

unconscionable, which limitations are unconscionable, and on what basis. (*See* FAC ¶¶ 539–41.) Beyond its total vagueness, this claim fails for numerous reasons.

*First*, unconscionability is not properly a cause of action. Rather, it is a defense against enforcement of a contract provision. *See* U.C.C. § 2-302(1).

*Second*, unconscionability must be adequately alleged as to both procedure and substance. *Nw. Acceptance Corp. v. Almont Gravel, Inc.*, 412 N.W.2d 719 (Mich. Ct. App. 1987). Procedural unconscionability is where the weaker party had no realistic alternative to accepting the term. *Allen v. Mich. Bell Tel. Co.*, 171 N.W.2d 689 (Mich. Ct. App. 1969). Here, the plaintiffs don't allege procedural unconscionability. Even if they had, such as alleging "no ability to haggle with their Ford dealer"—or with used-vehicle seller—"for a warranty tailored to their specific needs," the plaintiffs nonetheless "still had meaningful choices. General Motors, Toyota, and Kia, to name a few." *Roe*, 2019 WL 3564589, at *10.

Substantive unconscionability, meanwhile, requires that the challenged contract term be "substantively unreasonable," so much so that "the inequity of the term is so extreme as to shock the conscience." *Gardner v. Quicken Loans, Inc.*, No. 13-12720, 2013 WL 4533085, at *5 (E.D. Mich. Aug. 27, 2013), *aff'd*, 567 F. App'x 362 (6th Cir. 2014). The FAC is likewise silent on this issue, which is unsurprising, as there "is nothing facially unconscionable about a five-year/60,000 mile warranty in the auto industry." *Roe*, 2019 WL 3564589, at *10.

40

*Third*, unconscionability requires that Ford had "superior knowledge" of the "Transmission Defect," (FAC ¶ 540), yet as shown above, the plaintiffs have "not pled factual content" to support this bald conclusion, including by failing to plead both an actual defect and Ford's alleged "knowledge" thereof pre-dating the plaintiff's individual vehicle purchases. *Roe*, 2019 WL 3564589, at *10. "It follows that Plaintiffs have not pled the type of information asymmetry necessary to establish unconscionability." *Id.*

### vi.   The fraud-based claims (Counts VI–VIII) fail on many levels.

The plaintiffs don't plead their three fraud claims under any particular states' laws (FAC ¶¶ 543–80) —again, contrary to their pleading burden. *In re Refrigerant Compressors*, 2013 WL 1431756, at *24  Moreover, many of them still don't plead essential facts concerning their vehicle purchases, thereby precluding a choice-of-law analysis and continuing to frustrate proper scrutiny. Regardless, their fraud-based claims are all barred for numerous reasons, including failing to comply with Rule 9(b) and under the economic-loss rule, as well as on more individual grounds.

### 1.   The plaintiffs fail to plead fraud with Rule 9(b) particularity.

The plaintiffs' fraud-based claims in Counts VI through VIII each require heightened pleading—i.e., particularity under Rule 9(b). *McKee*, 376 F. Supp. 3d at 760  (recognizing that affirmative fraud Rule 9(b) particularity on the elements of the claim); *Smith v. Bank of Am. Corp.*, No. CIV. 10-14161, 2011 WL 653642, at *4

(E.D. Mich. Feb. 14, 2011), *aff'd*, 485 F. App'x 749 (6th Cir. 2012) (same for silent fraud); *Woodland Harvesting, Inc. v. Ga. Pac. Corp.*, 693 F. Supp. 2d 732, 743–44 (E.D. Mich. 2010) (same for innocent misrepresentation). Here, such particularity is wholly lacking, as the plaintiffs instead allege fraud with only vague, generalized, indiscriminate allegations that fail to satisfy even Rule 8. Indeed, *not one* of the 360 plaintiffs—neither in their "Plaintiff-Specific Allegations" nor in their various counts—provides "the who, what, where, when, and how" required to support a fraud-based claim. *See Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). Instead, they provide only vague, conclusory allegations, which "simply do not suffice under Rule 9(b)." *Id.*

