UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AARON GANT, et al.,

    Plaintiffs,

v.

FORD MOTOR COMPANY, INC.,

    Defendant.

Case: 2:19-cv-12533

Honorable Sean F. Cox

Magistrate Judge David R. Grand

**DEFENDANT FORD MOTOR COMPANY'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendant Ford Motor Company moves to dismiss plaintiffs' Second Amended Complaint (SAC) (ECF No. 38) under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), relying on the attached brief and accompanying exhibits.

Since last year, the parties have conferred several times to discuss Ford's opposition to the various complaints. On October 2, 2019, pursuant to E.D. Mich. LR 7.1(a), Ford sent plaintiffs' counsel a detailed email outlining the scope of Ford's motion to dismiss the earlier complaint (ECF No. 1-1) and requesting a teleconference. Plaintiffs' counsel responded that they would attempt to respond with their position on those issues, but did not before Ford's deadline for its motion to dismiss, which Ford filed on October 4, 2019 (ECF No. 9).

On January 10, 2020, after the plaintiffs filed their first amended complaint (FAC) (ECF No. 10), Ford's counsel corresponded with plaintiffs' counsel concerning the nature of Ford's anticipated motion to dismiss the FAC and the legal bases for it—including by resending the October 2, 2019 email that addressed many of the same grounds for dismissal that would be raised against the FAC. That was followed by a teleconference on January 13, 2020, during which plaintiffs advised that they anticipated seeking leave to file their SAC, which they did, along with responding to Ford's motion to dismiss the FAC.

The Court granted leave to amend, over Ford's opposition, making the SAC (ECF No. 38) the operative complaint. As Ford explained in opposing leave to file the SAC, it cures none of the deficiencies with the earlier complaints. On July 21, 2020, Ford's counsel suggested to plaintiffs' counsel that, in light of the protracted procedural history and motions practice, along with the prior meet-and-confer efforts, further discussions would be futile. Plaintiffs' counsel agreed that further discussions would not be useful, and that they will oppose Ford's motion.

WHEREFORE, Ford respectfully requests that the Court grant its motion[1] and dismiss the SAC in its entirety with prejudice.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY:   /s/ Thomas P. Branigan
_____

_____
[1] The Court granted leave for opening briefs up to 55 pages each. (ECF No. 37 at 2.)

THOMAS P. BRANIGAN (P41774)
JODI MUNN SCHEBEL (P55889)
MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone: 248.205.3300
Facsimile: 248.205.3309
Email: tom.branigan@bowmanandbrooke.com
Email: jodi.schebel@bowmanandbrooke.com
Email: matthew.berard@bowmanandbrooke.com

*Attorneys for Defendant
Ford Motor Company, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AARON GANT, et al., | |
| Plaintiffs, | Case: 2:19-cv-12533 |
| v. | Honorable Sean F. Cox |
| FORD MOTOR COMPANY, | Magistrate Judge David R. Grand |
| Defendant. | |

**BRIEF IN SUPPORT OF FORD MOTOR COMPANY'S MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

## STATEMENT OF ISSUES PRESENTED

1.     <u>All Counts</u> – Pleading rules require complaints to be well-organized, with relevant and factually supported allegations tailored to the elements of the plaintiffs' individual, discrete claims asserted, and the claims plead according to the applicable law. The SAC, at 840 pages with hundreds of pages of exhibits, conflates claims by 360 plaintiffs regarding their individual purchases of vehicles spanning eight model years and over the course of 10 years, across 42 states. If possible, this SAC is even more muddled and confusing than its predecessor, in that plaintiffs all still fail to provide any well-pled facts identifying any actual defect. While the plaintiffs now purport to assert claims under the applicable states' laws, they do so in only the most boilerplate fashion, all relying on the same generic set of facts on issues such as Ford's purported knowledge of a vague alleged "Transmission Defect," despite the patent irrelevance and inapplicability of those facts to their claims. Plaintiffs who have pled some facts as to their vehicle experiences show their claims are affirmatively barred for various reasons. Moreover, dozens of plaintiffs still provide no facts whatsoever supporting their claims, and instead recite merely that they purchased a Ford Fusion, with no other individual factual allegations. These are in addition to numerous other inconsistencies, contradictions, and confusing allegations that only serve to obfuscate the nature of their claims and make it impossible to determine which plaintiffs rely on which facts to support which claims. Should the Court dismiss the SAC in its entirety under Rules 8 and 12(b)(6)?

2.     <u>All Counts as to Certain Plaintiffs</u>[2] – Under Michigan's applicable statutes of limitations, including its borrowing statute: (1) the express warranty claims accrued either upon tender, or upon Ford's purported failure to repair or replace the allegedly defective vehicle component, (2) the implied warranty claim accrued upon tender of delivery, (3) the fraud-based and unjust enrichment claims accrued upon original sale; and (4) the new miscellaneous product liability/ negligence and dealer/franchise act claims are likewise subject to various limitations periods. Here, putting aside the plaintiffs' failure to provide essential facts as to their claims, it is clear that: (1) many plaintiffs' express warranty claims are barred under any set of facts, (2) many more of the implied warranty claims are facially time-barred, (3) the same goes for the fraud-based and unjust enrichment claims, and (4) likewise for the new miscellaneous claims. Meanwhile, the plaintiffs fail to

---

[2] Exhibit 1.1 is a chart showing which plaintiffs' claims are facially time-barred.

adequately plead any applicable tolling doctrine. Should the Court dismiss these claims with prejudice as time-barred?

3. <u>Express Warranty Claims</u> – As for the express warranty claim, plaintiffs still provide no well-pled facts plausibly supporting the terms of their warranties, that there was a warranty-covered actual defect, or that their alleged issues are covered by the terms of any applicable express warranty. Moreover, scores of plaintiffs still fail to allege even the most basic facts as to their compliance with those warranties (e.g., timely presentment to a Ford dealership for repair), much less any breach of those warranties, including failing to allege any facts supporting the occurrence of a warranted condition that arose within the earlier of the mileage and time limits that Ford failed to repair. Should the Court dismiss the express warranty claim as to all plaintiffs?

4. <u>Implied Warranty Claims</u> – As for the implied warranty claim, plaintiffs again provide no well-pled facts supporting any lack of merchantability, including failing to identify any actual defect, as well as failing to allege any facts as to timely notice to Ford. Moreover, for many of plaintiffs, a lack of vertical privity bars their claims under the applicable states' laws. Should the Court dismiss the implied warranty claim as to all plaintiffs? Moreover, with no underlying viable warranty claims, should the Court dismiss the Magnuson-Moss Warranty Act claim, which requires a predicate state-law warranty claim?

5. <u>Revocation Claims</u> – Many plaintiffs assert claims for revocation of acceptance the fact that (1) such is typically merely a remedy for a breach of warranty as opposed to an independent cause of action, (2) their underlying warranty claims fail precluding the remedy of revocation, (3) plaintiffs don't provide sufficient facts plausibly supporting the elements of entitlement to revocation (i.e., timely notice, no substantial change in the vehicle), and (4) even as a remedy, revocation is typically unavailable against a remote manufacturer such as Ford. Should the Court dismiss this purported claim as to all plaintiffs?

6. <u>Fraud- and Consumer Protection-Based Claims</u> – Many plaintiffs assert various fraud-based claims, including under their purchase states' consumer protection laws, but without providing any well-pled, particularized supporting facts as required under Rule 9(b) for such claims. The economic-loss rule, meanwhile, bars such fraud/tort-based claims. These various theories also fail for numerous other reasons, including failure to plead any actual defect, much less Ford's knowledge

thereof predating the plaintiffs' vehicle purchases. In addition, many states' consumer-protection laws, like Michigan's, preclude claims arising out of motor vehicle sales. Should the Court dismiss the fraud-based claims as to all plaintiffs?

7.      <u>Unjust Enrichment Claims</u> – Many plaintiffs assert claims for unjust enrichment, yet such claims are properly barred where—as here—there is an express contract addressing the subject matter (i.e., the vehicles' New Vehicle Limited Warranty). Moreover, these plaintiffs premise their unjust enrichment claim on alleged fraud, yet they fail to comply with Rule 9(b), and the economic-loss rule otherwise bars such a fraud-based theory of relief. In addition, the SAC lacks any facts supporting a benefit conferred by plaintiffs, much less on Ford (either as to new *or* used vehicles), nor any facts supporting anything "unjust" with respect to those who don't allege any issues with their vehicles. Should the Court dismiss this claim as to all plaintiffs who assert it?

8.      <u>Miscellaneous New Product Liability and Other Claims</u> – Many sets of plaintiffs now assert entirely new causes of action, including for common-law or statutory product liability, as well as under various dealer/franchise laws. The product-liability claims fail because (1) this is not and has never been a product liability action, and no plaintiff alleges any damage to person or other property, (2) plaintiffs have not pled any facts supporting an actual defect, (3) the economic-loss rule would nonetheless bar such tort-based claims, (4) and many states' product-liability laws expressly bar their application to economic-loss claims such as these. As for the two sets of plaintiffs asserting dealer/franchise law claims, those claims are inapplicable on the law and do not allow for an action by a consumer, or else are factually unsupported on the meager facts alleged, or both. Should the Court dismiss these miscellaneous new claims as well?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY[3]

*Agee v. Alphatec Spine, Inc.*, No. 1:15-cv-00750-TSB, 2017 WL 5706002 (S.D. Ohio. Mar. 27, 2017)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Beck v. FCA US LLC*, 273 F. Supp. 3d 735 (E.D. Mich. 2018)*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

*Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008)

*Hall v. Gen. Motors LLC*, No. 19-CV-10186, 2020 WL 1285636 (E.D. Mich. Mar. 18, 2020), *appeal docketed*, No. 20-1321 (6th Cir. Apr. 20, 2020)*

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL 3000646 (C.D. Cal. May 22, 2019)

*Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772 (E.D. Mich. 2019)*

*McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751 (E.D. Mich. Mar. 25, 2019)*

*Miller v. Gen. Motors, LLC*, No. 17-CV-14032, 2018 WL 2740240 (E.D. Mich. June 7, 2018)*

*Roe v. Ford Motor Co.,* No. 218CV12528LJMAPP, 2019 WL 3564589 (E.D. Mich. Aug. 6, 2019), reconsideration denied in part, 439 F. Supp. 3d 922 (E.D. Mich. 2020), and on reconsideration in part, No. 2:18-CV-12528, 2020 WL 1270778 (E.D. Mich. Mar. 17, 2020)*

*Tomas v. Ill. Dept. of Empl. Sec.*, No. 07 C 4542, 2009 WL 2916840 (N.D. Ill. Sept. 2, 2009)

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771 (7th Cir. 1994)

*Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015)

*Wozniak v. Ford Motor Co.*, No. 2:17-cv-12794, 2019 WL 108845 (E.D. Mich. Jan. 4, 2019)*

---

[3] Cases appended per the Court's Practice Guidelines are indicated with an *.

# TABLE OF CONTENTS

**Introduction** .................................................................................... 1

**Factual Background** ........................................................................ 4

    **A. In this fourth attempt by many of the same plaintiffs, 360 Ford Fusion purchasers from 42 different states join in an 840-page complaint.** .................................................. 4

    **B. Plaintiffs allege various "warranty/fraud" claims for unidentified vehicle "defects," including a vague "Transmission Defect."** .................................................. 4

    **C. Plaintiffs again cite various customer complaints to NHTSA, TSBs, and CSPs, but again without identifying which are purportedly relevant to individual plaintiffs' vehicles and claims.** ....................................................................... 7

    **D. After failing to plead according to the laws applicable to their claims individually, plaintiffs now allege multiple counts—as many as 11—under 42 states' laws, including claims never before pled.** ..................................................................... 9

**Argument** ........................................................................................ 10

    **I. The SAC remains an improper "shotgun" pleading—still confused and obfuscating, and even more prolix than its predecessors.** .......................................................... 12

        **A. The SAC persists in the improper practice of asserting all 360 plaintiffs' claims indiscriminately *en masse*, instead of individually.** .................................................. 13

        **B. The SAC's boilerplate and kitchen-sink inclusion of causes of action under 42 states' laws only further compounds the problem.** ........................................... 17

    **II. Beyond the facial improprieties of the plaintiffs' prolix and confusing complaint, their claims require dismissal for numerous other reasons.** .......................................... 22

        **A. Under applicable Michigan procedural law, most of the plaintiffs' claims require dismissal as outright time-barred.** ......................................................... 22

1. **Many plaintiffs' warranty claims are outright time-barred.** ........................................................................ 22

2. **Many plaintiffs' fraud-based claims are also facially time-barred.** ........................................................... 25

3. **Many plaintiffs' miscellaneous new claims are also time-barred.** ........................................................... 27

B. **The plaintiffs fail to plead facts plausibly supporting any tolling.** ........................................................... 28

C. **Plaintiffs' claims all fail on substantive grounds as well.** ........ 30

1. **The breach of express warranty claim fails for numerous reasons.** ................................................. 30

2. **Plaintiffs likewise fail to state valid implied warranty claims.** ................................................................. 35

3. **With no viable state-law warranty claims, the MMWA claim fails.** ................................................................. 39

4. **The Revocation of Acceptance claims are not properly stand-alone causes of action, and revocation is typically not available even as a remedy against a remote manufacturer.** ........................................................ 39

