UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AARON GANT, *et al.*, | Case No. 19-cv-12533 |
| Plaintiffs, | |
| v. | Sean F. Cox |
| | United States District Court Judge |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

Aaron Gant and 359 other plaintiffs across the country allege that transmission defects plagued their Ford Fusion automobiles with model years between 2010 and 2017. They filed suit against Ford Motor Company, which now seeks to dismiss the case in its entirety. The parties have briefed the issues, and the Court held a Zoom hearing on January 28, 2021. For the reasons discussed below, the Court grants Ford's motion in part and denies it in part.

## I.

Plaintiffs' complaint spans 841 pages and alleges seven types of causes of action: breach of express warranty, breach of implied warranty, violation of the Magnuson-Moss Warranty Act, revocation of acceptance, fraud and consumer-protection claims, unjust enrichment, and product-liability claims. They allege:

> The transmissions in Plaintiffs' Fusions are defective in design, materials, and/or manufacture and workmanship. This can result in various problems, including, but not limited to the following defects known to Ford: sudden and unexpected shaking, violent jerking, bucking and kicking on acceleration (commonly referred to as "shuddering" or "juddering"), delayed acceleration (especially from a complete

1

stop), gears slipping, hesitation on acceleration, difficulty stopping the vehicle, lack or loss of motive power, delayed downshifts, hard decelerations or 'clunks' when slowing down or accelerating at low speeds, premature wear of the internal components, transmission failures in the middle of roadways creating an unreasonably dangerous situation that increases the risk of an accident, and/or catastrophic failures necessitating replacement, attributable to one or more of the following: failing fluid seal integrity, throttle body deficiencies, failed torque converter welds, driveshaft failure, and failed Transmission Control Module ("TCM") or Powertrain Control Module ("PCM") updates to limit problems associated with transmission design and/or manufacture, or caused by the vehicle's design and architecture issues (collectively, the "Transmission Defects").

(ECF No. 38, PageID.4380–4381.)

Plaintiffs also assert that Ford "began rolling out a continuous series" of technical service bulletins, or "TSBs," shortly after introducing the Fusion. (*Id.* at 4407.) "The TSBs detail the same Transmission Defects that Plaintiffs complain of here, proving that Ford knew well that its Fusion transmissions were not functioning as marketed or expected, and that they were defective and not fit for their intended use," according to the complaint. (*Id.*) This includes a TSB from September 21, 2009, which stated that some 2010 Ford Fusions exhibited a "harsh 3-1 or 2-1 rolling stop downshift or downshift hesitation." (ECF No. 39-9, PageID.5700.) Furthermore, Plaintiffs allege that Ford was aware of complaints about the transmissions from consumers as well as reports from dealerships. (ECF No. 38, PageID.4388, 4405.)

## II.

Ford moved to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6).

In deciding a Rule 12(b)(6) motion, the Court "construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th

Cir. 2012) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "need not, however, accept unwarranted factual inferences." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### III.

### A. Shotgun Pleading

As a first matter, Ford suggests that the entire suit be dismissed as an improper form of "shotgun pleading." This term appears frequently in the Eleventh Circuit's case law. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321 & n.9 (11th Cir. 2015) (collecting cases). As the *Weiland* Court explained, the term is used to describe several different categories. *See id.* at 1321–23.

However, this specific phrase is not widely used in the Sixth Circuit. One practice that this circuit has condemned is failing to "connect specific facts or events with the various causes of action she asserted." *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 392 (6th Cir. 2020) (quoting *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 947 (7th Cir. 2013)). The Court held that this type of complaint "violate[s] Rule 8(a)(2)'s requirement that [a plaintiff] provide the defendants 'adequate notice of the claims against them and the grounds upon which each claim rests.'" *Id.* at 392–93 (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)). A plaintiff also violates Federal Rule of Civil Procedure 10(b) when she "fail[s] to separate each of her causes of action or claims for relief into separate counts." *Id.* at 393. In sum, the fatal flaw in such complaints is that the plaintiff does not connect specific facts to causes of action or provide defendants with adequate notice.

Here, Plaintiffs connect each fact with a cause of action and the complaint provides Ford with adequate notice of the claims against the company. An abundant page count alone is not cause for granting a motion to dismiss. *See, e.g.*, *Ciralsky v. CIA*, 355 F.3d 661, 670 (D.C. Cir. 2004) (noting that Rule 8 requires statements, not entire complaints, to be short and plain). Even though there are myriad claims, each individual claim for relief contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). So although the complaint is very long and has a large number of plaintiffs, it does not violate the Federal Rules of Civil Procedure based on so-called shotgun pleading.[1]