> a.    **The plaintiffs fail to plead the "who" with Rule 9(b) particularity.**

No plaintiffs allege any contact with Ford or any Ford personnel, and only a fraction of the plaintiffs allege in their "Plaintiff-Specific Allegations" any contact with "dealership sales personnel," and among those few, none identify the alleged individual, much less when the representation was made, nor its content. Instead, they allege in boilerplate fashion only that "dealership sales personnel made the following claims or representations to Plaintiff, on which Plaintiff relied in deciding to purchase the Vehicle:  Vehicle Dependability," or  that "Plaintiff viewed or otherwise received the following advertisement or representation by Ford and relied on them in deciding to purchase the Vehicle: Dealership Salesperson," or something

similarly vague and deficient. (*E.g.*, FAC ¶¶ 119, 159.) The failure to identify with particularity who supposedly made any representations (nor any other particularized facts) is all the more important given that, throughout the FAC, the plaintiffs label as Ford "dealerships" entities which clearly are *not*, such as "STS Transmission," "Argo Auto & Transmission," "Budget Car Sales," "AAMCO Transmissions and Total Car Care," "Cannon Honda," "CarMax," and "Precision Automotive," among many others. (FAC ¶¶ 130, 155, 175, 185, 220, 246, & 270.)

> ### b. The plaintiffs fail to plead the "what" per Rule 9(b).

Each of the plaintiffs' fraud-based theories requires them to plead—again, with Rule 9(b) particularity—facts plausibly supporting that Ford "knew of a defect before sale" as part of the "what" of the alleged fraud. *Wozniak*, 2019 WL 108845, at *3; *also McKee*, 376 F. Supp. 3d at 761 ("Plaintiff identifies GM's 'knowledge of the defect' as the 'what' of his fraud claim.").

Primarily, the FAC's allegations on this score fail to satisfy the "what" requirement for the same fundamental reason that their other claims fail—because the amorphous "Transmission Defect" "merely describes performance problems with the vehicle and does not amount to identifying the defect that Ford failed allegedly to disclose. It is therefore insufficient." *In re Ford Motor Co.*, 2019 WL 3000646, at *7; *also DeCoteau v. FCA US LLC*, No. 215CV00020MCEEFB, 2015 WL 6951296, at *3 (E.D. Cal. Nov. 10, 2015) (recognizing that with a "complex

component" such as a transmission, a complaint "must go further than a conclusory allegation that the Transmission Defect exists and is responsible for the injuries").

Ignoring this deficiency, the plaintiffs rely on two general bases for Ford's purported pre-purchase knowledge of their vague "Transmission Defect": 1) TSBs/CSPs, and complaints to NHTSA, and 2) generic references to "pre-and post-production testing data . . . amongst other sources of internal information." (FAC ¶¶ 25, 55, 80–84, 562, 565–66.) Neither suffices.

*First*, as to the CSPs and TSBs, the plaintiffs fail to allege any connection between the issues mentioned in those actions and their own vehicle experiences or conditions. For example, the plaintiffs all indiscriminately rely on TSB 16-0043, which addressed a "Fluid Leak at Left Side Halfshaft Seal" "due to wear on the transmission case bushing" in "some" 2010 to 2014 Ford Fusions "built on or before 10/14/2013." (FAC ¶ 66(c).) No plaintiff alleges having experienced a fluid leak, however, nor does the FAC explain how this TSB is relevant in any way to claims by plaintiffs who, for example, didn't even own a 2010 to 2014 Fusion.

*Second*, as to both the TSBs/CSPs and complaints to NHTSA, the plaintiffs fail to identify which of those purports to evince Ford's knowledge of the alleged defect pre-dating *their* individual vehicle purchases. For example, on their face, items such as TSB 16-0043, issued in March 2016, cannot support alleged knowledge by Ford of a "defect" pre-dating purchases by plaintiffs before March

44

2016. The same goes for the complaints to NHTSA. *McKee*, 376 F. Supp. 3d at 761–

62  (finding reliance on complaints to NHTSA insufficient, in part, because "most

of Plaintiff's consumer complaints *post-date* his purchase of the vehicle").