5. **The fraud- and consumer protection-based claims all fail.** ................................................................. 41

   a. **Many states' laws—including Michigan—exempt new vehicle purchase from their consumer protection laws, while there is no actionable transaction as to used-vehicle purchases.** ....................... 41

   b. **These claims fail for lack of Rule 9(b) particularity.** ........................................................ 43

   c. **The economic-loss rule bars the tort-based claims.** ....... 51

6. **The Unjust Enrichment claims also fail for several reasons.** ................................................................. 51

7. **The product liability-based claims (including negligence) and miscellaneous claims fail for several reasons.** ................................................................. 53

**Conclusion** ................................................................. 54

# INDEX OF AUTHORITIES

## Cases

*Agee v. Alphatec Spine, Inc.*,
  No. 1:15-cv-00750-TSB, 2017 WL 5706002 (S.D. Ohio. Mar. 27, 2017) ................................................................................................... 12, 22

*Ashcroft v. Iqbal*,
  *556 U.S. 662 (2009)* .........................................................................11

*Bangor Water Dist. v. Malcolm Pirnie Engineers*,
  534 A.2d 1326 (Me. 1988) ................................................................26

*Beck v. FCA US LLC*,
  273 F. Supp. 3d 735 (E.D. Mich. 2018) ....................................... 46, 48

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .........................................................................11

*Boyle v. Gen. Motors Corp.*,
  661 N.W.2d 557 (Mich. 2003) ..................................................... 26, 28

*Callaghan v. BMW of N. Am., LLC*,
  No. 13-cv-04794-JD, 2014 WL 6629254 (N.D. Cal. Nov. 21, 2014) ................47

*Cyr v. Ford Motor Co.*,
  No. 345751, 2019 WL 7206100 (Mich. Ct. App. Dec. 26, 2019) ......................42

*Darne v. Ford Motor Co.*,
  No. 13 CV 03594, 2017 WL 3836586 (N.D. Ill. Sept. 1, 2017) ........................34

*Davis v. Coca-Cola Bottling Co. Consol.*,
  516 F.3d 955 (11th Cir. 2008) ...........................................................13

*DeCoteau v. FCA US LLC*,
  No. 215CV00020MCEEFB, 2015 WL 6951296 (E.D. Cal. Nov. 10, 2015) ................................................................................................45

*Downing v. Ford Motor Co.*,
  No. 17-10652, 2018 WL 3301210, at *4 (E.D. Mich. Feb. 5, 2018),
  (adopting report and recommendation), No. 17-CV-10652, 2018
  WL 1417599 (E.D. Mich. Mar. 22, 2018), aff'd, No. 18-1335, 2018
  WL 4621955 (6th Cir. Sept. 24, 2018) ...............................................11

*Ducharme v. A & S RV Ctr., Inc.*,
  321 F. Supp. 2d 843 (E.D. Mich. 2004), *aff'd*, 127 F. App'x 204
  (6th Cir. 2005) ................................................................................35

*Duffie v. Mich. Grp., Inc. - Livingston*,
  No. 14-CV-14148, 2016 WL 8259511 (E.D. Mich. Jan. 15, 2016) ....................52

*East River S.S. Corp. v. Transamerica Delaval, Inc.*,
  476 U.S. 858 (1986) .........................................................................51

*Experian Mktg. Sols., Inc. v. Lehman*,
No. 1:15-CV-476, 2015 WL 5714541 (W.D. Mich. Sept. 29, 2015) ..................13

*Fleming v. Mich.*,
No. 09-11795, 2010 WL 931925 (E.D. Mich. Mar. 11, 2010) ...........................14

*Frank v. Dana Corp.*,
547 F. 3d 564 (6th Cir. 2008) ............................................................................12

*Gertz v. Toyota Motor Corp.*,
No. CV 10-1089 PSG (VBKx), 2011 WL 3681647 (N.D. Cal. Aug.
22, 2011) ............................................................................................................32

*Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*,
894 N.W.2d 700 (Mich. 2016) ...........................................................................23

*Hall v. Gen. Motors LLC*,
No. 19-CV-10186, 2020 WL 1285636 (E.D. Mich. Mar. 18, 2020),
*appeal docketed*, No. 20-1321 (6th Cir. Apr. 20, 2020) ............................... 45, 53

*Hammoud v. U.S. Attorney*,
No. 14-14398, 2015 WL 4756582 (E.D. Mich. Aug. 12, 2015) .................. 10, 11

*Henderson v. Chrysler Corp.*,
477 N.W.2d 505 (Mich. Ct. App. 1991) ............................................................40

*Hudson v. Genesee Interm. Sch. Dist.*,
No. 14-11939, 2015 WL 128030 (E.D. Mich. Jan. 8, 2015)..................................5

*In re Auto. Parts Antitrust Litig.*,
No. 12-MD-02311, 2017 WL 7689654 (E.D. Mich. May 5, 2017)............. 29, 30

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
280 F. Supp. 3d 975 (E.D. Mich. 2017) .............................................................39

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*,
No. CV1706656ABFFMX, 2019 WL 3000646 (C.D. Cal. May 22,
2019) ...................................................................................... 31, 45, 50

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*,
No. 03–4558, 2010 WL 2813788 (D.N.J. July 9, 2010), *am.*, 2011
WL 601279 (D.N.J. Feb. 16, 2011).....................................................................53

*In re Ford Motor Co. Speed Control Deactivation Switch Prod. Liab.
Litig.*,
21480 (E.D. Mich. Aug. 24, 2007)............................................................... 33, 37

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
No. 05 C 2623, 2009 WL 937256 (N.D. Ill. Apr. 6, 2009)..................................50

*Johnson v. Ventra Grp., Inc.*,
191 F.3d 732 (6th Cir. 1999) ..............................................................................22

*Kinner v. Ford Motor Co.*,
No. 2:19-cv-10583-SFC-DRG (ECF No. 1) (E.D. Mi. Feb. 26,
2019) ...................................................................................... 4, 10, 24

*Lamere v. St. Jude Med., Inc.,*
 827 N.W.2d 782 (Minn. Ct. App. 2013) ....................................................... 26, 28
*Liss v. Lewiston-Richards, Inc.,*
 732 N.W.2d 514 (Mich. 2007) ........................................................................42
*Mason v. Chrysler Corp.,*
 653 So. 2d 951 (Ala. 1995) ............................................................................51
*Matanky v. Gen. Motors LLC,*
 370 F. Supp. 3d 772 (E.D. Mich. 2019) .................................................. passim
*McKee v. Gen. Motors LLC,*
 376 F. Supp. 3d 751 (E.D. Mich. Mar. 25, 2019) ...................................... passim
*Miller v. Gen. Motors, LLC,*
 No. 17-CV-14032, 2018 WL 2740240 (E.D. Mich. June 7, 2018)............. passim
*Mullane v. Central Hanover Bank & Trust Co.,*
 339 U.S. 306 (1950) .......................................................................................55
*Murphy v. The Proctor & Gamble Co.,*
 695 F. Supp. 2d 600 (E.D. Mich. 2010) ...........................................................51
*Neal v. SMC Corp.,*
 99 S.W.3d 813 (Tex. App. 2003) .....................................................................40
*Nicholson v. Jayco, Inc.,*
 No. 5:15-CV-2010, 2016 WL 5463215 (N.D. Ohio Sept. 29, 2016 ....................51
*Republic Bank & Tr. Co. v. Bear Stearns & Co.,*
 683 F.3d 239 (6th Cir. 2012) ..........................................................................43
*Roe v. Ford Motor Co.,* No. 218CV12528LJMAPP, 2019 WL
 3564589 (E.D. Mich. Aug. 6, 2019), reconsideration denied in part,
 439 F. Supp. 3d 922 (E.D. Mich. 2020), and on reconsideration in
 part, No. 2:18-CV-12528, 2020 WL 1270778 (E.D. Mich. Mar. 17,
 2020) ...................................................................................................... passim
*Romeo Inv. Ltd. v. Mich. Consol. Gas Co.,*
 No. 260320, 2007 WL 1264008 (Mich. Ct. App. May 1, 2007).........................26
*Rosa v. Am. Water Heater Co.,*
 177 F. Supp. 3d 1025 (S.D. Tex. 2016) ............................................................31
*Rosenbaum v. Toyota Motor Sales, USA, Inc.,*
 No. 16-CV-12645, 2016 WL 9775018 (E.D. Mich. Oct. 21, 2016) ............. 35, 42
*Sautner v. Fleetwood Enters., Inc.,*
 No. 05-73252, 2007 WL 1343806 (E.D. Mich. May 8, 2007)............................40
*Saval v. BL Ltd.,*
 710 F.2d 1027 (4th Cir. 1983) ..........................................................................3
*Schechner v. Whirlpool Corp.,*
 237 F. Supp. 3d 601 (E.D. Mich. 2017) ...........................................................32

*Sloan v. Gen. Motors LLC*,
 No. 16-cv-07244-EMC, 2017 WL 3283998 (N.D. Cal. Aug. 1, 2017................32
*Smith v. Bank of Am. Corp.*,
 No. CIV. 10-14161, 2011 WL 653642 (E.D. Mich. Feb. 14, 2011),
 *aff'd*, 485 F. App'x 749 (6th Cir. 2012) ...........................................................43
*Snyder v. Boston Whaler, Inc.*,
 892 F. Supp. 955 (W.D. Mich. 1994)......................................................... 39, 40
*Tomas v. Ill. Dept. of Empl. Sec.*,
 No. 07 C 4542, 2009 WL 2916840 (N.D. Ill. Sept. 2, 2009)........................ 14, 17
*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
 20 F.3d 771 (7th Cir. 1994) ......................................................................12
*Walsh v. United States*,
 588 F. Supp. 523 (N.D.N.Y 1983) ..............................................................37
*Weiland v. Palm Beach Cnty. Sheriff's Office*,
 792 F.3d 1313 (11th Cir. 2015)........................................................ 12, 13, 17
*Wimbush v. Wyeth*,
 619 F.3d 632 (6th Cir. 2010) .....................................................................18
*Woodland Harvesting, Inc. v. Ga. Pac. Corp.*,
 693 F. Supp. 2d 732 (E.D. Mich. 2010) ........................................................43
*Wozniak v. Ford Motor Co.*,
 No. 2:17-cv-12794, 2019 WL 108845 (E.D. Mich. Jan. 4, 2019) .............. passim

**Other Authorities**

Colo. Rev. Stat. Ann. § 13-80-101(1)(a) ...............................................................23
Fed. R. Civ. P. 20.................................................................................................3
Fed. R. Civ. P. 8(a).............................................................................................10
Fed. R. Civ. P. 9(b) ...................................................................................... passim
Ga. Code Ann. § 10-1-401(a)(1)...........................................................................25
La. Civ. Code Ann. art. 2800.53(5) .....................................................................18
La. Civ. Code Art. 2520.......................................................................................38
La. Civ. Code Art. 2534.A.(1) .............................................................................38
La. Stat. Ann. art. 9:2800.52...............................................................................18
Mass. Gen. Laws Ann. ch. 106, § 2-318...............................................................23
Mass. Gen. Laws Ann. ch. 93A, § 3 .....................................................................42
Mich. Comp. Laws § 440.2725.............................................................................24
Mich. Comp. Laws § 440.2725(1).........................................................................23
Mich. Comp. Laws § 440.2725(3).........................................................................24
Mich. Comp. Laws § 445.904(1)...........................................................................42
Mich. Comp. Laws § 445.911....................................................................... 25, 26
Mich. Comp. Laws § 600.5827..................................................................... 26, 28

Mich. Comp. Laws § 600.5861 ...................................................................22
N.M. Stat. Ann. §§ 57-16-14 ....................................................................27
Neb. Rev. Stat. Ann. § 59-1617 ...............................................................42
O.R.C. § 2307.71(B) .................................................................................18
Ohio Rev. Code Ann. § 4165.04 ..............................................................42
Okla. Stat. Ann. tit. 15, § 754 ..................................................................42
S.C. Code Ann. § 56-15-120.....................................................................27
Tenn. Code Ann. § 47-18-111 ..................................................................42
U.C.C. § 2-607(3)(a) .................................................................................36
Uniform Commercial Code section 2-608(1) ...........................................39
Va. Code Ann. § 8.01-243 .........................................................................26
Va. Code Ann. § 8.01-243(A).....................................................................27

**Introduction**

After multiple amendments, the SAC has only convoluted matters further. The root problem is these 360 plaintiffs' dogged insistence on misjoinder and pleading their claims in mass, indiscriminate, and conflated fashion—as opposed to pursuing their claims individually, alleging only relevant facts under the applicable laws.

Ironically, while the complaints have gotten longer, they haven't gotten better. For example, with their FAC, many plaintiffs added allegations showing their claims are affirmatively barred and wholly unsupported, such as those who assert Ford breached its written warranty, yet bought their vehicles long *after* that warranty coverage had already expired; or plaintiffs who didn't allege ever seeking warranty coverage; or plaintiffs who, despite asserting fraud, didn't allege being exposed to or relying on *any* representations by Ford. In short, the FAC fixed nothing.

The SAC, meanwhile, weighing in at a staggering 840 pages, does not even pretend to address the majority of the pleading deficiencies Ford raised—most prominently, their "shotgun" pleading approach. Rather, it purports to make only three changes: 1) to add a Magnuson-Moss Warranty Act claim; 2) to generically assert state-law claims for 42 sets of plaintiffs grouped according to their states of purchase; and 3) to add nominal additional facts for one plaintiff. These revisions have added only bulk to the complaint, and no meaningful substance to remedy any of the issues Ford has raised, such as: the failure to identify any actual defect; the

1

failure to weed out plaintiffs and claims which, on the meager facts alleged, show they are unfounded; the improper aggregation and conflation of 360 plaintiffs' separate claims; and the wholesale lack of any particularized facts on alleged fraud.