### B. Breach of Express Warranty

The complaint alleges that Ford breached its express New Vehicle Limited Warranty ("NVLW"), which covers "any repairs needed to correct defects in materials or workmanship of covered parts." (ECF No. 38, PageID.4382–83.) The NVLW provides coverage for the earlier of three years or 36,000 miles, according to Plaintiffs, and powertrain coverage for the earlier of five years or 60,000 miles. (*Id.* at 4383.) And this warranty "assured consumers that Ford would repair any defects in materials or workmanship under normal use," the complaint says. (*Id.*)

In its motion to dismiss, Ford lists three reasons why these claims should fail. First, the company says Plaintiffs failed to plead "factual allegations plausibly supporting an actual defect

---

[1] As another procedural matter, Ford's motion also argues that some of the individuals' claims are procedurally barred because they fall outside the relevant statutes of limitations. "The statute of limitations is an affirmative defense," however, "and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). The Court agrees that "adjudication of a limitations defense at the pleading stage is particularly inappropriate where, as here, factual issues relating to concealment of the defect by the defendant potentially could impact whether it is estopped from asserting the limitations defense, or whether other exceptions to the defense could apply." *Francis v. Gen. Motors, LLC*, No. 19-11044, 2020 WL 7042935, at *20 (E.D. Mich. Nov. 30, 2020).

within warranty coverage." (ECF No. 42, PageID.5931.) Second, Ford argues that Plaintiffs have alleged only a design defect even though the NVLW only covers defects in materials and workmanship. (*Id.* at 5932.) Finally, Ford asserts that a large number of Plaintiffs never reported the need for repairs to a dealership within the warranty period. (*Id.*)

Plaintiffs dispute these three conclusions. They first maintain that they have sufficiently pleaded a cause of action for breach of express warranty. (ECF No. 43, PageID.6398.) Second, Plaintiffs argue that they adequately alleged defects outside of the normal "characteristics of the vehicle related to materials or workmanship." (*Id.*) Finally, Plaintiffs say they all "presented their vehicles for repair under the warranty, but that the problems were not fixed." (*Id.* at PageID.6401.)

Regarding Ford's first argument, the motion notes that more than one of the Plaintiffs do not specifically allege any malfunctioning—they simply state that they bought a new Ford Fusion or a used Ford Fusion outside the warranty period. (ECF No. 42, PageID.5933.) Plaintiffs respond that the "common allegations" paragraphs (numbered six through 27 in their complaint) apply to "all Plaintiffs." (ECF No. 43, PageID.6400.) "The Vehicles were delivered to Plaintiffs with serious defects and nonconformities to warranty, and each developed other serious defects and nonconformities to warranty including, but not limited to, a defective transmission," according to the complaint. (ECF No. 38, PageID.4380.) This statement does indicate that each and every plaintiff bought a car with a defective transmission even if the individual allegations are sometimes vaguer. So even though the allegations in some of the individual paragraphs are less detailed, the overall specificity is enough at this stage of the litigation.

Second, as for Ford's argument relating to design defects, other cases in this district have persuasively demonstrated that this is not a ground to dismiss. "At this early stage of the case,

without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of 'design' or 'manufacturing.'" *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1011 (E.D. Mich. 2017); *accord Francis v. Gen. Motors, LLC*, No. 19-11044, 2020 WL 7042935, at *7 (E.D. Mich. Nov. 30, 2020). The Court agrees that this issue need not be resolved now.

For the same reason as the first one, Ford's third argument about the warranty is adequately countered by the complaint's common allegations. Paragraph 27 states: "Each of the Plaintiffs to this Complaint requested or desired that Ford fix the defective transmission in their Vehicle, but Ford could not or would not permanently repair it." (ECF No. 38, PageID.4389.) Ford accurately notes that some individuals allege that they bought their vehicles too late to be covered by the warranty—but the factual disputes between the two sides cannot be resolved on a Rule 12(b)6) motion. As courts faced with similar facts have found, the well-pleaded factual assertions are sufficient to sustain a recovery under a breach of express warranty. *See McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 759 (E.D. Mich. 2019); *Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1009–13; *Francis*, 2020 WL 7042935, at *7.

### C. Breach of Implied Warranty

Next, the Court considers the claims for breach of implied warranty. As discussed below, the counts are dismissed for Plaintiffs bringing suit under the law of nine of the states. Therefore, the Court grants the motion to dismiss Alabama Count III, Arizona Count I, Florida Count III, Illinois Count III, New York Count IV, North Carolina Count I, Ohio Count IV, Washington Count III, and Wisconsin Count IV. The other counts survive.

Ford gives three reasons why the Court should dismiss all of Plaintiffs' breach of implied warranty claims. First, it argues that all Plaintiffs failed to plead "sufficient facts plausibly supporting timely notice to Ford of alleged breach under the UCC." (ECF No. 42, PageID.5936.) Next, the company says that many claims are barred because the lack of privity prohibits the claims under many states' laws. (*Id.* at 5937.) Finally, Ford asserts that Plaintiffs fail in their argument that the vehicles are "dangerous instrumentalities" that do not require privity. (*Id.* at 5938–5939.)