Overall, the FAC is like the complaint in *Beck v. FCA US LLC*, wherein the

court found no plausible inference of knowledge of an alleged defect based on

Chrysler's purported review of forty-three cited complaints to NHTSA because the

plaintiff there did not "state how many of these complaints were filed *before* [the

plaintiff] purchased" his vehicle. 273 F. Supp. 3d 735, 753 (E.D. Mich. 2018)

(emphasis in original). Here, *none* of the 360 plaintiffs identify which of the

complaints to NHTSA, TSBs/CPSs, or any other materials purportedly provided

knowledge of any alleged defect before each of their *individual* vehicle purchases.

Rather, by continuing to lump together their allegations and claims, the plaintiffs

improperly attempt to skirt such scrutiny and frustrate efficient adjudication.

*Third*, the plaintiffs further misplace their reliance on the TSBs/CSPs and

complaints to NHTSA because, in such limited quantities, they provide no plausible

support for the notion that Ford had "fair notice" that "one particular part is

constantly having problems." *Roe*, 2019 WL 3564589, at *7. Indeed, even without

weeding out those that have nothing to do with the transmission and the plaintiffs'

vague "Transmission Defect" (which would reduce the volume considerably give

the plaintiffs indiscriminate overinclusion), the plaintiffs are left with a relatively

small number of complaints and TSBs/CSPs over a ten-year period. This Court has recognized, however, that complaints about an alleged issue "must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day," which is the case with Ford, or GM, or Toyota, or any other manufacturer that sells "over two million vehicles in North America each year." *Id.* Yet the complaint here lacks any "factual allegations that make it reasonable to infer that complaints about and repairs of the [transmission] were anything more than a blip on Ford's complaints-and-repairs radar." *Id.*

The FAC's reliance on the complaints to NHTSA further erodes because even assuming Ford's knowledge of each complaint, "it does not necessarily follow that Ford knew that the [transmission] was *defective*," much less that there was any supposedly common defect. *Id.* (emphasis in original). Rather, as courts recognize, "[t]ransmissions can fail for a myriad of different reasons." *Callaghan v. BMW of N. Am., LLC*, No. 13-cv-04794-JD, 2014 WL 6629254, at *3 (N.D. Cal. Nov. 21, 2014). Moreover, as the cited TSBs/CSPs illustrate and the FAC concedes, what the plaintiffs label as one purportedly common "Transmission Defect" instead comprise numerous disparate, isolated, and unique issues impacting limited ranges of vehicles in each instance, and involving "a diverse range of transmission-related parts" with different "potential causes"—many of which the FAC shows Ford addressed by its TSBs/CSPs. (FAC ¶¶ 62, 82; *also id.* (alleging "multiple defects").)

46

In addition, the FAC provides no information concerning the overall vehicle population for the Ford Fusion line from 2010 to 2017, so as to provide any context for these customer complaints. In fact, the plaintiffs' vehicles span eight model years, comprising over 1.8 million vehicles. (ECF No. 9, Exs. 4.1–4.7) (showing sales of Ford Fusions from 2010 through 2017). Even crediting all the cited customer complaints to NHTSA results in a rate of only 0.031% (573 complaints ÷ 1,838,255 vehicles sold)—i.e., *31 one-thousandths of one percent*. The plaintiffs ignore this de minimis rate, and give no indication of how it "compares to the failure rate of a part that the law would deem 'defective.' " *Roe*, 2019 WL 3564589, at *7. Thus, "even assuming Ford knew of all [transmission] complaints and repairs," it is impossible to infer from the FAC that "Ford knew that the [transmission] was defective." *Id.*

The plaintiffs' even more boilerplate notice/knowledge allegations fare no better. (*E.g.*, FAC ¶¶ 25, 55, 56, 565, 571(a).) "Courts routinely reject generalized allegations about 'testing' and manufacturer 'analyses' made in support of finding knowledge of a defect," such as the FAC asserts. *See McKee*, 376 F. Supp. 3d at 761; *also Beck*, 273 F. Supp. 3d at 753 (collecting cases). Moreover, bald allegations about "testing" fail to support manufacturer knowledge where, as here, the complaint "does not say what the testing revealed." *Roe*, 2019 WL 3564589, at *6. To paraphrase *Roe*, even assuming the generic "testing" involved transmission testing, the Court would have to blindly infer that such testing "revealed some type of defect.