Instead, the SAC introduces even more flaws, like new claims under various state's product liability statutes where such claims are not only barred under the economic-loss doctrine, but—even were they not—would bar the remainder of their claims outright where those statutes supersede and preempt all other claims, as they typically do. Similarly, plaintiffs indiscriminately add claims under various states' trade practices acts, or dealer/franchise laws, despite their facial inapplicability.

Throughout its multiple motions to dismiss, Ford has shown the myriad, persistent flaws in plaintiffs' complaints. These pervasive and universal flaws alone provide ample basis to dismiss. However, Ford has also shown that plaintiffs' claims fail for more individualized reasons, such as on limitations, or failure to allege any facts supporting alleged breach or fraud, or based on their individual state's laws. As to each plaintiff, however, there are numerous other ways in which their claims require dismissal under their applicable state's laws as applied to their individual facts. Yet, the sheer volume of the claims at issue here—360 plaintiffs, across 42 states, asserting a total of 266 counts—precludes a thorough discussion of the myriad bases for dismissal of their individual claims within the confines of this brief.

Plaintiffs' mass misjoinder, however, should not preclude scrutiny ending with dismissal. Indeed, there is no basis here for joining claims under 42 different states' varying laws, by 360 plaintiffs who bought different models and years of vehicles over the course of 10 years, and who allege different vehicle purchase and driving experiences (where they allege any facts at all) arising from some vague and unidentified defects. *See Saval v. BL Ltd.*, 710 F.2d 1027, 1031 (4th Cir. 1983) (affirming denial of joinder of claims involving only four vehicles that alleged various problems from a "faultily designed cooling system"); *also* Fed. R. Civ. P. 20 (requiring joined claims to arise out of "the same transaction, occurrence, or series of transactions or occurrences"). Due process requires that such individual claims receive individual scrutiny before proceeding. But that appears precisely why these plaintiffs have chosen this route—to storm the courthouse gates *en masse* and force their way in through sheer volume under the notion of "strength in numbers."

Plaintiffs are either unwilling or unable to plead well supported claims.[4] Either way, it is time to end this matter, and to dismiss this action in its entirety with prejudice for the reasons stated herein. But if the Court is inclined to do anything short of that, then whatever remains may warrant additional motion practice, e.g., a motion to sever the claims or to transfer them to their respective states, or both. Ford respectfully reserves the right—consistent with due process—to pursue such relief.

---

[4] Ford is not suggesting that plaintiffs' counsel is "unable" as a matter of skill. Rather, these plaintiffs either lack facts or will to put forth well supported claims.

**Factual Background**

A.     **In this fourth attempt by many of the same plaintiffs, 360 Ford Fusion purchasers from 42 different states join in an 840-page complaint.**

This complaint spans 840 pages and over 2,600 paragraphs (not including subparagraphs and exhibits), and includes 360 plaintiffs[5] from 42 states. (*Generally* SAC.) This is now the fourth go-around for most, as over 190 of the current plaintiffs were also in the largely identical mass-action filed in this Court in February 2019— *Kinner v. Ford Motor Co.*[6] Before Ford could respond, the *Kinner* plaintiffs dismissed and refiled this action with an additional 169 plaintiffs. After removing, Ford moved to dismiss. (ECF No. 9.) Instead of responding (and with leave), plaintiffs filed their FAC, which Ford again moved to dismiss. (ECF No. 20.) This time, plaintiffs responded, but also moved to amend, which the Court while warning "**NO FURTHER AMENDMENTS** shall be permitted." (ECF No. 37 at 2.)

B.     **Plaintiffs allege various "warranty/fraud" claims for unidentified vehicle "defects," including a vague "Transmission Defect."**

Between 2009 and 2019, these 360 plaintiffs bought or leased 2010 to 2017 model-year Ford Fusions, which, as they acknowledge, comprise several different models, with different transmissions. (SAC ¶¶ 5, 17, 19, 28–35, 121–495.) Plaintiffs assert "this lawsuit is a breach of warranty/fraud case based on defective

---

[5] This is based on the number of vehicles at issue, not including the 15 plaintiffs who are "scheduled to be dismissed without prejudice." (SAC ¶¶ 121–495; *also* Ex. 1.3.)
[6] No. 2:19-cv-10583-SFC-DRG (ECF No. 1) (E.D. Mi. Feb. 26, 2019).

4

transmissions" in their vehicles. (*Id.* ¶ 1.) But plaintiffs don't identify what specifically is purportedly "defective" about their transmissions—at most, some of them merely allege experiencing one or more from among a largely generic checklist of assorted conditions. (*E.g.*, *id.* ¶¶ 9, 121.) Meanwhile, many plaintiffs provide only their model year, VIN, and purchase date. (*E.g.*, *id.* ¶¶ 123, 129, 133; *also* Ex. 1.2.)

Plaintiffs allege their vehicles were "backed by a New Vehicle Limited Warranty" (NVLW)—which they don't append—covering "any repairs needed to correct defects in materials or workmanship of covered parts" up to the earlier of "60 months or 60,000 miles." (*Id.* ¶ 13.) The Court may notice the NVLWs. *Hudson v. Genesee Interm. Sch. Dist.,* No. 14-11939, 2015 WL 128030, at *2 (E.D. Mich. Jan. 8, 2015); (ECF No. 9-3, PageID.586–930; *e.g.*, *id.* PageID.601–602).

Many (but not all) plaintiffs identify from whom they bought their vehicles, which, in many instances, show they bought them used, often after many years in service, with high mileage, and from non-Ford-affiliated sellers—such as plaintiff Parra, who bought his 2011 Ford Fusion in 2015, with "approximately 98,000 miles," from "Jose's Auto Salvage Yard." (SAC ¶ 330.) Many plaintiffs assert some facts as to when they first experienced any alleged issues, which they generically label as caused by their vague "Transmission Defect." For many, however, these newly added facts show vehicle purchases *post*-dating when their NVLWs expired (*e.g.*, SAC ¶¶ 212, 395), or allege issues that arose for the first time only *after* the

NVLWs expired (*e.g.*, *id.* ¶¶ 151, 223, 367). Meanwhile, many other plaintiffs still plead no facts as to when—or even whether—they experienced any alleged issues or sought warranty coverage (*e.g.*, *id.* ¶¶ 303, 473), and many others allege they sought repairs only *outside* warranty (*e.g.*, *id.* ¶ 441), while many others allege their vehicles *were repaired* (*e.g.*, *id.* ¶¶ 291, 348).

For alleged fraud, the SAC includes some newer allegations concerning alleged marketing representations. (*Id.* ¶¶ 37–49.) Many of these marketing materials, however, do not even pertain to 2010 through 2017 Fusions, and instead pertain only to prior model-year iterations. (*E.g.*, *id.* Exs. A–D.) No plaintiff alleges to have seen, read, heard, or relied on these materials. Even as to the limited materials cited with respect to 2010 through 2017 model years (*e.g.*, *id.* Exs. E–R), no plaintiff specifically identifies having seen, read, heard, or relied on any of them.

Instead, some plaintiffs include in their "Plaintiff-Specific Allegations" boilerplate references to what they supposedly saw and relied on "in deciding on Vehicle [sic]." (*E.g.*, *id.* ¶ 121.) For example, some allege they saw and relied on "Internet Marketing" (*id.* ¶ 130), or "TV, Radio or Billboard Ads" (*e.g.*, *id.* ¶ 144), or "Historical Brand Slogans" or "Consumer Awards/Reviews" (*e.g.*, *id.* ¶ 173), with no indication what those were. While some identify "Dealership Salesperson" on which they relied) they give no indication of what was supposedly said. (*E.g.*, *id.*) Rather, where any plaintiff alleges receiving or relying on representations by "Ford

dealership sales personnel," they identify only generic snippets, such as "Vehicle Dependability," "Drivability," and "Reliability." (*E.g.*, *id.*) Again, no plaintiff identifies what in particular they relied on that forms the basis of the alleged fraud.

## C. Plaintiffs again cite various customer complaints to NHTSA, TSBs, and CSPs, but again without identifying which are purportedly relevant to individual plaintiffs' vehicles and claims.

Ford previously highlighted the lack of any well-pled factual allegations supporting its supposed knowledge of the vague "Transmission Defect" pre-dating plaintiffs' individual purchases. (ECF Nos. 9, 20.) Oddly, plaintiffs responded by including in their SAC numerous allegations concerning *other* vehicles and *other* alleged issues—including allegations involving the entirely different DPS6 transmission found *not* in the Fusion but instead in Ford Focus and Fiesta vehicles— as well as allegations about brakes, airbags, steering wheels, and wheels, which have nothing to do with the plaintiffs' vague alleged "Transmission Defect." (SAC ¶¶ 81, 82; *id.* Exs. Y, Z, AA, BB, CC, EE.) Even for the limited number of alleged issues actually involving transmissions in some manner, plaintiffs don't identify which— if any—of those issues Ford was supposedly aware before they bought their vehicles. For example, plaintiffs cite a July 11, 2017 newspaper article discussing a small recall involving only a limited number of Ford Fusions that were manufactured at one particular plant from May to mid-June 2017. (*Id.* ¶ 81 & Ex. DD.) No plaintiff identifies their vehicle as within this limited recall population.

In addition, in the SAC, the plaintiffs cite programs Ford initiated to address various disparate issues over the past decade as supposedly addressing the "Transmission Defect"—for example, Customer Satisfaction Program (CSP) 17B38. (*Id.* ¶ 84.) That CSP, however, involved a possible condition in "some" vehicles—i.e., certain 2017 Ford Fusions built between certain dates at one plant— in which "if the ignition is briefly powered on and off, the powertrain control module (PCM) may not fully complete the shutdown process. As a result, the PCM will remain powered which results in excessive current draw and can lead to a drained battery." (*Id.* & n.13.) No plaintiff alleges having a "drained battery."

As they did before, Plaintiffs also rely on Technical Service Bulletins (TSBs), which they assert "detail the same Transmission Defects that Plaintiffs complain of here." (*Id.* ¶ 63.) On their face, this handful of TSBs address disparate issues impacting different model years of Fusion vehicles (and some others), with different root causes and different resolutions. (*Id.* Ex. U.) Plaintiffs allege Ford did not "share that knowledge" concerning the TSBs with them or the public (*id.* ¶ 67), yet TSBs— including these TSBs—are all publicly available. In fact, one of the cited "TSBs" is actually a voluntary safety recall, of which Ford sent notice directly to vehicle owners. (SAC Ex. U, ECF No. 39-9, PageID.5727–5740.)

In addition, as before, the SAC references customer complaints located on NHTSA's "Safercar.gov" website—423 for the 6F35 Ford Fusion transmission for

model years 2010 to 2017, and 150 for the hybrid HF35 transmission in the 2013 to 2017 model years. (SAC ¶ 53 & Exs. S & T.) These customer complaints include many involving 2010 to 2012 model-year Fusions, despite the fact that—as plaintiffs allege—some 2010 to 2012 Fusions "contain a different type of six-speed automatic transmission" that none of the plaintiffs own and is not at issue here. (SAC ¶ 17(c).) As before, many of these complaints appear to have nothing to do with transmissions. (*E.g.*, ECF No. 39-8, PageID.5687–5688 (NHTSA ID##10861612 (involving brakes), 10864820 (fuel system), 10983120 (steering)).) Many were not lodged until years after these plaintiffs' purchases—often not until 2017, 2018, and even 2019—and many involve vehicles that were well outside of warranty when any issues were experienced, either based on the model year, mileage, or both, such as the 2010 vehicle with a December 2018 "incident date" at over 223,000 miles. (*E.g.*, ECF No. 39-8, PageID.5677 (NHTSA ID #11163459 (a)).)

**D.    After failing to plead according to the laws applicable to their claims individually, plaintiffs now allege multiple counts—as many as 11—under 42 states' laws, including claims never before pled.**

In their prior complaints, these 360 plaintiffs each asserted the same nine "warranty/fraud" causes of action, but for the vast majority, not under the law applicable to their claims. (*Generally* ECF No. 12.) In the SAC, plaintiffs group themselves by their states of purchase and assert between two and as many as 11

counts under 42 different states' laws, largely in identical fashion under those states' warranty, consumer protection, fraud, and other laws. (SAC ¶¶ 121–2611.)

In addition, while their motion for leave to amend couched their then-proposed SAC as merely pleading their existing claims under applicable laws, in fact, their SAC includes many new claims. First, the SAC includes a Magnuson-Moss Warranty Act (MMWA) claim, which many plaintiffs dismissed in *Kinner*. (SAC ¶¶ 496–515.) Second, many plaintiffs now assert—albeit, in boilerplate fashion—claims under various states' product liability laws for unidentified "injuries and damages," yet it is unclear what "injuries" these are, since no plaintiff alleges any personal injury. (*E.g.*, *id.* ¶¶ 583–593; *also id.* ¶¶ 1230–36, 1354–77, 1508–18.) Third, certain plaintiffs also allege counts under various motor vehicle dealership and franchise laws—but again, only in boilerplate fashion. (*Id.* ¶¶ 1846–49, 2200–06.) All told, the SAC now contains a total of 266 counts.

## Argument

"Rule 8(a) sets forth the basic federal pleading requirement that a complaint 'shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Hammoud v. U.S. Attorney*, No. 14-14398, 2015 WL 4756582, at *3 (E.D. Mich. Aug. 12, 2015) (Cox, J.) (adopting report and recommendation). This Court has recognized, however, that despite "this relatively low threshold, a complaint must nevertheless contain more than legal labels, conclusions, and a

recitation of the elements of a cause of action; it must also contain 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 547). While a complaint need not contain detailed factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted) .