In response, Plaintiffs dispute that their allegations are insufficiently pleaded; the "common allegations" for all of Plaintiffs' automobiles indicate that "various problems" exist in the transmission, as indicated above. (ECF No. 43, PageID.6402.) They also indicate that the issues of timeliness and notice under the UCC are not pleading requirements. (*Id.* at 6403.) On the question of privity, Plaintiffs acknowledge that several states do require privity to assert an implied warranty claim. (*Id.* at 6404.) However, they claim that the complaint sufficiently pleads "the connections between Plaintiffs and Ford and/or its agents." (*Id.*)

First, the Court will consider the sufficiency of the facts at this stage of the litigation. "The elements of an implied warranty claim among the several states are quite similar, as one might expect with a uniform statute," such as the Uniform Commercial Code. See *Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1013. For example, § 2314 of California's commercial code provides that a "warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind," which mirrors the language of U.C.C. § 2-314(1). *See id.* To allege a vehicle is not merchantable, moreover, the complaint must allege that the car was "unfit for its intended purpose by compromising the vehicle's safety, rendering it inoperable, or drastically reducing its mileage range." *Id.* at 1015 (alterations omitted)

7

(quoting *Troup v. Toyota Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013)). Furthermore, U.C.C. § 2-607 requires that a buyer "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Francis*, 2020 WL 7042935, at *11.

The *Francis* Court held that the plaintiffs' complaint survived a motion to dismiss. *See id.* at *8. The allegations included "reports of numerous dangerous incidents" and caused plaintiffs "to be worried for their safety while driving the cars." *Id.* "Those pleaded facts taken together suffice to support an inference that the class vehicles were not fit for the intended purpose of providing safe and reliable transportation on public roadways." *Id.* Likewise, the complaint in *Monostable Electronic Gearshift Litigation* would allow an inference that the defect at issue could result in many unsafe scenarios. *See* 280 F. Supp. 3d at 1015. The allegations "certainly suffice[d] to suggest that the [part's] defect seriously 'compromised the safety' of the class vehicles." *Id.*

Here, the alleged transmission defects contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Heinrich*, 668 F.3d at 403. More questionable is whether all of the Plaintiffs notified Ford of the defects "within a reasonable time." *See Francis*, 2020 WL 7042935, at *11 (citing U.C.C. § 2-607). However, the reasonable-time statute "conspicuously does not state that it operates as a bar to *suit*, only to *recovery*. In other words, the notice requirement does not create a precondition to commencing a lawsuit." *See Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1012. Another federal court also concluded that this issue was not grounds for dismissal because "it is a question for the jury as to whether such notice was provided within a reasonable time." *Id.* (quoting *Bednarski v. Hideout Homes & Realty, Inc.*, 709 F. Supp. 90, 92 (M.D. Pa. 1988)). So while Ford raises some potentially valid

issues about the reasonable-time provision, the Court disagrees that this alone precludes Plaintiffs from advancing their claims of breach of implied warranty.

Finally, the parties quarrel over the issue of privity. Ford claims, and Plaintiffs do not dispute, that privity on implied warranty claims is required in 10 states listed in the complaint.[2] (ECF No. 42, PageID.5937; ECF No. 43, PageID.6404.) In Florida, for instance, a plaintiff must allege facts—not conclusory allegations—that the dealership where he purchased a car was an agent of company and under its control. *See McKee*, 376 F. Supp. 3d at 760. The same is true in Illinois and Ohio. *See Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 786–87 (E.D. Mich. 2019). Absence of privity also "is an insurmountable bar to implied warranty claims" in Alabama, Arizona, North Carolina, Washington, Wisconsin. *See Francis*, 2020 WL 7042935, at *9–10. Privity is required under California law, but an exception applies "when a plaintiff is the intended beneficiary of implied warranties in agreements linking a retailer and a manufacturer." *See Matanky*, 370 F. Supp. 3d at 786 (quoting *Roberts v. Electrolux Home Prods., Inc.*, No. 12-1644, 2013 WL 7753579, at *10 (C.D. Cal. Mar. 4, 2013)). New York also recognizes such a third-party exception, which requires "a fact-intensive exercise not amenable to resolution at the pleading stage." *See Francis*, 2020 WL 7042935, at *9. Therefore, the claims must be dismissed regarding plaintiffs in eight states: Alabama, Arizona, Florida, Illinois, North Carolina, Ohio, Washington, Wisconsin.