But absent even a hint as to the test results, it is no more likely that the testing revealed a flawed [transmission] than a flawless [transmission]." *Id.* Similarly, allegations as to Ford's "internal records, communications with its dealerships or service technicians, and review of its warranty data are conclusory and insufficient because they do not plausibly allege" facts supporting that Ford "knew of the defect *prior* to the time it distributed" the plaintiffs' vehicles. *McKee*, 376 F. Supp. 3d at 762  (emphasis in original); (*see, e.g.*, FAC ¶ 55).

In all, the plaintiffs fail to state the "who," the "what," and *every* other element of fraud (i.e., the "where, when, and how") with anything approaching the required particularity. Their wholesale Rule 9(b) failure requires dismissal.

### 2.     The economic-loss rule bars the fraud-based claims.

The economic-loss rule bars tort-based claims—including fraud claims—seeking purely economic losses arising from allegedly defective products. *See, e.g.*, *Murphy v. The Proctor & Gamble Co.*, 695 F. Supp. 2d 600, 608 (E.D. Mich. 2010). Again, the plaintiffs fail to plead their claims under applicable law, contrary to their pleading burden, which is reason enough to dismiss. Even under Michigan law, though, this rule bars their fraud-based claims seeking only economic damages.

### 3.     Each fraud-based claim also fails on numerous other levels.

### a.     The "Affirmative Fraud" claims fails for additional reasons.

The "Affirmative Fraud" claim further fails because none of the plaintiffs identify with any level of particularity the purportedly actionably fraudulent

statements on which any of them supposedly relied. Instead, they refer only vaguely

to "many representations about the quality, smooth shifting capabilities, efficiency,

power, and reliability" of Ford's transmissions, without identifying which plaintiffs

were exposed to and relied on which statements, by whom, when, and how those

statements were supposedly false as to them. (FAC ¶ 546.)   For example, while

scores of plaintiffs don't allege—even conclusorily—that they saw or heard any

marketing statements, even those who do rely on only vague references to "Internet

Marketing," or "TV, Radio or Billboard Ad's," with no information about their

alleged content. (FAC ¶¶ 121–22.). This is wholly deficient, since "plaintiffs have

the burden of alleging specifically which commercials they saw and the content of

those commercials.") *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices*

*Litig.*, No. 05 C 2623, 2009 WL 937256, at *6 (N.D. Ill. Apr. 6, 2009).

The affirmative fraud claim further fails because for lack of particularized

facts showing how any affirmative statements were false as to the plaintiffs and their

vehicles individually. *See In re Ford Motor Co.*, 2019 WL 3000646, at *4

(dismissing misrepresentation claims based on statements about vehicle

performance where complaint alleged only "problematic performance," which failed

to "render false a claim that it offered 'great handling on all roads,' 'the performance

of a manual,' and 'seamless gear changes for amazing responsiveness"). Instead, the

plaintiffs assert that Ford's unidentified marketing statements were "false" based on,

for example, their own allegations—i.e., classic bootstrapping. (FAC ¶ 549.) They also purport to rely on "the numerous publications reporting on the widespread and serious Fusion Transmission Defects," yet cite (in part) publications that had nothing to do with the Fusion or its transmission. (*Id.* (e.g., citing Exs. V (discussing the Focus and Fiesta models and their different DPS6 transmissions), X (discussing a brake issue), AA (discussing airbags.) The FAC fails to explain how an article about Takata airbags shows that any statements about Fusion transmissions were false.