In *Iqbal*, the Court expanded on *Twombly*'s "two-pronged approach." *Downing v. Ford Motor Co.*, No. 17-10652, 2018 WL 3301210, at *4 (E.D. Mich. Feb. 5, 2018), (adopting report and recommendation), No. 17-CV-10652, 2018 WL 1417599 (E.D. Mich. Mar. 22, 2018), *aff'd*, No. 18-1335, 2018 WL 4621955 (6th Cir. Sept. 24, 2018). "First, it must be determined whether a complaint contains factual allegations, as opposed to legal conclusions," since "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, the facts that are pled must show a 'plausible' claim for relief"—a "context-specific" analysis "that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Moreover, fraud allegations—whether as a theory of liability or, for example, for tolling—require heightened pleading under Rule 9(b), by which plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain

why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F. 3d 564, 570 (6th Cir. 2008). "At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied." *Id.*

In addition, numerous decisions—including in this circuit—recognize the myriad problems that so-called "shotgun" pleadings and prolix, muddled complaints present. *E.g.*, *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994); *Agee v. Alphatec Spine, Inc.*, No. 1:15-cv-00750-TSB, 2017 WL 5706002 (S.D. Ohio. Mar. 27, 2017). Here, the SAC violates all these basic pleading principles. At 840 pages (not counting exhibits), it is undeniably prolix, with each plaintiff indiscriminately asserting all the same claims on all the same facts under their respective states' laws despite their patent inapplicability. At the same time, the SAC lacks fundamental facts to support its claims and, despite its prolixity, lacks the particularity required to assert fraud-based claims. Moreover, the newly asserted claims under the MMWA and various states' laws add nothing except more confusion. For numerous reasons, the Court should dismiss this action entirely.

## I.  The SAC remains an improper "shotgun" pleading—still confused and obfuscating, and even more prolix than its predecessors.

Poorly crafted complaints such as this can take many forms, but they commonly go by the name "shotgun pleadings," whose unifying characteristic is "that they fail to one degree or another, and in one way or another, to give the

12

defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1321; *also Experian Mktg. Sols., Inc. v. Lehman*, No. 1:15-CV-476, 2015 WL 5714541, at *2 (W.D. Mich. Sept. 29, 2015) ("Shotgun pleadings include those in which 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.' ").

"The unacceptable consequences of shotgun pleading are many." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 981 (11th Cir. 2008). "First, and perhaps foremost, shotgun pleading inexorably broadens the scope of discovery, much of which may be unnecessary." *Id.* Shotgun pleadings also "lessen the time and resources the court has available to reach and dispose of the cases and litigants waiting to be heard," and "wreak havoc on appellate court dockets." *Id.* at 982. Despite multiple amendments, the SAC remains an improper shotgun pleading.

### A.   The SAC persists in the improper practice of asserting all 360 plaintiffs' claims indiscriminately *en masse*, instead of individually.

The prior complaints were improper "shotgun" pleadings for many reasons, as Ford showed. (ECF No. 9 at 13–21, No. 20 at 13–18.) While they have twice made only piecemeal amendments, plaintiffs still fail to address the root "shotgun" problem, as the SAC continues the improper amalgamation of 360 plaintiffs' claims spanning nearly a decade of transactions across 42 states. The result is a confusing mess of vague and conclusory allegations and claims, whereby it is impossible to discern "which allegations apply to which plaintiffs and to which counts," leaving

the complaint "unanswerable" and warranting its dismissal. *See Tomas v. Ill. Dept. of Empl. Sec.*, No. 07 C 4542, 2009 WL 2916840, at \*3 (N.D. Ill. Sept. 2, 2009); *also Fleming v. Mich.*, No. 09-11795, 2010 WL 931925, at \*8 (E.D. Mich. Mar. 11, 2010) (recognizing as one form of "shotgun complaint" where it "fails to link adequately a cause of action to its factual predicates").

Indeed, all 360 plaintiffs purport to rely on all the same marketing statements, all the same CSPs and TSBs, and all the same customer complaints for all of their asserted counts. (*E.g.*, SAC ¶ 517 (incorporating ¶¶ 1–495).) None of them identify which of those items in particular (if any) are purportedly relevant to their claims individually. Meanwhile, it is patently obvious that the same items are not—and cannot be—relevant to each individual plaintiff's claims. For example, the marketing materials for the 2010 and 2011 Ford Fusion are patently irrelevant to plaintiffs such as Barry Satarsky, who bought a used 2016 Ford Fusion in November 2018. (SAC ¶¶ 39, 41, 99, 154.) Nor are marketing materials for a 2017 Ford Fusion relevant to plaintiffs like Janice Cook, who bought her 2010 Ford Fusion in December 2009, whose vehicle was repaired in 2011, and who has not pled she was ever exposed to—much less relied on—the 2017 marketing materials. (*Id.* ¶¶ 47, 322). Yet every plaintiff indiscriminately adopts these and all the other supposedly "common" factual allegations, regardless of their (ir)relevance. (*E.g.*, *id.* ¶ 496.)

Similarly, in their attempt to show Ford's supposed knowledge of a defect pre-dating their individual vehicle purchases, plaintiffs cite various customer complaints to NHTSA. But those customer complaints all address varying model years of vehicles, made at different times, for different issues, with many having nothing to do with transmissions. As a result, it is impossible to tell which complaints to NHTSA purportedly support which plaintiffs' individual claims. This is a critical failing because where, as here, a plaintiff must allege facts plausibly supporting a manufacturer's knowledge of a defect pre-dating that plaintiff's purchase to support fraud-based causes of action, a paucity of alleged customer complaints can prove dispositive on a motion to dismiss. *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 761–62 (E.D. Mich. Mar. 25, 2019). Yet, by their amalgamation, these 360 plaintiffs improperly attempt to rely on customer complaints that are irrelevant to their claims.

For example, plaintiff Rita Hinkle alleges she bought a 2010 Ford Fusion on or about November 1, 2009. (SAC ¶ 328.) However, only one of the plaintiffs' cited complaints to NHTSA was filed before her alleged November 2009 purchase date. (*Id.* Ex. S, ECF No. 39-7, PageID.5594, NHTSA ID No. 10284037.) The rest were lodged only *after* she bought her vehicle, and thus provide zero support for her claims. *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 793 (E.D. Mich. 2019).

Likewise, all 360 plaintiffs purport to rely also on the same CSPs and TSBs to show Ford's supposed knowledge of an alleged defect pre-dating the plaintiffs'

purchases. (SAC ¶¶ 65–68, 85.) Yet many of these (on their face and regardless of their content) provide no such support for many plaintiffs for the same reason as with the complaints to NHTSA—i.e., because they *post*-date the vehicle purchases. For example, "TSB" 17S16, originally issued on August 21, 2017, cannot support knowledge of a defect *pre*-dating vehicle purchases that took place *before* that date. (SAC Ex. U, ECF No. 39-9, PageID.5727; *also* SAC ¶ 84 & n.13.)

The confusion is further magnified as to the scores of plaintiffs who have *still* provided *no* individual information whatsoever, and instead identify only their residence and their vehicle's model, year, VIN, and purchase date. (*E.g.*, SAC ¶¶ 123, 129, 133, 135, *etc.*; *also* Ex. 1.2.) Given their lack of allegations of having experienced *any* issues with their vehicles or having any contacts whatsoever with Ford, it is entirely unclear why these plaintiffs are even suing Ford.

Also, the SAC now compounds the improper "shotgun" approach by asserting even more patently irrelevant allegations with no discernable connection to any plaintiff's claims, such as those concerning alleged issues with completely different vehicle lines, components, and systems (*e.g.*, *id.* ¶ 81), and the repeated references to marketing statements about fuel economy despite no plaintiff alleging any issues with fuel economy (*id.* ¶¶ 17(a), 29, 30, 32, 35, 41, 43, 45, 46).

The Court has permitted multiple opportunities to amend, yet the SAC remains the epitome of a shotgun complaint that fails "to give the defendants

adequate notice of the claims against them and the grounds upon which each claim rests," *Weiland*, 792 F.3d at 1321, and makes it impossible to discern "which allegations apply to which plaintiffs and to which counts," leaving the complaint "unanswerable" and warranting its dismissal. *See Tomas*, 2009 WL 2916840, at *3.

**B.    The SAC's boilerplate and kitchen-sink inclusion of causes of action under 42 states' laws only further compounds the problem.**

Ford showed that plaintiffs failed to plead their claims individually and according to the laws that would apply to their claims. (ECF No. 20 at 13–18.) Plaintiffs' moved to file their SAC, in part, "to plead state-specific claims for breach of implied and express warranties, consumer protection act violations, and various state-law claims sounding in fraud and contract." (ECF No. 19 at 7.) But plaintiffs wholly misunderstood the problem, and their proposed solution misses the mark. The result is an SAC just as flawed as its predecessor.

Contrary to their assertion, plaintiffs added far more than merely state-law claims "sounding in fraud and contract." Throughout, the SAC contains numerous counts alleging product liability, negligence, and claims for purported violations of dealer/franchise laws. (SAC at 392, 395, 480, 482, 484, 537, 543, 563, 565, 567, 568, 592, 594, 596, 599, 670, 746, 797.) The addition of these new claims only adds confusion. For starters, this is not and has never been a product liability action—as plaintiffs have labeled it, this is merely "a standard 'lemon law'/breach of warranty type complaint." (ECF No. 4 at 2.) Whereas, product liability laws are intended to

17

address claims for alleged damage to persons or property *other than* the product itself. *E.g.*, La. Civ. Code Ann. art. 2800.53(5). Yet no plaintiff alleges any facts plausibly supporting any damage to either person or property other than their Fusions (if that). The addition of product liability claims now is simply confounding.

Moreover, many of the product liability laws they now assert, such as Louisiana's, provide "the *exclusive* theories of liability for manufacturers for damage caused by their products," meaning the assertion of such a claim would preclude others, such as the Louisiana plaintiffs' warranty and negligence claims. (SAC at 542–43); La. Stat. Ann. art. 9:2800.52 ("A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter."). By the same token, to the extent some plaintiffs purport to assert product liability claims, their claims are improperly pled in states such as Ohio, whose product liability act "explicitly eliminated 'all common law product liability claims or causes of action.' " *Wimbush v. Wyeth,* 619 F.3d 632, 639 (6th Cir. 2010); O.R.C. § 2307.71(B); (SAC at 706).

But the confusion does not stop there. Rather, plaintiffs' insistence on presenting their claims in anything but the most generic, boilerplate fashion—with no individual tailoring—renders it impossible to discern which plaintiffs are bringing which claims on which facts under their new state-law claims. For example, the California express warranty claim is brought by "those Plaintiffs who sought

18

repairs pursuant to the recalls or who sought repairs for transmission-related issues."
(SAC ¶ 698.) Yet, no plaintiff—*not one*—asserts to have had repairs under recall.
Moreover, of the five California plaintiffs, two allege not experiencing any issues
until *after* their express warranties expired, the third does not allege having sought
any repairs, the fourth says her vehicle was repaired under warranty in 2016, and the
fifth is a resident of Minnesota who alleges only having sought warranty repairs from
a dealership in Minnesota. (*Id.* ¶¶ 138–42.) In short, *none* of these plaintiffs asserts
a valid express warranty claim under California law as they have pled it.

Similarly, according to the SAC, the New York plaintiffs are asserting claims
only under New York law—yet many New York plaintiffs *cannot* pursue any of the
New York claims. Each of the six New York counts limits on whose behalf they are
asserted, requiring the plaintiffs either to have "suffered a Transmission defects
event," "sold their vehicle at a loss," or "presented their Vehicle to a dealer for
repair." (SAC ¶¶ 1851, 1861, 1869, 1883, 1890, 1895.) None of the New York
plaintiffs—nor any of the 360 plaintiffs—alleges selling their vehicle at a loss, and
at least six of the 19 New York plaintiffs don't allege either of the other two
qualifiers to assert the six New York claims. (*Id.* ¶¶ 349, 351, 355–56, 361–62.)

As yet another example, throughout the SAC with its bald and conclusory
boilerplate assertions under individual state laws are countless examples of simply
false assertions. For example, under their count for "Breach of Lease / Contract," the

Illinois plaintiffs all uniformly assert they "entered in lease agreements with Ford," and that their "leases and purchase agreement provided that Plaintiffs would make payments and in return would receive a *new* vehicle that would operate properly." (SAC ¶¶ 1011–12.) Yet among the Illinois plaintiffs are numerous examples showing these assertions to be untrue, such as plaintiff Sevak, who bought a used 2010 Fusion in 2018, and plaintiffs Figures and Raynor, who each bought their vehicles used from CarMax, and the numerous other examples of plaintiffs who bought their vehicles used and/or from non-Ford dealerships. (SAC ¶¶ 197–98, 205–07, 211–12.) These and many other examples show the SAC to be merely a cobbled-together amalgam of generic state-law claims (from other litigation, no less), with no effort made to tailor the claims to these individual plaintiffs. (*E.g.*, *id.* ¶ 1001 (asserting with respect to the Illinois Fraudulent Concealment/Fraud By Omission claim that Ford "affirmatively represented" to the Illinois plaintiffs "that the vehicles they were selling were new"), ¶ 1065 (same for Indiana), ¶ 1216 (same for Kentucky), ¶ 1464 (same for Minnesota), ¶¶ 1983 & 2020 (same for Ohio).)