---

[2] The complaint also lists Connecticut, but there is no implied warranty claim under that state's law in the complaint. Furthermore, the parties are incorrect that Indiana law continues to require vertical privity. *See Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 959 (Ind. 2005) (abrogating earlier case law); *accord Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008).

The only question remains whether a third-party exception applies in states where the law recognizes it. Plaintiffs assert that the exception applies to the California Plaintiffs, who "specifically allege that they are intended beneficiaries of Ford's implied warranties." (ECF No 43, PageID.6409.) Applying California law, this Court will deny the motion to dismiss these claims because plaintiffs "allege they purchased their cars from dealers authorized by [Ford], that they were the intended beneficiaries of the warranty agreements, and that they—not the dealers—were the intended consumers of the cars." *See Matanky*, 370 F. Supp. 3d at 786; *see also Mosqueda v. Am. Honda Motor Co., Inc.*, 443 F. Supp. 3d 1115, 1128 (C.D. Cal. 2020). Plaintiffs' response brief does not claim that New York's third-party exception applies to this situation, however, so this claim is abandoned. *See Cruz v. Capital One, N.A.*, 192 F. Supp. 3d 832, 838 (E.D. Mich. 2016) (citing *Doe v. Bredesen*, 507 F.3d 998, 1007–08 (6th Cir. 2007)); *PNC Bank, Nat. Ass'n v. Goyette Mech. Co.*, 88 F. Supp. 3d 775, 785 (E.D. Mich. 2015).

So the Court will dismiss the implied warranty claims brought by Plaintiffs in the eight states identified above in addition to New York. The other claims survive.

### D. Magnuson-Moss Warranty Act ("MMWA")

"The Magnuson–Moss Warranty Act provides a federal cause of action for a 'consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under a written warranty or implied warranty.'" *Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1017 (alteration omitted) (quoting *Bennett v. CMH Homes, Inc.*, 770 F.3d 511, 512 n.1 (6th Cir. 2014)). "Claims under the Magnuson–Moss Warranty Act 'stand or fall with express and implied warranty claims under state law.'" *Id.* (alterations omitted) (quoting *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015)).

So as with the implied warranty claims above, the Court dismisses the MMWA claims brought by Plaintiffs of Alabama, Arizona, Florida, Illinois, New York, North Carolina, Ohio, Washington, and Wisconsin.

### E. Revocation of Acceptance

Plaintiffs also bring claims of revocation of acceptance, which is governed by U.C.C. § 2-608. Many states, including Michigan, have adopted that section in its entirety. The statute provides:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
>
> (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>
> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Mich. Comp. Laws § 440.2608; *see also, e.g.*, Cal. Com. Code § 2608.

Ford argues that revocation is not available against a non-seller manufacturer. The Court agrees. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1187 (C.D. Cal. 2010) ("Plaintiffs have not alleged that they purchased their vehicles from Defendants. Thus, they seek revocation against an improper Defendant."); *Sautner v. Fleetwood Enterprises, Inc.*, No. 05-73252, 2007 WL 1343806, at *8

(E.D. Mich. May 8, 2007) ("Revocation of acceptance . . . is generally used against an immediate seller. . . . The weight of authority under Michigan law opposes remote revocation."); *Newmar Corp. v. McCrary*, 309 P.3d 1021, 1024 (Nev. 2013) ("A majority of jurisdictions have determined that revocation is not available against a manufacturer because the manufacturer is not a 'seller' under the UCC.").

In arguing against this rule, Plaintiffs cite only a single, inapposite case. *See Davis v. Forest River, Inc.*, 774 N.W.2d 327 (Mich. 2009). That brief order, which considers the question whether "plaintiff should be allowed to relinquish title," *see id.* at 328, does not conflict with Ford's argument. In fact, that order never discusses revocation, only how to measure damages in a breach of warranty action. *See id.*

Considering this analysis, the Court dismisses the revocation of acceptance claims against Ford, which was a non-seller manufacturer in this case.

## F. Consumer-Protection and Fraud Claims

### 1.

Ford next argues that the consumer protection claims should be dismissed. The Court agrees.

Under the Michigan Consumer Protection Act ("MCPA"), "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful." Mich. Comp. Laws § 445.903(1). However, there are several exemptions, including any "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." *Id.* § 445.904(1).