In addition, while an affirmative-fraud claim requires particularized allegations showing a "fraudulent scheme," *McKee*, 376 F. Supp. 3d at 760, the plaintiffs provide none. Instead, the plaintiffs baldly assert the "scheme" was that Ford misrepresented the nature of its vehicles "to prevent Plaintiffs from obtaining information about the nature and existence of their claims involving their vehicles' defective transmissions." (FAC ¶ 551.) In other words, the alleged "scheme" is either the same as the alleged fraud itself (i.e., circular reasoning), or else the plaintiffs confuse a claim for fraud with a tolling argument based on alleged fraudulent concealment of the existence of a claim. Regardless, they allege no facts plausibly supporting the required "scheme." *See McKee*, 376 F. Supp. 3d at 760.

Other allegations in the lone "scheme" paragraph are bizarre—for example, that Ford refused "to service vehicles because Plaintiffs have commenced litigation against Ford, to limit the number of repairs or repair attempts." (*Id.*) No plaintiff

alleges anything about any other litigation nor any refusal of service because of it. This is simply indiscriminate, baseless, kitchen-sink pleading.

### b.    "Silent Fraud" likewise fails for additional reasons.

The plaintiffs baldly assert:  "Ford's silent fraud goes beyond mere failure to disclose and includes repeatedly and continually misrepresenting the Fusion and its transmissions." (FAC ¶ 560.) The lone "misrepresentation" they cite, however—"a smooth-shifting 6-speed automatic" (FAC ¶ 563)—is merely textbook subjective, non-actionable puffery. *E.g.*, *Nicholson*, 2016 WL 5463215, at *19 ("quietest riding, best handling coach on the market" was mere subjective opinion and nonactionable puffery); *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954 (Ala. 1995) (finding "a 'smooth riding' car" was "merely sales talk" and not a statement "of material fact"). Moreover, this statement would apply only to 2010 and 2011 Fusion models, and even then, only to plaintiffs who allege they saw and relied on it, which *none* do.

In addition, under Michigan law—given the failure to plead under other states' laws, much less to establish such states would even recognize the claim— "mere nondisclosure is insufficient" for silent fraud because there "must be circumstances that establish a legal duty to make a disclosure." *Matanky*, 370 F. Supp. 3d at 793.  This duty typically requires that specific "inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Id.* A "failure to inquire dooms the silent-

51

fraud claim" because without it, there is "no duty to make any further disclosure." *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 666 (6th Cir. 2013).

Here, *no plaintiff* alleges making any specific inquiries; rather, the FAC shows many of them did not, stating that in only "some cases, a Plaintiff expressed a particular concern or directly inquired about quality and reliability of the Vehicle and its transmission." (FAC ¶ 560.) But the FAC doesn't identify which plaintiffs supposedly made such inquiries, what they inquired, to whom, nor what the response was. They provide no facts whatsoever, "Accordingly, their silent fraud claim fails to state a claim on which relief may be granted." *Matanky*, 370 F. Supp. 3d at 794.

### c. "Innocent Misrepresentation" also fails for additional reasons.

Under Michigan law, at least—again, given the failure to plead the claims under other states' laws, much less to establish that the applicable law would even recognize such a theory—innocent misrepresentation "requires proof of five elements: (1) a contractual relationship between [a plaintiff and defendant] in which (2) defendant made a false representation (3) on which plaintiff relied (4) resulting in injury to plaintiff (5) where plaintiff's loss inured to the benefit of defendant." *Kahn v. Burman*, 673 F. Supp. 210 (E.D. Mi. 1987).

As with every other claim, in addition to failing to plead according to applicable law, the plaintiffs fail to plead this claim in anything approaching any individualized manner. In addition to failing on other elements of this claim for the

same reasons as shown above (e.g., no false representation, no reliance), no plaintiff alleges the requisite contractual relationship; instead, many plead only facts showing *no such relationship* with remote manufacturer Ford. This claim fails on every level.