In addition, despite Ford showing that plaintiffs must plead their claims individually according to the laws that apply to their claims, despite plaintiffs appearing to concede this, and despite multiple amendments, they nonetheless all indiscriminately assert entitlement "to recover non-economic damages" under the

MCPA (SAC ¶ 113), even though all but 11 plaintiffs didn't purchase their vehicles in Michigan and the MCPA would not apply to their claims. (ECF No. 20 at 35–37.)

Other examples abound of the SAC's boilerplate and generic pleading of the state law claims, which appear to have been cut and pasted from some other complaint. For example, the SAC repeatedly refers to the "numerous warranties that Ford made relating to safety, reliability and operation, which are more fully outlined in Section IV.A, *supra*." (*E.g.*, SAC ¶¶ 530, 703, 747, 810, 858, 898, 1092, *etc*.); *also id.* ¶ 702 (similarly referring to "Section IV.A).) There *is no* "Section IV.A." In fact, the SAC contains no sections whatsoever. (*Id.* ¶ 703 (referring also to a nonexistent section "I").) Similarly, the SAC refers to a "Section IV.A, *of the MCC*," yet it nowhere explains what the "MCC" is. (*Id.* ¶ 2151.)

As these numerous examples show, the ability of plaintiffs' claims to withstand even initial scrutiny requires that they plead their claims properly and on an individual basis, providing adequate facts to support each plaintiff's claims under the elements of the causes of action they assert, while omitting facts and allegations irrelevant to their individual claims. Plaintiffs yet again failed to do this. Instead, they have improperly amalgamated their allegations and asserted their claims only in the baldest of boilerplate, in the hopes of evading the Court's individual scrutiny and presenting a false impression of validity by sheer volume of plaintiffs. In short, they have again pled "by means of obfuscation," which courts rightly condemn. *E.g.*,

*Agee*, 2017 WL 5706002, at *2. After plaintiffs' multiple failed pleading attempts, the Court should dismiss this action with prejudice under Rule 8.[7]

## II. Beyond the facial improprieties of the plaintiffs' prolix and confusing complaint, their claims require dismissal for numerous other reasons.

### A. Under applicable Michigan procedural law, most of the plaintiffs' claims require dismissal as outright time-barred.

A "federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state." *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). "Under Michigan's common law choice of law rule, statutes of limitation are considered procedural and are governed by the law of the forum." *Id.* at 746. And where the law of the state where it accrued would bar the claim, then Michigan's borrowing statute would also bar it here. MCL § 600.5861.

Here, many—and in some cases, all—the applicable statutes of limitations bar plaintiffs' claims outright, requiring their dismissal with prejudice. Meanwhile, many plaintiffs' claims remain insufficiently pled in terms of their timeliness and evince that they are very likely time-barred, warranting their dismissal as well.

### 1. Many plaintiffs' warranty claims are outright time-barred.[8]

All plaintiffs assert some form of express warranty- or contract-based claims. To the extent they rely on Ford's "repair or replace" NVLW as a UCC-defined

---

[7] Again, if not dismissed, Ford reserves the right to move to sever and for other relief.
[8] As explained below, the revocation of acceptance counts are not properly considered independent claims, but rather are adjunct to underlying warranty claims and therefore subject to the same limitations periods. *See infra* Part II.C.4.

warranty, Michigan law disagrees, holding these same warranty terms do "not constitute an 'express warranty' within the meaning of the" UCC. *Miller v. Gen. Motors, LLC*, No. 17-CV-14032, 2018 WL 2740240, at \*4 (E.D. Mich. June 7, 2018). Such provisions "are contractual promises under Article 2, but are not warranties." *Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 894 N.W.2d 700, 706 (Mich. 2016).

Michigan law considers the NVLW's promise to repair or replace any defects in materials or workmanship that arose within the earlier of five years or 60,000 from original purchase to be a "contractual promise" subject to the UCC's four-year limitations period, which runs from an alleged breach—i.e., the failure to repair or replace as promised—instead of from delivery. *Id.* at 705–07  (recognizing that a repair-and-replace provision is nonetheless a "term of a contract of sale"); *also* MCL § 440.2725(1) ("An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued."). Thus, at most, and barring facts pled to the contrary, a plaintiff could have nine years to bring a claim—five years from original purchase *plus*, assuming a warranted defect manifested and was not cured on the last day of that five-year period, another four years. Where Michigan would borrow another state's shorter limitations period, the expiration could be even shorter. *E.g.*, Colo. Rev. Stat. Ann. § 13-80-101(1)(a) (providing a three-year limitations period); Mass. Gen. Laws Ann. ch. 106, § 2-318 (same). Here,

on the face of the SAC, even assuming this scenario, many plaintiffs' express warranty claims are outright time-barred on this basis, requiring their dismissal with prejudice.[9] (Ex. 1.1.) In addition, some plaintiffs plead facts affirmatively showing their claims are time-barred, like plaintiff Callan, who bought her 2010 Ford Fusion on May 16, 2010, experienced "the Transmission Defect" *the next day*, and had her last "unsuccessful" repair attempt in March 2011, yet did not file suit until August 2019—more than *eight years later*. (SAC ¶ 126; *also, e.g.*, *id.* ¶¶ 155, 255, 373.)

To the extent the plaintiffs assert there is a UCC-defined express warranty (which they fail to identify), then such claims are subject to a four-year limitations period from tender of delivery—the same as for implied warranty. MCL § 440.2725. In which case, for the same reasons many plaintiffs' implied warranty claims are facially time-barred as discussed below, so too are such express warranty claims.

As for alleged breach of the UCC's implied warranty of merchantability (*e.g.*, SAC ¶¶ 538–43), "a buyer only has four years" to file suit, which "starts to run at 'tender of delivery,' " *Roe*, 2019 WL 3564589, at *13, unless a shorter period applies under the respective states' laws. "And once started, the four-year timer runs even if the buyer does not know of the breach of warranty." *Id.* The implied warranty runs from the original purchase or in-service date. *Miller*, 2018 WL 2740240, at *8.

---

[9] This is so even with *Kinner* and accounting for MCL § 440.2725(3).

Here, "tender of delivery was when Ford sold Plaintiffs' vehicles to one of its dealers or, at latest, when Plaintiffs' vehicles were purchased from the dealer." *Roe*, 2019 WL 3564589, at *13. As a result, dozens of plaintiffs' implied warranty claims are outright time-barred—for example, plaintiff Copeland, who bought her 2012 vehicle in August 2017, after the warranty had expired, and plaintiffs Hall and Duncan, who bought their 2010 Fusion "[o]n or about June 1, 2017." (SAC ¶¶ 303, 395); *also Miller*, 2018 WL 2740240, at *9 ("because the Limited Warranty expired before Plaintiff Miller purchased her vehicle, her claim for breach of the implied warranty of merchantability fails"). The Court should therefore dismiss the implied warranty claims as listed in Exhibit 1.1 on this basis.

### 2.   Many plaintiffs' fraud-based claims are also facially time-barred.

Under Michigan law, the claims for various forms of fraud—including, for example, consumer protection statutes and the like—and for unjust enrichment are all subject to six-year statutes of limitations (unless a shorter period were to apply under the borrowing statute).[10] MCL §§ 445.911 (MCPA limitations period), 600.5813 (catch-all six-year limitations period), & 600.5861 (borrowing statute); *Romeo Inv. Ltd. v. Mich. Consol. Gas Co.*, No. 260320, 2007 WL 1264008, at *8

---

[10] For example, Georgia's Fair Business Practices Act has a two-year limitations period from when the plaintiff knew or should have known of the occurrence of the alleged violation. (SAC ¶ 885 *et seq.*); Ga. Code Ann. § 10-1-401(a)(1). Georgia plaintiff King bought a 2012 Fusion in 2015, experienced the alleged defect in April 2016 at 90,000 miles, and contacted Ford about it on June 15, 2016, but did not file suit until over three years later. (SAC ¶ 187.)

(Mich. Ct. App. May 1, 2007) (same for unjust enrichment); *also, e.g.*, Va. Code Ann. § 8.01-243 (two-year limitations period on fraud claims).

The latest the statutes would have started to run on the fraud and consumer protection-based claims was when the vehicles were first offered for sale, since the alleged violations all stem from alleged misrepresentations and nondisclosures in the course of offering the vehicles for sale. (*E.g.*, SAC ¶¶ 559–67); *also, e.g.*, MCL § 445.911 (stating an MCPA action "shall not be brought more than 6 years after the occurrence of the method, act, or practice which is the subject of the action"). Plaintiffs allege no facts plausibly supporting that their claims accrued at any later date. Thus, the Court should dismiss with prejudice the fraud-based claims by those plaintiffs whose actions are time-barred, as identified in Exhibit 1.1.

The same goes for the fraud-based claims for which, as in Michigan and other states that do not recognize the discovery rule, the limitations period "begins to run from the time the fraud is perpetrated," *Boyle v. Gen. Motors Corp.*, 661 N.W.2d 557, 559 (Mich. 2003) , "regardless of the time when damage results," MCL § 600.5827; *also, e.g.*, *Lamere v. St. Jude Med., Inc.,* 827 N.W.2d 782, 788 (Minn. Ct. App. 2013) (observing that Minnesota courts "have expressly rejected the 'discovery rule,' except where the "plaintiff can demonstrate that the defendant engaged in fraudulent concealment"); *Bangor Water Dist. v. Malcolm Pirnie Engineers*, 534 A.2d 1326, 1328 (Me. 1988) (observing that Maine recognizes the discovery rule

only "in particular cases" of professional malpractice). Here, that accrual date would be the same as with the MCPA—when the vehicles were first offered for sale or originally purchased (with the borrowing statute, where applicable). Thus, likewise time-barred are those claims as shown in Exhibit 1.1.

### 3.   Many plaintiffs' miscellaneous new claims are also time-barred.

The limitations analysis with respect to the plaintiffs' various new claims is somewhat obfuscated by their failure to plead a triggering event—such as the date of alleged damage to person or other property for their product liability claims. For example, in Virginia, a claim for alleged negligent product design or manufacturing must be filed within two years of when the cause of action accrued. *E.g.*, Va. Code Ann. § 8.01-243(A). Yet none of the Virginia plaintiffs plead any facts as to any triggering event for their negligent design claim. (*See* SAC ¶¶ 473–79, 2429–35.)

Many plaintiffs' newly asserted claims under certain states' product liability laws and dealer and franchising laws are likewise time-barred under those states' applicable limitations periods. N.M. Stat. Ann. §§ 57-16-14 (providing a four-year limitations period); (SAC ¶¶ 344–45 (showing both N.M. plaintiffs bought their vehicles no later than 2014, more than four years before filing suit); *also* . S.C. Code Ann. § 56-15-120 (four-year limitations period); (SAC ¶¶ 420–26 (showing multiple plaintiffs with vehicle purchases more than four years before filing suit)). These time-barred claims are likewise identified in Exhibit 1.1 and also require dismissal.

**B.** **The plaintiffs fail to plead facts plausibly supporting any tolling.**

Recognizing the time-barred nature of their claims, plaintiffs baldly assert that all limitations periods for all claims under all states' laws are tolled by the discovery rule and fraudulent concealment. (SAC ¶¶ 8, 92–111.) They are incorrect.

*First*, the SAC lacks facts supporting either of these tolling doctrines, including its failure to identify to which plaintiffs' claims they apply. For example, the SAC indiscriminately asserts the discovery rule, but Michigan law rejects its application in most or all instances. *Boyle*, 661 N.W.2d at 559 (recognizing that the discovery rule has been "rejected" in fraud-based actions); Mich. Comp. Laws §§ 440.2725 (warranty claims accrue upon tender of delivery, "regardless of the aggrieved party's lack of knowledge of the breach"), & 600.5827 (a claim generally "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results"). Other states hold similarly. *E.g.*, *Lamere,* 827 N.W.2d at 788 (Maine); *Bangor Water Dist.*, 534 A.2d at 1328 (Minnesota).

*Second*, plaintiffs don't support their delayed-discovery assertion. If they are claiming Ford did not honor its "repair or replace" promise (SAC ¶ 103), they offer nothing to support how or why discovery of that fact was delayed; if Ford did not honor its warranty, plaintiffs would have known that immediately. Similarly, plaintiffs assert Ford made "factual representations about the transmission," but they refer only to the lone representation of a "smooth-shifting 6-speed automatic," which

28

is (1) non-actionable puffery, and (2) pertained to the 2010 and 2011 "non-hybrid transmission" only. (SAC ¶ 98.)[11] Moreover, they assert that their "vehicles as delivered to Plaintiffs were extremely unresponsive and were not 'smooth-shifting,' as Plaintiffs' drive [sic] was repeatedly interrupted by jerky shifts and dangerous hesitations," (*id.* ¶ 100), which belies any reasonable inference that their discovery of the alleged "defect" was delayed.

*Third*, fraudulent concealment tolling is lacking, as it requires three elements pled with Rule 9(b) particularity: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2017 WL 7689654, at *4 (E.D. Mich. May 5, 2017). In short, it requires "affirmative acts . . . designed to prevent subsequent discovery"—"[m]ere silence is insufficient." *Miller*, 2018 WL 2740240, at *9. Plaintiffs fail to plead sufficient facts as to any of the three elements, much less to a Rule 9(b) standard. There are no well-pled facts of any affirmative acts of concealment by Ford. Instead, plaintiffs rely on the same alleged misrepresentations and nondisclosures from when they purchased their vehicles, (SAC ¶¶ 92–111), which is insufficient. *See Matanky*, 370 F. Supp. 3d at

---

[11] The SAC asserts that "[s]uch marketing efforts are considered to be transcendent into the purchasing process of those who purchased Fusions secondhand or outside of the Model Year sales cycle." (SAC ¶ 99.) This bald legal conclusion, for which the plaintiffs offer neither legal nor factual support, is entitled to no weight.