Ford argues that this exemption applies to motor vehicle sales. (ECF No. 42, PageID.5941.) Another judge in this district recently considered this identical argument, concluding that the MCPA claim should be dismissed. *See Matanky*, 370 F. Supp. 3d at 800. "The Michigan Supreme Court construes this exemption broadly, finding that 'the relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" *Id.* at 799 (*quoting Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 518 (Mich. 2007). That court held that "the sale of a new car by a licensed dealer . . . is one specifically authorized and regulated by law; thus, it is exempt from the MCPA." *Id.* at 800 (citing *Jimenez v. Ford Motor Credit Co.*, 2015 WL 9318913, at \*7 (Mich. Ct. App. Dec. 22, 2015); *Rosenbaum v. Toyota Motor Sales, USA, Inc.*, 2016 WL 9775018, at \*3 (E.D. Mich. Oct. 21, 2016)); *accord Divis v. Gen. Motors LLC*, 2019 WL 4735405, at \*9 (E.D. Mich. 2019). *Rosenbaum* specifically considered whether Toyota was exempt under the MCPA for allegations of improper miles-per-gallon advertising; it held that § 445.904(1) prevented the company from being sued because "Michigan regulates how car wholesalers like Toyota advertise automobiles, *see* MCL 257.248d, and it regulates the content of general automobile advertisements. *See* MCL 445.315." *See* 2016 WL 9775018, at \*3

Plaintiffs' attempts to create ambiguity in the case law are unavailing. They say that the holdings of both *Liss* and *Smith v. Globe Life Insurance Co.*, 597 N.W.2d 28 (Mich. 1999) conflict with the earlier language of *Attorney General v. Diamond Mortgage Co.*, 327 N.W.2d 805 (Mich. 1982). But *Liss* already harmonized the case law as it relates to the issue before this Court. That case held that "the MCPA exemption applies to residential home builders who engage in the type of activities that define a residential home builder . . . unlike *Diamond Mortgage*, where the

13

defendants engaged in activity, mortgage writing, that their real estate broker license simply did not permit them to do." *See* 597 N.W.2d at 521. And as *Matanky* conclusively, sales of new cars (which were not considered in either *Liss* or *Diamond Mortgage*) squarely qualifies for the exemption. *See* 370 F. Supp. 3d at 800.

Next, both briefs refer to *Cyr v. Ford Motor Co.*, No. 345751, 2019 WL 7206100 (Mich. Ct. App. Dec. 26, 2019), *appeal denied*, 950 N.W.2d 51 (Mich. 2020). (ECF No. 42, PageID.5942; ECF No. 43, PageID.6422 n.3.) The Michigan Court of Appeals, in its unpublished decision, stated: "In light of our Supreme Court's interpretation of MCL 445.904(1) in *Smith* and *Liss*, we conclude that the manufacture, sale, and lease of automobiles, and the provision of express and implied warranties concerning those automobiles and their components are all conduct that is 'specifically authorized' under federal and state law." *Cyr*, 2019 WL 7206100, at *2. The parties note that the Michigan Supreme Court, which denied the application for leave to appeal, has not yet acted on a motion for reconsideration. (ECF No. 48.) But that does not change the analysis. The persuasive reasoning of *Matanky* and *Rosenbaum*—as well as the synthesis of the case law in *Liss*, which is still binding authority—carries the day.

Plaintiffs' other arguments about consumer-protection violations are not convincing. Nor do they present precedent that the analysis under other states' consumer-protection statutes is different. Their brief notes that certain states' statutes do not use the words "automobile sales"— but neither does § 445.904(1). In fact, the language of some of those statutes closely tracks the scheme in Michigan that provides an exemption for automobile sales. *See, e.g.*, Mass Gen. Laws ch. 93a, § 3 ("Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of

14

the commonwealth or of the United States."); Tenn. Code Ann. § 47-18-111 ("This part does not apply to . . . Acts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States . . . .").

Therefore, the consumer-protection counts are dismissed.

## 2.

The various claims of fraud are among the lengthiest and most complicated allegations in the complaint. The Court declines to dismiss these claims. A summary of the relevant case law helps demonstrate why.

In general, a cause of action sounding in fraud requires a heightened pleading standard under Federal Rule of Civil Procedure 9(b), requiring the plaintiff to "state with particularity the circumstances constituting fraud or mistake." *See Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255 (6th Cir. 2012) ("Rule 9(b) is designed, not only to put defendants on notice of alleged misconduct, but also 'to prevent fishing expeditions . . . and to narrow potentially wide-ranging discovery to relevant matters.'" (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011))). Under this standard, a plaintiff "must specify 'the who, what, when, where, and how' of the alleged omission," that is, "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what Appellees obtained as a consequence of the alleged fraud." *Id.* at 255–56 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006)). "A complaint may suffice under the applicable standard if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that

the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Matanky*, 370 F. Supp. 3d at 789 (quoting *Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019)).