### vii.    The Unjust Enrichment claim similarly fails for several reasons.

The plaintiffs baldly assert "Unjust Enrichment," but again, in boilerplate fashion only and under no state's law in particular, despite the fact that "[s]tate law requirements under unjust enrichment law vary widely." *In re Refrigerant Compressors*, 2013 WL 1431756, at *24. (FAC ¶¶ 581–84.) While the FAC fails to present it in any kind of manner tailored to individual plaintiffs, this claim regardless fails primarily on higher and more generally applicable grounds.

*First*, the unjust enrichment claim relies on alleged fraud, triggering Rule 9(b). (FAC ¶ 583.) Yet, as with the other fraud-based claims, this claim wholly lacks the requisite particularity, requiring its dismissal.

*Second*, under Michigan law (and given the plaintiffs' failure to plead according to any individually applicable state's laws) "unjust enrichment claims must be dismissed" where there is an express contract governing the subject matter. *Matanky*, 370 F. Supp. 3d at 803.  For example, where—as here—the terms of a manufacturer's limited warranty govern "the parties' rights and obligations with respect to defects in materials and workmanship . . . no contract will be implied in law to defeat" the warranty's express terms. *Miller*, 2018 WL 2740240, at *15.

53

*Third*, unjust enrichment is not available where, as here, the plaintiffs allege adequate legal remedies by other causes of action, even if those other claims fail. *See Duffie v. Mich. Grp., Inc. - Livingston*, No. 14-CV-14148, 2016 WL 8259511, at *1 (E.D. Mich. Jan. 15, 2016).

*Fourth*, this claim—like all the others—lacks sufficient facts plausibly supporting the existence of any actual defect from which it can be reasonably inferred that there is anything "unjust" or inequitable. *See, supra*, Part II.C.i.

*Fifth*, this claim lacks "facts sufficient to establish that Ford obtained any benefit from the complained-of conduct." *Wozniak*, 2019 WL 108845, at *4. The FAC asserts "Ford has profited and benefitted from the purchase and leasing of Plaintiffs' vehicles, in that Ford sold Plaintiffs defective products for the price of non-defective products." (FAC ¶ 582.) Yet it lacks any supporting facts, such as what these "non-defective products" are and their relative cost. *Wozniak*, 2019 WL 108845, at *4.

*Sixth*, the FAC lacks facts plausibly supporting a benefit conferred *on Ford*— not as to any plaintiffs who purchased their vehicles new from a Ford dealer, and certainly not with respect to those who bought their vehicles used. *See In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03–4558, 2010 WL 2813788, at *33 (D.N.J. July 9, 2010), *am.*, 2011 WL 601279 (D.N.J. Feb. 16, 2011) (holding unjust enrichment claims failed both as to new and used vehicle purchases where

plaintiffs failed to show a "sufficiently direct relationship . . . such that Ford received

a benefit" from such purchases). For these many reasons, the Unjust Enrichment

claim fails as to all plaintiffs.

### Conclusion

For the foregoing reasons, defendant Ford Motor Company asks that the Court

dismiss this action in its entirety with prejudice.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY: /s/ Thomas P. Branigan
THOMAS P. BRANIGAN (P41774)
JODI MUNN SCHEBEL (P55889)
MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone: 248.205.3300
Facsimile: 248.205.3309
Email: tom.branigan@bowmanandbrooke.com
Email: jodi.schebel@bowmanandbrooke.com
Email: matthew.berard@bowmanandbrooke.com

*Attorneys for Defendant*
*Ford Motor Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2020, I electronically filed the foregoing paper Defendant Ford Motor Company's Motion to Dismiss with the Clerk of the Court using the ECF System, which will send notification to all ECF counsel of record.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY:  /s/ Thomas P. Branigan
THOMAS P. BRANIGAN (P41774)
JODI MUNN SCHEBEL (P55889)
MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone:  248.205.3300
Facsimile:  248.205.3309
Email:  tom.branigan@bowmanandbrooke.com
Email:  jodi.schebel@bowmanandbrooke.com
Email:  matthew.berard@bowmanandbrooke.com

*Attorneys for Defendant*
*Ford Motor Company, Inc.*