802. Where they do assert any subsequent affirmative acts, they do so in only conclusory fashion, with no facts. (*E.g.*, SAC ¶¶ 101, 110.) And while a "mere allegation of due diligence without asserting what steps were taken is insufficient," *In re Auto. Parts*, 2017 WL 7689654, at *4, plaintiffs don't even allege due diligence and instead insist that "[n]o amount of diligence by Plaintiffs could have led to the discovery" of their claims. (SAC ¶ 109.) Yet they contradict this bald assertion by citing *publicly available* complaints to NHTSA, TSBs, and CSPs.

Also, "for Ford to have fraudulently concealed the [Transmission Defect], it would have to at least have known that" they were defective. *Roe*, 2019 WL 3564589, at *14. But the SAC lacks any facts plausibly supporting either a defect or Ford's knowledge thereof. *See infra* Part II.C.5.b.ii. The bald tolling assertions fail.

## C. Plaintiffs' claims all fail on substantive grounds as well.

The claims fall into one of several buckets: express warranty; implied warranty; revocation; fraud- and consumer protection-based claims; unjust enrichment; and their new miscellaneous claims under various product liability or dealer/franchise laws. None of the claims withstands substantive scrutiny, mainly for reasons that have persisted despite multiple opportunities to amend.

### 1. The breach of express warranty claim fails for numerous reasons.

In typical boilerplate fashion, plaintiffs all allege their vehicle purchases or leases were "accompanied by an express warranty," which are thereby incorporated

by reference, allowing the Court to take notice of Ford's NVLW's. (SAC ¶ 494); *Rosa v. Am. Water Heater Co.*, 177 F. Supp. 3d 1025, 1038 (S.D. Tex. 2016). Together, the SAC and NVLWs show the express warranty claims fail.

*First*, pleading breach of the NVLW requires plaintiffs to plead factual allegations plausibly supporting an actual defect within warranty coverage, which they fail to do. Instead, they merely "describe a laundry list of ways in which their vehicles' performance is subpar," and then conclusorily "tie all of these problems to a 'defect' in the transmission." *See In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*, No. CV1706656ABFFMX, 2019 WL 3000646, at *7 (C.D. Cal. May 22, 2019).[12] In *In re Ford Motor Co.*, the complaint defined "the 'Transmission Defect' as follows: the DPS6 transmission 'is defective in design and/or manufacture in that, among other problems, the transmission consistently slips, bucks, kicks, jerks, harshly engages, has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and, eventually, premature transmission failure.' " *Id.* This is virtually identical to "the Transmission Defect" alleged here (SAC ¶ 9), which "merely describes performance problems with the vehicle and does not amount to identifying the defect" and "is therefore insufficient." 2019 WL 3000646, at *7.

---

[12] The discussion there was in the context of fraud claims, but applies equally here where plaintiffs have asserted merely a legal conclusion of "defect," as opposed to pleading facts plausibly supporting what they claim to be the defect or defects.

*Second*, by not alleging facts as to an actual defect, plaintiffs necessarily fail to allege facts plausibly supporting any breach of the NVLW. Moreover, "if 'sufficient facts are alleged to assert both' a design and a manufacturing defect, 'then dismissal at the pleading stage is premature.' " *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 614 (E.D. Mich. 2017)*.* But here, plaintiffs allege that *all* their vehicles and *all* 2010 through 2017 Ford Fusion vehicles in general were "defective" for the same reasons, which is tantamount to alleging only design defect. *See Gertz v. Toyota Motor Corp.*, No. CV 10-1089 PSG (VBKx), 2011 WL 3681647, at *10 (N.D. Cal. Aug. 22, 2011). The NVLW, however, covers only defects in materials and workmanship, which does not apply to design defects. *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998, at *8 (N.D. Cal. Aug. 1, 2017 (noting the "overwhelming weight of state law authority holds that design defects are *not* covered under" a "materials or workmanship warranty").

*Third*, Ford's NVLW is a promise to repair or replace "if the vehicle 'is properly operated and maintained' and 'was taken to a Ford dealership for a warranted repair during the warranty period.' " *Wozniak v. Ford Motor Co.*, No. 2:17-cv-12794, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019); (*also, e.g.*, ECF No. 9-3, PageID.601–602). The *Wozniak* court found those plaintiffs "failed to adequately plead a breach because they ha[d] not pleaded that the named Plaintiffs presented their vehicles to a Ford dealership before the earlier of" the NVLW's

32

mileage or time limits. *Id.* The court concluded: "Because the warranty expires upon the earlier of the time or mileage limits, Plaintiffs must allege both the timeline between the start of the warranty period and the sought-after repairs and the mileage on their vehicles at the time of presentment." *Id.*; *also Roe*, 2019 WL 3564589, at *9. In addition, an express warranty claim requires well-pled facts showing the plaintiff provided "individual notice to Defendants of the alleged defect," and that they requested warranty service "within the [time] period set forth in the Limited Warranty." *In re Ford Motor Co. Speed Control Deactivation Switch Prod. Liab. Litig.,* No. MDL 1718, 2007 WL 2421480, at *6 (E.D. Mich. Aug. 24, 2007).

Even after amendment, however, scores of plaintiffs still fail to plead any facts of having experienced *any* issues with their vehicles, such as plaintiff Young, who alleges only that she purchased a 2010 Ford Fusion, and nothing more. (*E.g.*, SAC ¶ 129.) Meanwhile, many other plaintiffs added facts confirming they bought their vehicles *used* and *outside* the warranty period—i.e., beyond five years or 60,000 miles from original purchase. *Miller*, 2018 WL 2740240, at *8  (dismissing claim where the limited warranty expired in 2013, and plaintiff bought the vehicle in 2014); (*e.g.*, SAC ¶¶ 212, 232, 264, 276, 280, 308, 395, 472). Still more plaintiffs provide no facts plausibly supporting that there was any warranty coverage still in effect when they bought their vehicles used, and what facts they do provide plausibly support only the inference that there was no coverage. (*E.g*., SAC ¶¶ 223, 253.)

33

While other plaintiffs allege having sought repairs only "outside the warranty"—for example, plaintiff Hand sought leave to amend to plead additional facts in the SAC, yet those facts show she bought a 2013 vehicle in 2016, which did not experience any alleged issues until 2017, after it traveled 70,000 miles and past its warranty period. (*Id.* ¶ 170; *also, e.g.*, *id.* ¶ 127.) And other plaintiffs likely also purchased their vehicles beyond the NVLW's mileage expiration, but they plead no facts showing their vehicles were within NVLW coverage, contrary to their pleading burden. (*E.g.*, SAC ¶ 437); *Darne v. Ford Motor Co.*, No. 13 CV 03594, 2017 WL 3836586, at *6 (N.D. Ill. Sept. 1, 2017) (requiring facts like the mileage and incident date to support that "the alleged issues fell within the covered period").

Despite these requirements, and even after multiple amendments, scores of plaintiffs still don't allege notice and presentment to a Ford dealership within the NVLW's time/mileage limits with a failure to repair. (*E.g.*, SAC ¶¶ 122–24, 127, 129–36, 138–39, 143, 147, 151, *etc.*)[13] While many of these plaintiffs don't plead any supporting facts whatsoever, many others allege they sought repairs only from non-Ford facilities (*e.g.*, *id.* ¶ 314), or that their vehicles were actually repaired under warranty (*e.g.*, *id.* ¶ 348). This listing is far from exhaustive, but for numerous reasons, the express warranty claims identified in Exhibit 1.1 fail.

---

[13] Should plaintiffs argue, as in *Wozniak*, that the limited warranty failed of its essential purpose, (SAC ¶ 532), the Court should dispense with that argument as in *Wozniak* under virtually identical circumstances. 2019 WL 108845, at *2–3.

### 2.    Plaintiffs likewise fail to state valid implied warranty claims.

The implied warranty of merchantability provides for only a minimum level of quality. Indeed, "[m]erchantable is not a synonym for perfect. The warranty of merchantability is that goods are of average quality in the industry." *Rosenbaum v. Toyota Motor Sales, USA, Inc.*, No. 16-CV-12645, 2016 WL 9775018, at \*2 (E.D. Mich. Oct. 21, 2016). Even assuming some plaintiffs' vehicles required repairs at some point, "it is inevitable that a complex product [such as an automobile and its transmission] will require some service and that fact alone does not establish a breach of warranty." *Ducharme v. A & S RV Ctr., Inc.,* 321 F. Supp. 2d 843, 850 (E.D. Mich. 2004), *aff'd*, 127 F. App'x 204 (6th Cir. 2005).

The implied warranty claim primarily fails for lack of well-pled facts plausibly supporting that the plaintiffs' vehicles were unmerchantable. *See supra* Part II.C.1. Instead, the SAC presents only generic boilerplate and legal conclusions of alleged "Transmission Defect." (SAC ¶¶ 9; *also, e.g.*, *id.* ¶¶ 538–43.) Such a conclusory assertion that products "did not comply with the statutory definition of 'merchantable goods' adds no substance" to implied warranty claims like these that "contain[] no factual allegations." *Miller*, 2018 WL 2740240, at \*9.

The "Plaintiff-Specific Allegations" further reveal numerous deficiencies in the implied warranty claims. For example, lead plaintiff Gant alleges he "experienced the Transmission Defect" by early 2016, yet his only repair attempt

was in March 2019—*three years later*—indicating the alleged issue did not impede his use. (SAC ¶ 289.) Other examples abound, such as the scores of plaintiffs who still allege no facts to support that they experienced any issues whatsoever with their vehicles (*e.g.*, *id.* ¶¶ 245, 435), those alleging facts showing their vehicles performed without issue for many years (*e.g.*, *id.* ¶¶ 232, 276), and those alleging that their vehicles were repaired (*e.g.*, *id.* ¶¶ 125, 127). As these and numerous other examples show, the plaintiffs' bald legal conclusions are entitled to no weight. Beyond these fundamental flaws, the plaintiffs' claims fail for one or more additional reasons.

*First,* a UCC implied warranty claim requires that when tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." U.C.C. § 2-607(3)(a). No plaintiff pleads sufficient facts plausibly supporting timely notice to Ford of alleged breach under the UCC. The most a few assert—again, only with boilerplate—is that they "contacted Ford about the Transmission Defect" at some time. (*E.g.*, SAC ¶ 145.) Yet they don't say whom they contacted supposedly as "Ford," nor that this contact included providing actual notice of an alleged breach. Nor are plaintiffs entitled to any such inference, considering the numerous examples of alleged "contact" with Ford that make no sense, such as plaintiffs Hall and Duncan, who allege they bought their 2010 Ford Fusion in June 2017, experienced "the Transmission Defect" *three years earlier* in 2014, and "contacted Ford about

the Transmission Defect in 2015"—two years *before* they bought their vehicle. (*Id.* ¶ 395; *also, e.g.*, *id.* ¶¶ 353, 376 (similar).) Meanwhile, other plaintiffs alleging they "contacted" Ford did so only *outside* the implied warranty period. (*E.g.*, ¶ 337 (contact nearly 90,000 miles after purchase), ¶ 342 (similar).)

*Second*, many of the state's laws under which plaintiffs now plead implied warranty claims require privity—for which the plaintiffs plead no plausibly supporting facts and which is, in fact, wholly lacking. *E.g.*, *Walsh*, 588 F. Supp. at 527–35 (cataloging states requiring privity on implied warranty claims, including Alabama, Arizona, California, Connecticut, Florida, Illinois, Indiana, New York, North Carolina, Ohio, Washington, and Wisconsin); *also Matanky*, 370 F. Supp. 3d at 786-87 (same for Connecticut, Illinois, and Ohio); *McKee*, 376 F. Supp. 3d at 759 (same for Florida). Plaintiffs again address this issue with nothing more than conclusory, factually unsupported and contradicted boilerplate.

For example, they baldly assert multiple times—with the same boilerplate— that they have all "had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract." (*E.g.*, SAC ¶¶ 509, 542, 715, 910, 1580, 2067, 2450.) There is no well-pled factual support for the bald legal conclusion that Ford dealerships are its agents—to the contrary, this conclusory assertion would gut the privity requirement. *See In re Ford Speed Control Deactivation Switch*, 2007 WL 2421480, at *2 (recognizing Ford dealerships are "independent" entities).

Likewise, they plead no facts to support the bald assertion that they don't need privity because they are "third-party beneficiaries of Ford's implied warranties." (*E.g.*, *id.* ¶ 509); *McKee*, 376 F. Supp. 3d at 760 n.9 (rejecting third-party beneficiary theory where plaintiff allege no supporting facts). Moreover, many plaintiffs allege no facts of any dealings whatsoever with Ford or its dealerships, such as the many plaintiffs who bought used vehicles from third parties. (*E.g.*, SAC ¶¶ 303.)

Similarly, while plaintiffs generically attempt to invoke various jurisdictions' laws, they wholly fail to tailor them to their plaintiffs' alleged facts. For example, the Louisiana plaintiffs assert a claim under its unique redhibition law, which is generally analogous to implied warranty of merchantability or "lemon law." (SAC at 539); *also* La. Civ. Code Art. 2520, *et seq*. However, one of its primary requirements is that the purchaser offer a reasonable opportunity to repair. La. Civ. Code Art. 2522. Only one of the five Louisiana plaintiffs alleges having experienced any issues and having sought any repairs. (SAC ¶¶ 241–45.) Yet that lone plaintiff alleges no facts of presentment within the time and mileage limits, nor any facts to support that his action is timely, given the requirement to bring suit within one year of the last failed repair attempt. La. Civ. Code Art. 2534.A.(1).