Ford argues that Plaintiffs did not adequately plead the "what" component of the fraud, citing cases such as *McKee*. In that case, the plaintiffs made "allegations of GM's omissions and concealments." *See McKee*, 376 F. Supp. 3d at 761. The "what," so to speak, was GM's "knowledge of the defect" related to the 6L50 transmissions used by the company. *Id.* "Plaintiff also argue[d] that GM knew of the defect before the sale of the Class Vehicles and that the various channels through which GM sold the vehicles failed to disclose the defect." *Id.* The complaint listed five sources of GM's alleged knowledge: complaints to the National Highway Traffic Safety Administration ("NHTSA") about the transmission in an older vehicle, contemporary complaints to the NHTSA about these vehicles, complaints on online forums, GM's own testing, and GM's internal monitoring. *See id.*

The Court held that these allegations were insufficient:

Plaintiff's allegations fail to sufficiently plead GM's knowledge. Courts routinely reject generalized allegations about "testing" and manufacturer "analyses" made in support of finding knowledge of a defect. And Plaintiff's allegations of consumer complaints online or to the NHTSA are insufficient to support a finding of GM's knowledge. Moreover, most of Plaintiff's consumer complaints *post-date* his purchase of the vehicle. Finally, Plaintiff's allegations based on GM's internal records, communications with its dealerships or service technicians, and review of its warranty data are conclusory and insufficient because they do not plausibly allege that GM "knew of the defect *prior* to the time it distributed" the Class Vehicles.

*See id.* (internal citations omitted).

16

Ford also claims that the instant case is analogous to out-of-district cases such as *DeCoteau v. FCA US LLC*, No. 15-00020, 2015 WL 6951296 (E.D. Cal. Nov. 10, 2015) and *In re Ford Motor Co. DPS6 Powershift Transmission Products Liability Litigation*, No. 17-06656, 2019 WL 3000646 (C.D. Cal. May 22, 2019). The court in *DeCoteau* acknowledged that the case presented "a close question." *See* 2015 WL 6951296, at *3. *DeCoteau* agreed with the plaintiffs that "they are not required to plead the precise mechanical details of an alleged defect in order to state a claim." *Id.* However, "Plaintiffs must go further than a conclusory allegation that the Transmission Defect exists and is responsible for the injuries outlined in the FAC because automatic transmissions, including the DDCT, are complicated systems that demand more detailed factual allegations in order to identify a plausible defect." *Id.* In the *DPS6* case, the court agreed with Ford that the complaints failed to plead with particularity. *See* 2019 WL 3000646, at *7. "While Plaintiffs describe a laundry list of ways in which their vehicles' performance is subpar, they tie all of these problems to a 'defect' in the DPS6 transmission that they allege Ford should have disclosed." *Id.* "However, while Plaintiffs describe the alleged defect's effects on their vehicles, nowhere do they describe what exactly the defect is." *Id.*

By contrast, several other courts have denied motions to dismiss the fraud claims in similar cases. For example, one court in this district found that plaintiffs sufficiently pleaded the circumstances of alleged fraud concerning cars marketed for use on racetracks. *See Matanky*, 370 F. Supp. 3d at 789. The court wrote:

> Plaintiffs identify specific GM marketing materials, communications, and product information which, they allege, misrepresent the track capabilities of the Z06 and fail to disclose that the Z06 has a defective cooling system that causes overheating, loss of engine power Limp Mode. Plaintiffs adequately allege they saw and relied on those communications and materials in deciding to purchase their cars, and

17

allege that if they knew of the defect they would have either not purchased or paid less for their cars. . . . Indeed, Plaintiffs adequately pled the "who" (GM), the "what" (knowing about, yet failing to disclose, the alleged cooling system defect), the "when" (beginning in 2014, when GM first marketed the Z06), the "where" (vehicle information kits and brochures, owner manuals for the car, press kits, and GM-sponsored track events), and the "how" (if Plaintiffs knew about the alleged defect, they would have paid less for or not bought/leased their cars).

Plaintiffs' fraudulent concealment claims satisfy Rule 9(b)'s heightened pleading standard.

*Id.* at 790 (internal citations omitted).

*Matanky* continued that plaintiffs must allege that the manufacturer was aware of the alleged defect when the automobile was sold. *See id.* In that instance, the "specific allegations regarding GM's pre-release testing of the Z06's track-based performance capabilities, coupled with [an engineer's] February 2015 statement, ma[d]e it reasonable to infer that GM knew of the overheating defect prior to the release of the 2015 and 2016 Z06s." *Id.* at 792.

Another recently published case also declined to dismiss similar counts. *See In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 636 (E.D. Mich. 2019). In that case, the complaint alleged that GM was aware of an air conditioning defect via several sources, including evaluation and testing, repair data, and consumer complaints collected by the NHTSA. *See id.* Furthermore, GM issued a TSB concerning defects in components of the air conditioning systems, experienced a large amount of sales of replacement parts, and received complaints from customers themselves. *See id.* at 637. As a whole, these allegations were sufficient for the purposes of Rule 9(b). *See id.* This remained true even though GM had issued some of the TSBs after some of the purchases. *See id.* at 637 n.15 ("'It is reasonable to infer' that automakers have knowledge of potential defects before they issue technical service bulletins because

18

'presumably, the [bulletins are] proceeded by an accretion of knowledge.'" (quoting *In re MyFord Touch Litigation*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014))).