Finally, the "dangerous instrumentalities" assertion is another example of the SAC's kitchen-sink approach. (SAC ¶ 509.) That doctrine is entirely inapplicable to this action, which they have labeled as a routine lemon-law matter, not a product

liability action to which the doctrine applies. Indeed, the repeated references to the "dangerous instrumentality" doctrine only further confuses the nature of these claims, especially combined with the new-found reliance on product liability theories. (SAC ¶¶ 542, 715, 910, 1230–36, 1239, 1354–77, 1580, 2067, 2540.)

### 3.  With no viable state-law warranty claims, the MMWA claim fails.

MMWA claims " 'stand or fall with . . . express and implied warranty claims under state law.' " *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1017 (E.D. Mich. 2017). Here, plaintiffs' failure to plead viable state-law warranty claims dooms their MMWA claim as well. *See id.*

### 4.  The Revocation of Acceptance claims are not properly stand-alone causes of action, and revocation is typically not available even as a remedy against a remote manufacturer.

Plaintiffs from 28 states[14] assert counts for "Revocation of Acceptance" under Uniform Commercial Code section 2-608(1). Of these 28 sets of plaintiffs, all but five[15] also assert revocation as a remedy for alleged breach. As this Court is familiar in applying Michigan law, however, revocation is properly considered merely a remedy, as opposed to a claim that can exist absent some actionable nonconformity with a warranty or breach of contract. *See, e.g.*, *Snyder v. Boston Whaler, Inc.*, 892 F. Supp. 955, 959 (W.D. Mich. 1994). Where there is no breach of warranty, there

---

[14] Ala., Ark., Colo., Del., Ga., Ind., Ia., Kans., Me., Md., Mass., Miss., Mo., Nev., N.H., N.J., N.M., N.D., Okla., Ore., Penn., S.D., Tex., Utah, Va., Wash., W. Va., & Wisc.

[15] Ark., Maine, Miss., Nev., & Ore.

is likewise no remedy for either revocation or damages. *Id.*; *also Henderson v. Chrysler Corp.*, 477 N.W.2d 505, 507–08 (Mich. Ct. App. 1991) (acknowledging that "[r]evocation of acceptance is a statutory remedy" and "is inextricably connected" to the predicate underlying contract claim). The Court should dismiss the Revocation of Acceptance counts—at a minimum, where the plaintiffs also assert it as a remedy on their warranty claims. (*E.g.*, SAC ¶ 536.)

As a remedy, revocation is properly unavailable against a remote manufacturer like Ford. *E.g.*, *Sautner v. Fleetwood Enters., Inc.*, No. 05-73252, 2007 WL 1343806, at *8 (E.D. Mich. May 8, 2007) ("The weight of authority under Michigan law opposes remote revocation."). Indeed, "a majority of courts" hold likewise, precluding claims against a manufacturer. *Neal v. SMC Corp.*, 99 S.W.3d 813, 816 (Tex. App. 2003) (citing cases from around the country).

Even as a remedy, revocation requires well-pled supporting facts, which the SAC lacks. Section 2-608(2) requires that revocation "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." No plaintiff alleges the required timely revocation, much less before a substantial change in their vehicles. In boilerplate fashion, they assert they all "demanded revocation and the demands were refused." (*E.g.*, SAC ¶ 545.) Yet none allege any

facts supporting this assertion. They likewise baldly assert there "has been no change in the condition of Plaintiffs' vehicles not caused by the caused by the defects and nonconformities." (*E.g.*, SAC ¶ 548.) Yet this, too, is unsupported and belied.

For example, Alabama plaintiff Callan bought her 2010 Fusion in May 2010, and first experienced the "Transmission Defect on or about May 17, 2010," with a last repair attempt in March 2011, yet never sought revocation. (SAC ¶¶ 126, 544–54.) Similarly, Oklahoma plaintiff Dunahoo bought his 2011 Fusion in August 2013 and first experienced alleged issues in 2014 at approximately 130,000 miles, but his vehicle at some point "Caught on Fire," with no facts alleging any connection between the fire and any transmission issue. (*Id.* ¶¶ 392, 2069–79). Scores of similar ones abound, but these examples highlight the boilerplate and conclusory nature of the plaintiffs' allegations as a whole on revocation—including as to timeliness and lack of substantial change—and why they are entitled to no weight whatsoever.

### 5. The fraud- and consumer protection-based claims all fail.

The SAC claims based on alleged fraud as well as consumer protection and other fraud-based statutes all fail for multiple reasons. (*See* Ex. 1.1.)

### a. Many states' laws—including Michigan—exempt new vehicle purchase from their consumer protection laws, while there is no actionable transaction as to used-vehicle purchases.

Many plaintiffs' consumer protection claims are barred outright by the very acts they assert. The MCPA, for example, does not apply to a "transaction or conduct

specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." MCL § 445.904(1). This exemption is broadly construed, whereby "the relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited." *Liss v. Lewiston-Richards, Inc*., 732 N.W.2d 514 (Mich. 2007) (citation and internal quotation marks omitted).

Sales of new vehicles by licensed dealers are "specifically authorized and regulated by law" and thus "exempt from the MCPA." *Matanky*, 370 F. Supp. 3d at 799–800; *also Rosenbaum*, 2016 WL 9775018, at *3 (same); *also Cyr v. Ford Motor Co.*, No. 345751, 2019 WL 7206100, at *6 (Mich. Ct. App. Dec. 26, 2019) (unpublished).[16] Other jurisdictions similarly preclude application of their consumer protection laws to regulated transactions, including automobile sales. *E.g.*, Mass. Gen. Laws Ann. ch. 93A, § 3; Neb. Rev. Stat. Ann. § 59-1617; Ohio Rev. Code Ann. § 4165.04; Okla. Stat. Ann. tit. 15, § 754; Tenn. Code Ann. § 47-18-111. On this basis, the consumer protection claims under these jurisdictions' laws fail. Moreover, those plaintiffs who bought used vehicles (including from non-Ford affiliated entities or persons) had no transaction—even indirectly—with Ford, and therefore no basis to assert a consumer protection claim.

---

[16] Published authority following *Liss* for this proposition exists, including that cited above, but Ford cites *Cyr* for its particularly striking factual similarities, and per MCR 7.215(C), provided a copy as ECF No. 20-2, PageID.3479. *Cyr* is on appeal.

**b.      These claims fail for lack of Rule 9(b) particularity.**

Rule 9(b)'s particularity requirement applies to all its various forms, whether affirmative, silent, by concealment, or under state consumer protection laws and the like that "sound in fraud." Fed. R. Civ. P. 9(b) ; *also McKee*, 376 F. Supp. 3d at 760 (recognizing Rule 9(b) particularity is required on the elements of affirmative fraud); *Smith v. Bank of Am. Corp.*, No. CIV. 10-14161, 2011 WL 653642, at *4 (E.D. Mich. Feb. 14, 2011), *aff'd*, 485 F. App'x 749 (6th Cir. 2012) (same for claims of silent fraud or fraud by concealment); *Woodland Harvesting, Inc. v. Ga. Pac. Corp*., 693 F. Supp. 2d 732, 743–44 (E.D. Mich. 2010) (same for innocent misrepresentation); *Matanky*, 370 F. Supp. 3d at 797  (applying Rule 9(b) to consumer protection claim).

Here, such particularity is lacking, as the plaintiffs assert only vague, generalized, indiscriminate allegations that fail to satisfy even Rule 8. Indeed, *not one* of the 360 plaintiffs—neither in their "Plaintiff-Specific Allegations" nor in their various counts—provides the requisite "who, what, where, when, and how." *See Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). Instead, they provide only vague, conclusory allegations, which "simply do not suffice under Rule 9(b)," *id.*, and which requires their dismissal. (*See* Ex. 1.1.)

**i.      Plaintiffs fail to plead the "who" with Rule 9(b) particularity.**

No plaintiffs allege any facts plausibly supporting contact with Ford or any Ford personnel, and only a fraction of the plaintiffs allege in their "Plaintiff-Specific

Allegations" any contact even with "dealership sales personnel," and among those few, none identify the alleged individual, much less when the representation was made, nor its content. Instead, they allege in boilerplate fashion only that "dealership sales personnel made the following claims or representations to Plaintiff, on which Plaintiff relied in deciding to purchase the Vehicle: Vehicle Dependability," or that "Plaintiff viewed or otherwise received the following advertisement or representation by Ford and relied on them in deciding to purchase the Vehicle: Dealership Salesperson." (*E.g.*, SAC ¶¶ 228, 391.) The failure to identify with particularity who supposedly made any representations is all the more important given the plaintiffs label as Ford "dealerships" entities which clearly are *not*, such as "AAMCO," "Budget Car Sales," and "CarMax," and among many others. (SAC ¶¶ 134, 229, 452; *also, e.g.*, ¶¶ 139, 147, 167, 206, 227, 277, 287, 309, 325, *etc.*)

### ii.   Plaintiffs fail to plead the "what" per Rule 9(b).

The plaintiffs' fraud-based theories require them to plead—per Rule 9(b)—facts plausibly supporting that Ford "knew of a defect before sale" as part of the "what" of the alleged fraud. *Wozniak*, 2019 WL 108845, at *3; *also McKee*, 376 F. Supp. 3d at 761. Primarily, the SAC fails to satisfy the "what" requirement for the same reason that their other claims fail—because the vague "Transmission Defect" "merely describes performance problems with the vehicle and does not amount to identifying the defect that Ford failed allegedly to disclose. It is therefore

44

insufficient." *In re Ford Motor Co.*, 2019 WL 3000646, at *7; *also DeCoteau v. FCA US LLC*, No. 215CV00020MCEEFB, 2015 WL 6951296, at *3 (E.D. Cal. Nov. 10, 2015) (recognizing that with a "complex component" such as a transmission, a complaint "must go further than a conclusory allegation that the Transmission Defect exists and is responsible for the injuries"). Ignoring this deficiency, the plaintiffs rely on two general bases for Ford's purported pre-purchase knowledge of the vague "Transmission Defect": 1) TSBs/CSPs, and complaints to NHTSA, and 2) generic references to "internal investigations." (SAC ¶¶ 26, 49–84.) Neither suffices.

*First*, as to the CSPs and TSBs, the SAC lacks any connection between the issues mentioned in those actions and their own vehicle experiences or conditions. For example, the plaintiffs all indiscriminately rely on TSB 16-0043, which addressed a "Fluid Leak at Left Side Halfshaft Seal" "due to wear on the transmission case bushing" in "some" 2010 to 2014 Ford Fusions "built on or before 10/14/2013." (SAC ¶ 67(c).) No plaintiff alleges having experienced a fluid leak, however, nor does the SAC explain how this TSB is relevant in any way to claims by plaintiffs who, for example, didn't even own a 2010 to 2014 Fusion. *See Hall v. Gen. Motors LLC*, No. 19-CV-10186, 2020 WL 1285636, at *4–7 (E.D. Mich. Mar. 18, 2020), *appeal docketed*, No. 20-1321 (6th Cir. Apr. 20, 2020) (rejecting similarly vague and unconnected items as support of manufacturer's knowledge of defect).

*Second*, as to both the TSBs/CSPs and complaints to NHTSA, plaintiffs don't identify which of those purportedly evinces Ford's knowledge of the alleged defect pre-dating *their* individual vehicle purchases. For example, on their face, items such as TSB 16-0043, issued in March 2016, cannot support alleged knowledge by Ford of a "defect" pre-dating purchases by plaintiffs *before* March 2016. The same goes for the complaints to NHTSA. *McKee*, 376 F. Supp. 3d at 761–62   ("most of Plaintiff's consumer complaints *post-date* his purchase of the vehicle").

Overall, the SAC is like the complaint in *Beck v. FCA US LLC*, wherein the court found no plausible inference of knowledge of an alleged defect based on Chrysler's purported review of 43 cited complaints to NHTSA because the plaintiff there did not "state how many of these complaints were filed *before* [the plaintiff] purchased" his vehicle. 273 F. Supp. 3d 735, 753 (E.D. Mich. 2018)  (emphasis in original). Here, *none* of the 360 plaintiffs identify which of the complaints to NHTSA, TSBs/CPSs, or any other materials purportedly provided knowledge of any alleged defect before each of their *individual* vehicle purchases. Rather, by continuing to lump together their allegations and claims, plaintiffs improperly attempt to skirt such scrutiny and frustrate efficient adjudication.