Finally, a case from just a few months ago also found that plaintiffs had satisfied Rule 9(b) in their fraud claims against GM. *See Francis*, 2020 WL 7042935, at *16. The court held that the plaintiffs had adequately alleged the "who," "what," and "when" about the defect. *See id.* at *14. They presented numerous allegations in their complaint that "the transmissions [had] a persistent and widespread tendency to abnormally wear and malfunction." *See id.* For instance, the complaint asserted GM knew about the problems from experience with a predecessor transmission design, results of pre-production testing, complaints by test drivers and early buyers, and complaints that ultimately led to the issuance of more than 60 TSBs. *See id. Francis* distinguished those allegations from the cases on which GM relied in that case. In *DeCoteau*, for instance, the complaint "featured little or no coherent description of the defect or how it impacted the products at issue, beyond unsupported allegations that the devices were 'defective.'" *Id.* at *15. The court continued: "Unlike *DeCoteau*, in which plaintiffs merely alleged 'that [a] Transmission Defect exist[ed] and [was] responsible' for their vehicles' erratic movements, Plaintiffs here plead the 'mechanical details' of the alleged defect, explaining how Defendant's transmission system functions and why Plaintiffs believe the transmission systems in their vehicles are faulty." *Id.*

The Court finds the instant case to be more analogous to cases like *Francis*, *Matanky*, and *General Motors Air Conditioning* than *McKee* and *DeCoteau*. Here, Plaintiffs pleaded the mechanical details of the alleged defect and explained how the transmission systems in their vehicles were faulty. Their complaint lists a variety of issues related to faulty transmissions, such as "sudden and unexpected shaking," "delayed acceleration," and "hard decelerations." At this

stage of the litigation, that level of detail sufficiently alleges that "the transmissions [had] a persistent and widespread tendency to abnormally wear and malfunction." *See Francis*, 2020 WL 7042935, at *14. The Court disagrees with Ford that these allegations are speculative and simply amount to driver error. Plaintiffs convincingly point to TSBs as early as September 21, 2009, showing that Ford had knowledge of "harsh 3-1 or 2-1 rolling stop downshift or downshift hesitation" in some of its 2010 Fusion vehicles.

When accepted as true for the purposes of this motion, Plaintiffs' factual allegations plausibly establish Ford's knowledge of the transmission defect. So the Court is not persuaded that the fraud claims should be dismissed for failure to meet the Rule 9(b) standard.

### G. Unjust Enrichment

Many Plaintiffs also plead unjust enrichment claims. Ford is correct that each of these should be dismissed.

When an express warranty covers the matter at issue, an unjust enrichment claim is not cognizable. *See Matanky*, 370 F. Supp. 3d at 803. Indeed, "courts will not *imply* a contract where there is an *express* contract governing the same subject matter." *General Motors Air Conditioning Litig.*, 406 F. Supp. 3d at 634 (quoting *Bowlers' Alley, Inc v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 833 (E.D. Mich. 2014)). Many recent cases in this District confirm that unjust enrichment claims should be dismissed against auto manufacturers when a valid express warranty exists. *See, e.g.*, *McKee*, 376 F. Supp. 3d at 762; *Hall v. Gen. Motors, LLC*, No. 19-10186, 2020 WL 1285636, at *9 (E.D. Mich. Mar. 18, 2020), appeal dismissed, No. 20-1321, 2020 WL 6140402 (6th Cir. Sept. 28, 2020); *Miller v. Gen. Motors, LLC*, No. 17-14032, 2018 WL 2740240, at *15 (E.D. Mich.

June 7, 2018), *appeal dismissed per stipulation*, No. 20-1321, 2020 WL 6140402 (6th Cir. Sept. 28, 2020).

Plaintiffs fail to convincingly argue otherwise. In their brief, they note that plaintiffs are permitted to plead a breach of contract claim and a quasi-contract claim in the alternative. (ECF No. 43, PageID.6436.) But in the same paragraph of the case they cited for that position, the court said, "Defendant is absolutely correct that parties cannot recover under the theory of unjust enrichment when an express contract exists." *See Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 687 (E.D. Mich. 2013). In that case, the court did not dismiss the unjust enrichment claims "because Plaintiffs expressly allege that they never agreed to the Terms." *See id.* at 687–88. That is not the situation here, where the parties agree that there is a valid express warranty. When it is undisputed that a warranty covers the matter at issue, a plaintiff cannot plead an alternative quasi-contract claim. *See General Motors Air Conditioning Litig.*, 406 F. Supp. 3d at 635; *Hall*, 2020 WL 1285636, at *10. So the Court dismisses the unjust enrichment counts here.