*Third*, plaintiffs further misplace their reliance on the TSBs/CSPs and complaints to NHTSA because, in such limited quantities, they provide no plausible support for the notion that Ford had "fair notice" that "one particular part is

constantly having problems." *Roe*, 2019 WL 3564589, at *7. Indeed, even without weeding out those that have nothing to do with the transmission and plaintiffs' vague "Transmission Defect" (which would reduce the volume considerably given the plaintiffs' indiscriminate overinclusion), plaintiffs are left with a relatively small number of complaints and TSBs/CSPs over a 10-year period. This Court has recognized, however, that complaints about an alleged issue "must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day," which is the case with Ford, or GM, or Toyota, or any other manufacturer that sells "over two million vehicles in North America each year." *Id.* Yet the complaint here lacks any "factual allegations that make it reasonable to infer that complaints about and repairs of the [transmission] were anything more than a blip on Ford's complaints-and-repairs radar." *Id.*

The SAC's reliance on complaints to NHTSA further erodes because even assuming Ford's knowledge of each complaint, "it does not necessarily follow that Ford knew that the [transmission] was *defective*," much less that there was any supposedly common defect. *Id.* (emphasis in original). Rather, as courts recognize, "[t]ransmissions can fail for a myriad of different reasons." *Callaghan v. BMW of N. Am., LLC*, No. 13-cv-04794-JD, 2014 WL 6629254, at *3 (N.D. Cal. Nov. 21, 2014). Moreover, as the cited TSBs/CSPs illustrate and the SAC concedes, what the plaintiffs label as one purportedly common "Transmission Defect" instead comprise

47

numerous disparate, isolated, and unique issues impacting limited ranges of vehicles in each instance, and involving "a diverse range of transmission-related parts" with different "potential causes"—many of which the SAC shows Ford addressed by its TSBs/CSPs. (SAC ¶¶ 63, 83; *also id.* ¶ 83 (alleging "multiple defects").)

In addition, the SAC provides no information concerning the overall vehicle population for the Ford Fusion line from 2010 to 2017, so as to provide context for these customer complaints. In fact, these eight model years comprise over 1.8 million vehicles. (ECF No. 9-5, PageID.1138–1174 (showing sales of Ford Fusions from 2010 through 2017).) Even crediting all the cited customer complaints to NHTSA results in a rate of only 0.031% (573 complaints ÷ 1,838,255 vehicles sold)—i.e., *31 one-thousandths of one percent*. The plaintiffs ignore this *de minimis* rate, and give no indication of how it "compares to the failure rate of a part that the law would deem 'defective.' " *Roe*, 2019 WL 3564589, at *7. Thus, "even assuming Ford knew of all [transmission] complaints and repairs," it is impossible to infer from the SAC that "Ford knew that the [transmission] was defective." *Id.*

Plaintiffs' even more boilerplate notice/knowledge allegations fare no better, as courts routinely reject such "generalized allegations about 'testing' and manufacturer 'analyses' made in support of finding knowledge of a defect." *See McKee*, 376 F. Supp. 3d at 761; *also Beck*, 273 F. Supp. 3d at 753 (collecting cases) ; (*e.g.*, SAC ¶¶ 26, 56, 57, 588). Moreover, bald allegations about "testing" fail to

support manufacturer knowledge where, as here, the complaint "does not say what the testing revealed." *Roe*, 2019 WL 3564589, at \*6. Even assuming the generic "testing" involved transmission testing, the Court would have to blindly infer that such testing "revealed some type of defect. But absent even a hint as to the test results, it is no more likely that the testing revealed a flawed [transmission] than a flawless [transmission]." *Id.* Similarly, allegations as to Ford's "internal records, communications with its dealerships or service technicians, and review of its warranty data are conclusory and insufficient because they do not plausibly allege" facts supporting that Ford "knew of the defect *prior* to the time it distributed" the plaintiffs' vehicles. *McKee*, 376 F. Supp. 3d at 762; (*see, e.g.*, SAC ¶ 56).

### iii.   The SAC lacks particularized facts to support affirmative fraud.

The SAC's claims asserting some form of "affirmative fraud," (*e.g.*, SAC ¶¶ 1065, 1216, 2020, 2266), fail because none of the plaintiffs identify with particularity the purportedly actionably fraudulent statements or misrepresentations on which any of them supposedly relied. Instead, they refer only vaguely to such generic, boilerplate statements as "Vehicle Dependability, Drivability, Sustainability/Long-Lasting, and Reliability." (*Id.* ¶ 368.) Meanwhile, scores of plaintiffs don't allege—even conclusorily—that they saw or heard *any* marketing statements, and even those who do rely only on vague references to "Internet Marketing," or "TV, Radio or Billboard Ads," with no information about their

alleged content. (SAC ¶¶ 303, 348.) This is wholly deficient, since "plaintiffs have the burden of alleging specifically which commercials they saw and the content of those commercials." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 2623, 2009 WL 937256, at *6 (N.D. Ill. Apr. 6, 2009).

Any supposed affirmative fraud also fails for lack of particularized facts showing how any such statements were false as to the plaintiffs and their vehicles individually. *See In re Ford Motor Co.*, 2019 WL 3000646, at *4 (dismissing misrepresentation claims based on statements about vehicle performance where complaint alleged only "problematic performance," which failed to "render false a claim that it offered 'great handling on all roads,' 'the performance of a manual,' and 'seamless gear changes for amazing responsiveness"). The few marketing statements plaintiffs do generically reference—albeit, without any of them alleging they saw, heard, read, or relied on any of them—further fail to support any actionable fraud, such as that Ford's "2012 Fusion marketing brochure touts the six-speed automatic transmission's contribution to 'fuel economy a similar equipped Camry and Altima can't beat." (SAC ¶ 43.) No plaintiff alleges any fuel-economy issues.

Moreover, while no plaintiff identifies any particular statements on which he or she relied (much less where or when), they generically refer to marketing statements that are nothing more than non-actionable puffery, such as the references to "a smooth-shifting 6-speed automatic" (SAC ¶ 38), which is textbook subjective,

non-actionable puffery. *E.g.*, *Nicholson*, 2016 WL 5463215, at *19 ("quietest riding, best handling coach on the market" was mere subjective opinion and nonactionable puffery); *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954 (Ala. 1995) (finding "a 'smooth riding' car" was "merely sales talk" and not a statement "of material fact"). This statement also would apply only to 2010 and 2011 Fusion models, and even then, only to plaintiffs who allege they saw and relied on it, which *none* do.

### c. The economic-loss rule bars the tort-based claims.

The economic-loss rule bars tort-based claims—including fraud- and negligence-based claims—seeking purely economic losses. *See, e.g.*, *Murphy v. The Proctor & Gamble Co.*, 695 F. Supp. 2d 600, 608 (E.D. Mich. 2010). Indeed, this is necessary to keep warranty and tort claims separate, and to prevent warranty law from "drown[ing] in a sea of tort." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986). Under numerous applicable states' laws, the economic loss rule serves to bar the plaintiffs' tort-based claims, as shown in Exhibit 1.1.

### 6. The Unjust Enrichment claims also fail for several reasons.

In typical boilerplate fashion, numerous plaintiffs assert claims for unjust enrichment. (*E.g.*, SAC at 389, 391, 402, 441.) These claims fail for many reasons.

*First*, these claims predominately rely on assertions of alleged "fraudulent acts," thereby triggering Rule 9(b). (*E.g.*, SAC ¶ 570.) Yet, these claims—as with

all the others—lack the requisite particularity, requiring their dismissal. Moreover, the economic-loss rule would bar such fraud-based claims. *See supra* Part II.C.5.c.

*Second*, "courts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where"—as here—"a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims." *Hall*, 2020 WL 1285636, at *9 (citing cases); *also Matanky*, 370 F. Supp. 3d at 803 (dismissing unjust enrichment claims for many states alleged here, including Colo., Ga., Ill., Kans., Mo., Nev., N.H., Ohio, Penn., S.C., Tenn., Va., & Wash.). Similarly, unjust enrichment is not available where the plaintiffs allege adequate legal remedies, even if those other claims fail. *See Duffie v. Mich. Grp., Inc. - Livingston*, No. 14-CV-14148, 2016 WL 8259511, at *1 (E.D. Mich. Jan. 15, 2016).

*Third*, this claim—like all the others—lacks sufficient facts plausibly supporting the existence of any actual defect from which it can be reasonably inferred that there is anything "unjust" or inequitable. *See supra* Part II.C.1.

*Fourth*, this claim lacks "facts sufficient to establish that Ford obtained any benefit from the complained-of conduct." *Wozniak*, 2019 WL 108845, at *4. Plaintiffs assert Ford "benefitted" because it sold them "defective products for the price of non-defective products." (*E.g.*, SAC ¶ 994.) Yet the SAC lacks any facts of what these "non-defective products" are or their cost. *Wozniak*, 2019 WL 108845, at *4. Nor are there facts plausibly supporting a benefit conferred *on Ford*—not as

to any plaintiffs who bought new vehicles from a Ford dealer, nor as to those who bought used vehicles. *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03–4558, 2010 WL 2813788, at *33 (D.N.J. July 9, 2010), *am.*, 2011 WL 601279 (D.N.J. Feb. 16, 2011); *Hall*, 2020 WL 1285636, at *10.

*Fifth*, the scores of plaintiffs across the 37 jurisdictions asserting unjust enrichment who plead no facts whatsoever of experiencing any issues with their transmissions fail to state a claim that Ford "was unjustly enriched at their expense." *Miller, LLC*, 2018 WL 2740240, at *15; (*also, e.g.*, SAC ¶¶ 123, 129, 133, 135, 148).

### 7. The product liability-based claims (including negligence) and miscellaneous claims fail for several reasons.

Primarily, these are *not* product liability claims—they are routine "'lemon law'/breach of warranty" claims. (ECF No. 4 at 2.) Indeed, no plaintiff alleges any damage to person or other property. Moreover, these claims—like the rest—fall well short of pleading sufficient facts plausibly supporting any actual product defect, much less to show negligence in design, manufacture, or otherwise. The product liability/negligence counts also fail for various reasons explained above, including under 1) the product liability statutes that preclude their use for non-product liability claims like these, and 2) the economic-loss rule. *See supra* Parts I.B & II.C.5.c; (SAC at 392, 395, 482, 484, 537, 543, 563, 565, 567, 568, 596, 599, 670, 746, 797.)

As for the dealer/franchise counts, the two New Mexico plaintiffs assert violations of that state's Motor Vehicle Dealers Franchising Act, which, as its name

53

implies, deals primarily with regulating conduct between auto manufacturers and dealers. (SAC at 670–71.) On its face, the Act does not appear to apply to a claim by a consumer against a manufacturer, and applies instead only to "any person who shall be injured in his business or property by reason of anything forbidden in this act," which neither plaintiff alleges. N.M. Stat. Ann. § 56-16-13. Even were it to apply to consumers, the Act would not apply to these plaintiffs given they both bought their vehicles used, and neither from a Ford dealer. Moreover, only the first plaintiff purports to have seen any marketing of any kind, yet she identifies only "Internet Marketing," which is wholly insufficient; while the second plaintiff doesn't allege having seen any advertising and experienced the alleged defect at 100,000 miles, when the vehicle was well outside warranty. (SAC ¶¶ 344–45.)

The South Carolina act, meanwhile, appears (in theory) to permit a consumer action. (*See* SAC at 746.) However, Ford's supposedly violative "bad faith and unconscionable actions" all relate to marketing representations and advertising. (*Id.* ¶ 2204.) Yet *none* of the seven South Carolina plaintiffs allege actually having seen, heard, or relied on *any* representations or advertising. (*Id.* ¶¶ 420–26.) Rather, this is simply another baseless, indiscriminately asserted, factually unsupported claim.

## Conclusion

The SAC, like its numerous predecessors, is patently deficient and improper in myriad respects. But its gravest offense is the improper manner in which, by the

amalgamation and conflation of 360 plaintiffs' claims, it seeks to deprive Ford of its due process rights to subject each of their claims to proper scrutiny,[17] and seeks to overwhelm both the Court and Ford with non-meritorious claims by sheer volume. The Court can and should roundly reject this patent abuse of proper pleading.

Plaintiffs have had ample opportunities to attempt to plead their claims, and the "parties and the Court have now spent significant time and resources analyzing the facts and claims" in their serial complaints—it "would not be just to require the parties and the Court to repeat this process." *Hall*, 2020 WL 1285636, at *13. For the foregoing reasons, this Court should dismiss this entire action with prejudice.

Should the Court believe that it cannot at this time dismiss all plaintiffs' claims with prejudice for their wholesale, widespread, and persistent infirmities, Ford requests and reserves the right to pursue severance of these misjoined claims, along with the ability to challenge them more individually, along with other appropriate relief, including potentially transfer to more appropriate venues.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY: /s/ Thomas P. Branigan
THOMAS P. BRANIGAN (P41774)
JODI MUNN SCHEBEL (P55889)

---

[17] "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action *and afford them an opportunity to present their objections.*" *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (emphasis added).

MATTHEW G. BERARD (P77024)
41000 Woodward Avenue, Suite 200 East
Bloomfield Hills, MI 48304-4132
Telephone: 248.205.3300
Facsimile: 248.205.3309
Email: tom.branigan@bowmanandbrooke.com
Email: jodi.schebel@bowmanandbrooke.com
Email: matthew.berard@bowmanandbrooke.com

*Attorneys for Defendant*
*Ford Motor Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2020, I electronically filed the foregoing paper Defendant Ford Motor Company's Motion to Dismiss with the Clerk of the Court using the ECF System, which will send notification to all ECF counsel of record.

Respectfully submitted,

**BOWMAN AND BROOKE LLP**

BY:   /s/ Thomas P. Branigan
        THOMAS P. BRANIGAN (P41774)
        JODI MUNN SCHEBEL (P55889)
        MATTHEW G. BERARD (P77024)
        41000 Woodward Avenue, Suite 200 East
        Bloomfield Hills, MI 48304-4132
        Telephone: 248.205.3300
        Facsimile: 248.205.3309
        Email: tom.branigan@bowmanandbrooke.com
        Email: jodi.schebel@bowmanandbrooke.com
        Email: matthew.berard@bowmanandbrooke.com

        *Attorneys for Defendant*
        *Ford Motor Company, Inc.*