### H. Product-Liability Claims

In this catch-all section of Ford's motion to dismiss, the brief mentions a few specific statutes. Upon review, the Court will dismiss one product-liability count only.

First, Ford asserts that the product-liability claims from the New Mexico plaintiffs should be dismissed. (ECF No. 42, PageID.5953–54.) These two plaintiffs allege that they sustained damages from Ford's "false, misleading, and deceptive advertising in connection with their business." (ECF No. 38, PageID.4619, 5046.) Under the New Mexico Motor Vehicle Dealers Franchising Act ("MVDFA"), it is unlawful for "any dealer to . . . use false, deceptive or misleading advertising in connection with his business." N.M. Stat. Ann. § 57-16-4. Ford notes

21

that the New Mexico Plaintiffs did not buy their Fords from a Ford dealership; rather, they purchased them used from a Honda dealership and a private seller, respectively. However, it similarly is unlawful for "a manufacturer, distributor or representative to . . . use false, deceptive or misleading advertising in connection with the manufacturer's, distributor's or representative's business." N.M. Stat. Ann. § 57-16-5. The complaint alleges that the New Mexico Plaintiffs saw vehicle advertising. As the Supreme Court of New Mexico has stated, the MVDFA is both a "dealer protection act" and "consumer protection act." *Key v. Chrysler Motors Corp.*, 918 P.2d 350, 356 (N.M. 1996). Ford has not persuasively argued that consumers cannot sue for false advertising under § 57-16-5. Therefore, the Court allows these claims to move forward.

Second, Ford asks the Court to dismiss the seven similar claims from South Carolina plaintiffs. Under South Carolina law, it is unlawful for "any manufacturer . . . to engage in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties or to the public." S.C. Code Ann. § 56-15-40. Ford states that Plaintiffs' claims of actions that were "unconscionable" or in "bad faith" all relate to advertising even though none of the South Carolina plaintiffs alleged seeing and relying on advertising. (ECF No. 42, PageID.5954.) They instead allege that they relied on representations from a dealership salesperson. (ECF No. 38, PageID.4685–4692.)

Under South Carolina law, bad faith is defined as the "opposite of good faith, generally implying or involving actual or constructive fraud, or a design to deceive or mislead another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Brown v. Dick Smith Nissan, Inc.*, 777 S.E.2d 208, 211 (S.C. 2015) (quoting *State v. Griffin*, 84 S.E. 876, 877 (S.C.

1915)). By comparison, an unconscionable action is "the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms which are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Id.* (quoting *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 472 S.E.2d 242, 245 (S.C. 1996)). Plaintiffs did not respond to this argument in the motion to dismiss, so this claim is abandoned. *See Cruz*, 192 F. Supp. 3d at 838; *PNC Bank*, 88 F. Supp. 3d at 785. Thus, Count IV of the South Carolina claims is dismissed.

The brief also argues that the product-liability claims overall, like the fraud claims, should be entirely barred by the so-called economic loss doctrine. (ECF No. 42, PageID.5953.) That principle in some jurisdictions "bars plaintiffs from recovering in tort for losses consisting merely of an impairment of the benefit in a contractual bargain with the defendant (i.e., having overpaid for a substandard product)." *See Francis*, 2020 WL 7042935, at \*17. In *Francis*, the court held that the doctrine did not prevent any of the claims from going forward. *See id.* at \*18. As another court acknowledged: "Whether the economic loss doctrine bars Plaintiffs' fraud claims is an especially complex issue with seemingly persuasive authority on both sides and with potentially different applications of the doctrine under the laws of different states." *See General Motors Air Conditioning Litig.*, 406 F. Supp. 3d at 640 (declining to address the argument). Following the lead of that case, this Court holds that the economic loss doctrine does not bar these claims at the motion-to-dismiss stage.

## IV.

In conclusion, the Court **GRANTS** the motion to dismiss the implied warranty claims in Alabama Count III, Arizona Count I, Florida Count III, Illinois Count III, New York Count IV,

North Carolina Count I, Ohio Count IV, Washington Count III, and Wisconsin Count IV. The Court also **GRANTS** the motion to dismiss the related MMWA claims as well as the revocation of acceptance claims, consumer-protection claims, and unjust enrichment claims. Regarding the product-liability claims, the Court **GRANTS** the motion to dismiss South Carolina Count IV but **DENIES** the motion to dismiss the other product-liability claims. The Court **DENIES** the motion to dismiss the remainder of the implied warranty and MMWA claims not dismissed above. Finally, the Court **DENIES** the motion to dismiss the breach of express warranty claims and fraud claims.

**IT IS SO ORDERED.**

Dated:  February 3, 2021                              s/Sean F. Cox
                                                      Sean F. Cox
                                                      U. S. District Judge

24